UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, CAROLYN PATTON,<br><br>               Plaintiffs<br><br>    v.<br><br>CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST AND CAPTAIN PARKER ARMS PARTNERSHIP,<br>               Defendants | CIVIL ACTION<br>CASE NO. 03CV12231 (RGS) |

## AFFIDAVIT OF CHARLENE DORMAN IN SUPPORT
## OF MOTION TO DISQUALIFY

I, Charlene Tropeano Dorman, depose and state as follows:

1. I am one of the named defendants in the above entitled litigation. I live in Menlo Park, California. I own a 36.14% interest in the Captain Parker Arms Partnership ("the Partnership"), which is a named defendant in the litigation. My children, Bianca, Lydia and Todd, who are also named as defendants in the litigation, each own a 7% interest for a collective total of 21%. Thus, in total, the members of the Dorman family own a 57.14% interest in the partnership. I refer in this affidavit to the members of my immediate family who own interests in the Partnership as the Dorman Partners.

2. The plaintiffs in the litigation, who own a collective total interest of 42.86% of the partnership, are my uncle (Philip) and two cousins. I refer in this affidavit to the members of my cousins' family who own interests in the Partnership as the Tropeano Partners.

3. The Dorman Partners acquired their interest in the partnership based upon the provisions of the will of my father, Alfred P. Tropeano, who died in 1997. As the largest interest holder in

the partnership and by agreement of my children, I began taking over responsibility as the managing partner of the Partnership in about 1998.

4. Over approximately the past ten (10) years, dating to well before the death of my father, I understood that Attorney Frederick J. Conroy ("Conroy") was an attorney for the Partnership and that he also provided personal legal services to interest holders in the partnership, including my father. When my father died, I had a number of meetings and telephone conversations with Conroy to discuss the affairs and future of the partnership. During at least one of these meetings, Conroy encouraged me to take a more active role in the management and decision-making for the Partnership in keeping with my large personal holding. I have endeavored to do that, since he gave me that advice.

5. From 1994 through 1996, there was a litigation brought by one of my aunts, Emily Tropeano, against the Partnership. It is my understanding that the lawsuit was a petition to partition the real estate, which is now the subject of this litigation. That lawsuit was eventually settled. Conroy represented the Partnership and individual partners in that litigation. A copy of one of the bills rendered by Conroy in that litigation is attached hereto as Exhibit A. A Release Of All Demands ("Release") was executed in December 1996 terminating the litigation. Conroy witnessed eight of the signatures on the Release. A copy of the Release is attached hereto as Exhibit B.

6. In 2001 and continuing into 2002, Conroy advised the partners in the Partnership to consider changing its legal form to a limited partnership. He drafted a document for discussion purposes in connection with that recommendation. A copy of that document is attached hereto as Exhibit D. The document was never finalized and thus never signed. I understood

that Conroy was acting as the lawyer for the Partnership and each of the partners, at the time of that recommendation.

7. The remaining defendant in the litigation is T & N Realty Trust ("the Realty Trust"). It was created in 1962 and holds title to the real estate, which is the subject of the litigation, in trust for the benefit of the Partnership. I am a trustee of the Realty Trust. As of 2002, other current trustees of the Realty Trust were Mary Carol Tropeano (my cousin and Philip's daughter), Laurence Tropeano (my brother), Peter L. Tropeano (my cousin and one of the plaintiffs) and Philip L. Tropeano (my uncle and one of the plaintiffs).

8. In January 2002, a document was executed by the Trustees of the Realty Trust, acknowledging their powers and duties. This document is attached hereto as Exhibit C. The document was drafted by Conroy, who also notarized all of the signatures of the trustees. It was my understanding that Conroy was the lawyer for the Realty Trust and the Partnership, when this document was executed.

9. In 2003, acting as the managing partner of the Partnership, I decided to shift day to day management of the Partnership property to a professional management company, the Dolben Company. In doing so, I ended the prior management, which was run by plaintiff Peter Tropeano. I did this because I felt that a professional management company would be better suited to the task for a number of reasons and would perform the necessary services at greater benefit to the Partnership. Before the decision was made I considered the change for two years or more, during which time I viewed Conroy to be the lawyer for the Partnership. During that period, I consulted with Conroy before making that decision and he encouraged me to make the change in management. The dispute, leading up to this litigation, followed the management change.

10. On August 21, 2003 Conroy sent a letter to me, and to each of my children (i.e. the other Dorman Partners). In it he reported that he represented the Tropeano Partners and that they sought to separate from the Partnership and to be paid for their interests. A copy of that letter is attached hereto as Exhibit E.

11. When I received Conroy's letter, I was terribly troubled about the fact that the lawyer who had represented me, my father, the Partnership, the other partners and the Realty Trust was now seeking to represent one group of partners in an adversarial situation against the other partners and the Partnership. I consulted with counsel, Kevin Sargis ("Sargis"), who thereafter communicated with Conroy about the issues raised by the August 21, 2003 letter. On two occasions, Sargis raised the issue of the propriety of Conroy representing the Tropeano Partners in the dispute. Copies of letters by Sargis to Conroy on September 15 and October 15, 2003 are attached hereto as Exhibits F and G respectively. On each occasion, Conroy failed to respond to the concern about his role.

12. Also during the same time frame of the Fall 2003, I sent a letter to my cousin, Peter Tropeano (one of the plaintiffs). In that letter, I raised the issue of a conflict of interest in Conroy's new role as counsel to the Tropeano Partners. As I said in my letter:

> As the attorney for T + N Realty Trust and as my father's attorney, Mr. Conroy several times acknowledged the rights that accompany majority partnership; in fact he encouraged my use of them. He did this quite strongly soon after my Dad's passing. Later, when we spoke of Dolben Company saving money for CPA [Captain Parker Arms Partnership], he said, "Of course it would, of course it would." On his own, I believe, he set the property up as a corporation and put me as president, encouraging me to do "whatever I wanted." Was he advising the minority partners along those lines or differently? I have been advised that a conflict of interest in a counsel is a very serious matter.

A copy of that letter is attached hereto as Exhibit H.

Sworn to under the pains and penalties of perjury this 27th day of January 2004.

_Charlene Dorman_
Charlene Dorman