03-12231

# United States Court of Appeals
## For the First Circuit

---

No. 05-1435

PHILIP L. TROPEANO, PETER TROPEANO AND CAROLYN PATTON,

Plaintiffs, Appellants,

v.

CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN,
T&N REALTY TRUST AND CAPTAIN PARKER ARMS PARTNERSHIP,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

---

Thomas M. Ciampa with whom Ciampa & Associates was on brief
for appellants.
Gary C. Crossen with whom Rubin and Rudman LLP was on brief
for appellees.

---

March 24, 2006

---

**CAMPBELL, Senior Circuit Judge.**   Plaintiffs-appellants
Philip L. Tropeano, Peter Tropeano, and Carolyn Patten appeal from
the dismissal of their complaint and denial of their motion for
summary judgment against defendants-appellees Charlene Dorman,
Bianca Dorman, Lydia Dorman, Todd Dorman, T&N Realty Trust and
Captain Parker Arms Partnership, in the United States District
Court for the District of Massachusetts.

## I.   Background and Facts

The undisputed facts of the case are as follows.   On
January 8, 1964, Alfred Tropeano, Louis Tropeano, Joseph Tropeano,
Philip Tropeano and Wilbur Nylander created the Captain Parker Arms
Partnership (the "Partnership") by means of a two-page Agreement
(the "Partnership Agreement").   The partners agreed therein to
"become and remain partners in the business of acquiring the title
[to a specific piece of land in Lexington] . . . to construct
apartments on said land, for the term of thirty years from the date
hereof."   A nominal trust, T&N Realty Trust (the "Trust"), was
created to hold the real estate for the partners' benefit.   The
Partnership Agreement provided that "[a]ll applicable provisions
and sections of [Massachusetts] General Laws Chapter 108A [enacting
the Uniform Partnership Act] are herein incorporated by reference
and made a part hereof."

Sometime after the formation of the Partnership and the
Trust, Joseph Tropeano died.   His death caused the remaining

-2-

partners to execute an agreement modifying the Partnership Agreement (the "Modification"). The Modification provided in relevant part as follows:

\* \* \*

WHEREAS, Joseph C. Tropeano is now deceased.

NOW, THEREFORE, this Modification and affirmation of the Partnership by the surviving partners Alfred P. Tropeano, Wilbur C. Nylander, Louis Tropeano and Philip Tropeano agree:

1. Co-Partners. That the partnership agreement dated January 8, 1964, was not dissolved or terminated by the surviving partners when Joseph C. Tropeano died, has been and is in full force with exception of Joseph's interest.

2. Rights of Deceased Former Partner. The 15% interest of the late Joseph C. Tropeano is to be paid or distributed as provided in his will allowed for probate.

3. Death of an Existing Partner. The death of an existing partner shall not terminate the Partnership and his interest will be held by the persons or entities set forth on the deceased partner's schedule attached and made a part hereof which bears his signature and they shall have all the rights of the deceased partner. Said person or entities shall be to those set forth in 5 hereunder.

Upon the death of a partner, the partners herein agree and so instruct the Trustees to execute whatever documents may be necessary to permit said representative to borrow money to pay estate taxes.

If there is sufficient cash held by the Trustees, the partners agree that the Trustees may loan monies to the representative of the deceased partner who have or will file Federal and State Estate Tax forms bearing interest at the then prime interest rate of Shawmut Boston plus 1%. Said loan shall be paid back to the Trust or deducted from the distributive share of said deceased partner.

4. Termination. The partnership can be terminated by a vote of not less than 60% interest of 100% and upon such vote the partners shall so notify the Trustees to

-3-

liquidate the assets and distribute the net principal and accumulated income as provided by number 8 hereunder.

5.   Partner's Rights to Assign or Sell to Certain Individuals.  Any partner shall have the right to assign or to sell any portion of his interest to his wife or his children or grandchildren, without the consent of the other partners, who may take title in their own name or a separate entity in which they will be the sole beneficiary.

6.  Partner's Right to Assign or Sell to Others.  Prior to any assignment or sale of any partner's interest or those having his interest to those than the aforesaid, the assigning or selling partner shall offer the same in writing with a certified copy of the terms offered to him by the proposed assignee or purchaser.  The partners shall have thirty (30) business days to accept or reject the offer.   If they do not accept the offer, the assignment or sale to the third party shall only be made with the consent of the other partners and those claiming through them which consent will not be unreasonably withheld.

7. Voting Minors Interest. If any holder of an interest in the partnership is a minor, his interest during minority shall be voted by his father and if no father, by his mother and if no mother, by his legal guardian.

8.   Distribution on Termination.   In the event of the dissolution and termination of the partnership, the Trustees shall be instructed to proceed to the liquidation of the partnership and the proceeds of the liquidation shall be applied and distributed in the following order of priority:

(a) Debts.  To the payment of the debts and liabilities of the partnership . . . .

(b) Reserves.   To the setting up of any reserves which the partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the partnership . . . .

(c) Partner loans.  To the repayment of any loans or advances that may have been made by any of the partners to the partnership . . . .

(d) Balance.  Any balance remaining shall be distributed among all partners as follows according to their percentage holding . . . .

−4−

Except as herein modified, the said partnership is hereby affirmed, dated this 11th day of March, 1987.

The Modification thus specified three ways for the partners, while alive, either to terminate and liquidate the Partnership or else to transfer individual interests to others. Termination leading to liquidation could be accomplished by a 60% percent interest vote. A partner could, as of right, assign or sell any section of his interest to specified family members but could not assign or sell to any others except with the consent of the other partners after first offering them refusal rights. Several partners thereafter transferred their interests to family members, as permitted, including many of the current parties. Since the Modification, there have been no further revisions to the Partnership Agreement, and through the bringing of the present lawsuit in November 2003, the Partnership has continued to operate even though the 30-year term specified in the Partnership Agreement came to an end on January 8, 1994. As the district court found, "Not only did the Partnership continue to manage its rental property without interruption after the 30-year term expired, but many of the plaintiffs and defendants acceded to their interest in the Partnership through assignments made after the expiration date pursuant to ¶ 5 of the Modification."

On August 21, 2003, Philip, Peter and Carolyn Tropeano, holding collectively a 42.86% interest in the Partnership, served

-5-

written notice on the defendants that they intended to retire, effective October 1, 2003, according to the provisions of Mass. Gen. Laws ch. 108A, § 42.  The notice stated that "[p]ursuant to the provisions of M.G.L. Ch. 108A, Sec. 29, the change in our relationship effected by our retirement from the partnership is to be treated as dissolution of the partnership.  Pursuant to the provisions of Chapter 108A, Section 42, as retiring partners we wish to have the value of our interests ascertained as of the date of dissolution (that is, October 1, 2003)."  The notice stated that the retiring partners understood that a complete termination of the Partnership required a 60% vote of the partners but that after the leaving partners retired, the remaining members could also continue on as the sole partners.  The letter stated:

> We recognize that in order to terminate the partnership, a vote of 60% of the partners is required . . . .  If you wish to terminate the partnership, we would participate in that vote in the affirmative.

The plaintiffs sought to be paid their respective interests of the value of the Partnership's assets.  They valued their collective interest in the Partnership's assets (totaling $18.8 million) at an appraised value of $6,600,000.

The defendants responded that the plaintiffs were not entitled to withdraw and receive from the Partnership the liquidation value of their respective interests in the Partnership. The defendants, however, offered to purchase the plaintiffs' minority interest for $2,750,000 under paragraph 6 of the

-6-

Modification. In a letter to plaintiffs' then-counsel from counsel for defendant Charlene Dorman, the defendants explained their offer, saying:

on your client's management watch, the partner distributions to your clients have averaged $174,119 over the last four years per Kennedy & Kennedy's financial statements. If a yield of 6.4% on Mrs. Dorman's offer of $2,750,000 was achieved (a very reasonable figure) your clients would be in an identical pre-tax position having converted their illiquid minority interest to cash.

After efforts to compromise failed, plaintiffs brought this action in the district court in November of 2003.

In their initial complaint, the plaintiffs asserted a right to retire from the Partnership pursuant to Mass. Gen. Laws ch. 108A, § 42 and to secure the partnership accounting outlined in that provision. Defendants moved to dismiss, and plaintiffs filed an opposition, to which defendants replied. The defendants also successfully moved to disqualify the plaintiffs' counsel, who had previously represented the Partnership.

After obtaining new counsel, the plaintiffs filed an amended complaint. Besides the relief originally sought, the amended complaint requested, inter alia, declaratory judgments that (1) the Partnership was a partnership at will and therefore terminable by any partner, at any time, for any reason; (2) the plaintiffs had lawfully terminated the Partnership; and (3) the plaintiffs' termination of the Partnership required the winding up of the Partnership's business, the liquidation of the Partnership's

-7-

assets, and the distribution of the liquidation proceeds to the partners according to their respective partnership interests.

The defendants moved to dismiss the plaintiffs' amended complaint or, in the alternative, for summary judgment. The plaintiffs filed a consolidated pleading opposing the motion to dismiss and cross-moving for summary judgment and for declaratory judgments on the three above-mentioned points on which they sought declarations. Defendants opposed the plaintiffs' cross-motion, and the plaintiffs filed a reply brief. The district court heard oral argument on December 2, 2004.

The plaintiffs argued to the district court that the express Partnership had terminated on January 8, 1994 when the 30-year term of the Agreement had expired. Thereafter, they said, the Partnership became a partnership at will by operation of law under Mass. Gen. Laws ch. 108A, § 23(1), which states:

> When a partnership for a fixed term or particular undertaking is continued after the termination of such term or particular undertaking without any express agreement, the rights and duties of the partners remain the same as they were at such termination, so far as is consistent with a partnership at will.

Under the plaintiffs' theory, any restrictions expressed in the Modification to the Partnership Agreement could not affect their ability to retire from, and in effect dissolve, the Partnership, since once the partnership became one at will, any partner could terminate the partnership at any time for any reason. See, e.g., Meehan v. Shaughnessy, 404 Mass. 419, 428 (1989). Plaintiffs

-8-

argued that when a partner in a partnership at will retires, his or her withdrawal triggers an accounting pursuant to the terms of the Uniform Partnership Act ("UPA") as codified in Mass. Gen. Laws ch. 108A, § 42.

The defendants disagreed.   In their view, the Modification supplanted the 30-year term with an agreement to continue the Partnership, unless or until a 60% liquidation vote was achieved.   The defendants asserted that the Modification substituted a new structure for that under the old Agreement: rather than being subject to a fixed term of thirty years, the property would be maintained indefinitely under the Agreement until a dissolution occurred by a 60% vote.   Alternatively, the defendants argued that even if the Partnership had become a partnership at will, no accounting was called for under § 42 as the accounting provision did not come into effect if the parties had otherwise agreed to a different course of action.   Thus, § 42 provides that

> [w]hen any partner retires or dies, and the business is continued . . . without any settlement of accounts . . . <u>unless otherwise agreed</u>, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest . . . (emphasis supplied).

Here, defendants argued, the partners had, in the Modification, agreed otherwise by limiting a partner's withdrawal or retirement

-9-

to the three options described therein (i.e., termination by 60% vote; assignment to a family member; or third-party sale subject to the partners' consent). Any other interpretation, the defendants said, would render meaningless the restrictions agreed to in the Modification, including the 60% termination requirement.

In response, plaintiffs insisted that defendants were wrong to assert that the partners' rights upon retirement, as conferred in § 42, were lessened or eliminated by something said in the Modification. They argued that there is no provision that "otherwise agrees" as to how a retiring partner's share is to be valued. No formula is set forth in the Modification for valuing a retiring partner's interest. Accordingly, the accounting described in § 42 must be utilized.

The district court ruled against defendants' contention that the Modification had substituted for the 30-year term an agreement to continue the Partnership until terminated by a 60% vote. It agreed with plaintiffs that nothing in the Modification eliminated the original 30-year term, hence, after January 8, 1994, the Partnership became one at will by operation of § 23(1) of Mass. Gen. Laws ch. 108A. Nonetheless, the court found for defendants on the ultimate issue, finding the partners had "otherwise agreed" to a method of valuation such as defendants proposed. Because the parties had agreed upon an alternative means, the method of valuation called for in § 42 of the UPA did not apply, the

-10-

plaintiffs being restricted, in these circumstances, to terminating and valuing their interest pursuant to paragraph 6 of the Modification.

While thus holding for the defendants, the court observed as an aside that the "easy thing for the court to do would be to pronounce an ambiguity in the intent of the original partners in crafting the Modification and proceed to a trial." Nevertheless, the court found no such ambiguity, hence made no such pronouncement. As a further reason for avoiding a trial, the court noted there was no disinterested person alive who could testify as to the partners' intent in modifying the agreement. The court granted the motion to dismiss and denied the plaintiffs' cross-motion for summary judgment.

## II.  Discussion

### A.  Standard of Review

We review de novo the district court's denial of the cross-motion for partial summary judgment and the granting of the motion to dismiss. Centro Medico Del Turbo, Inc. v. Feliciano De Melecio, 406 F.3d 1, 5 (1st Cir. 2005).

The question of whether a contract is ambiguous is one for the courts. ITT Corp. v. LTX Corp., 929 F.2d 1258, 1261 (1st Cir. 1991). All of the contract's terms should be construed together to find a coherent whole. As such, a court may look to related provisions of a contract to cast light on the meaning of

-11-

disputed language.  <u>Nadherny</u> v. <u>Roseland Property Co., Inc.</u>, 390 F.3d 44, 49 (1st Cir. 2004).

The intent of contracting parties is "generally . . . deemed a material issue of fact" precluding summary dismissal.  <u>Blanchard</u> v. <u>Peerless Ins. Co.</u>, 958 F.2d 483, 488 (1st Cir. 1992).

## B.  Analysis

The question now on appeal is whether, under Mass. Gen. Laws ch. 108A, § 42, each of the plaintiffs is entitled to receive the full value of his or her shares in the Partnership as determined upon liquidation, or rather must accept the much-reduced value offered by the remaining partners purportedly under their powers to approve sales to third parties under paragraph 6, <u>supra</u>, of the Modification.  The plaintiffs-appellants make two arguments. First, they argue that the Partnership became a partnership at will after the expiration of the 30-year term; that as partners at will they enjoyed an absolute right to dissolve the Partnership; and that nothing in the Modification constitutes an agreement otherwise for the valuing of their partnership shares upon retirement. Second, and alternatively, they argue that at the very least, the Modification is ambiguous and thus its meaning leaves a question of fact open to be decided by a jury.  We agree with the first argument and therefore reverse the judgment of the district court.

-12-

### i. Nature of the Partnership

Mass. Gen. Laws ch. 108A, which the partners expressly referenced in the Partnership Agreement and which enacts the UPA, governs the formation, conduct, and liquidation of partnerships in Massachusetts. Under ch. 108A, § 29, a "change in the relation of the partners caused by any partner ceasing to be associated in the carrying on . . . of the business" results in the dissolution of the partnership. Dissolution may occur by the express will of any partner at any time, even in contravention of the agreement between the partners, where the circumstances do not otherwise permit dissolution. Mass. Gen. Laws. ch. 108A, § 31(b)(2). Where, however, a partnership agreement provides that the partnership is to continue indefinitely or without the specification of a particular undertaking, and the partnership is therefore "at will," a partner has the right to dissolve the partnership, and the dissolution opted for by the partner occurs "[w]ithout violation of the agreement between the partners." Id. at § 31(1). The statute further provides that:

> When a dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his co-partners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners.

Id. at § 38(1) (emphasis supplied).

-13-

From the foregoing we glean the following: if a partner withdraws from a partnership at will, thus causing its dissolution, the dissolution is not regarded in law as contravening the agreement between the partners, even if the terms of that agreement provide otherwise. Thereupon, the partner is entitled under § 38(1) to his full share of the partnership net assets <u>unless otherwise agreed</u>. This contrasts with the situation in which a partner withdraws from a term or other partnership <u>not</u> at will, where the partnership agreement similarly disallows or restricts withdrawal.   In the latter case (unless there are other factors), the restrictive terms of the partnership agreement may be dispositive.

Clearly, therefore, it is of considerable importance whether the Partnership here was or was not at will when plaintiffs withdrew.[1]   If it was at will, withdrawal was lawful, and the withdrawing partners were entitled to their net shares unless some other method of distribution could be found to have been otherwise agreed to.   But if the Partnership was <u>not</u> at will, plaintiffs' right to withdraw from the enterprise was arguably barred altogether

---

[1]A more simplistic view of the difference between a partnership at will and one for a term can be drawn from <u>Black's Law Dictionary</u>, which describes a "partnership at will" as "a partnership that any partner may dissolve at any time without thereby incurring liability" and a "partnership for a term" as "a partnership that exists for a specified duration or until a specified event occurs.   Such a partnership can be prematurely dissolved by any partner, but that partner may be held liable for breach of the partnership agreement." <u>Black's Law Dictionary</u>, 1153 (8th ed. 2004).

-14-

(although we need not finally decide) by paragraph 4 of the Modification, which required a 60% vote for termination, resulting in a significantly stronger argument for limiting plaintiffs to the distribution being proposed by defendants under paragraph 6.

It is, therefore, of importance to determine initially whether the Partnership was "at will" when the plaintiffs sought to withdraw. We turn first to that issue, answering in the affirmative.

### ii. **Whether when Plaintiffs Retired, the Partnership was "At Will."**

The plaintiffs argue, and the district court so found, that when the partners continued to operate the Partnership after the expiration of the original 30-year term on January 8, 1994, it ceased to be a partnership for a fixed term and became a partnership at will. They base this assertion on the language in Mass. Gen. Laws ch. 108A, § 23(1) that,

> [w]hen a partnership for a fixed term or particular undertaking is continued after the termination of such term or particular undertaking without any express agreement, the rights and duties of the partners remain the same as they were at such termination, so far as is consistent with a partnership at will.

The district court adopted plaintiffs' analysis, and we agree. The 30-year term was expressly provided for in the original agreement and was not mentioned, much less stricken or modified, in the Modification. The Modification states at the end that, "[e]xcept as herein modified, the said Partnership is hereby affirmed." The

-15-

Modification further states that its purpose is to continue the original agreement in "full force with exception of Joseph [Tropeano's] interest." Defendants would nonetheless have us hold that the Modification sub silentio struck out the 30-year term. They argue that paragraph 4 of the Modification, stating in part that, "[t]he partnership can be terminated" by a 60% interest vote implicitly eliminated the 30-year term provision contained in the original Agreement, and substituted an agreement to continue the Partnership indefinitely unless or until a 60% liquidation vote was achieved.

Like the district court, however, we believe defendants' contention exceeds any reasonable reading of the relevant instruments. To adopt it would necessitate revising the plain language of both the Partnership Agreement and the Modification itself. When the Modification was executed, seven years yet remained of the 30-year term. Seven years was not such a brief remaining period as to make it unreasonable for the parties to have left intact the original 30-year term. It would have been easy enough for them to have executed an extension any time prior to January 8, 1994, in order to continue the term partnership and avoid the at-will consequences of § 23(1). Had the parties intended, when they executed the Modification, to eliminate the 30-year term provision, leaving the Partnership to continue until terminated by a 60% vote, as defendants suggest, one would expect them to have so

-16-

stated in the Modification, given the express affirmance therein of the original partnership, "[e]xcept as herein modified." We thus affirm the district court's conclusion that the 30-year term provision forming part of the original Partnership Agreement was not deleted by the Modification.

Defendants argue in the alternative that, even if the 30-year term provision remained and the 30 years expired, the 60% provision made the partnership venture a "particular undertaking," so as to keep the Partnership from becoming one at will under § 23(1) when the 30 years was up. We disagree. The defendants rely on Girard Bank v. Haley, 460 Pa. 237, 244, 332 A.2d 443, 447 (1975), to support their argument that the 60% termination provision turned the Partnership into a "particular undertaking," noting that the Pennsylvania Supreme Court had ruled that "a 'particular undertaking' under the statute must be capable of accomplishment at some time, although the exact time may be unknown and unascertainable at the date of the agreement." Id. The Girard court, however, immediately went on to undermine defendants' argument, writing of the partnership agreement at issue in that case that

[t]he agreement contains no provision fixing a definite term, and the sole 'undertaking' to which it refers is that of maintaining and leasing real property. Leasing property, like many other trades or businesses, involves entering into a business relationship which may continue indefinitely; there is nothing 'particular' about it.

-17-

Id. at 244. Business activities which may continue indefinitely are not "particular" in nature and do not constitute particular undertakings. Miami Subs Corp. v. Murray Family Trust, 142 N.H. 501, 509, 703 A.2d 1366, 1371 (1997). The defendants rely also on Osborne v. Workman, 621 S.W.2d 478, 273 Ark. 538 (1981), for the principle that a partnership agreement which provided that it could only be "dissolved mutually or by law" was not terminable at will by an individual partner (though the plaintiff was permitted to withdraw from the partnership and receive the value of his partnership interest as specified in the agreement). Id. at 479. The analogy is tenuous at best. The Osborne court focused on the specific nature of the partnership, a coalition of medical doctors which had provided expressly for the valuation of a withdrawing partner's share, and emphasized the idea that partnerships among professionals often require agreements that promote continuity and longevity. Here, the partnership is not one of professionals, and there is no provision expressly for the valuation of a withdrawing partner's interest.

Defendants emphasize that the Agreement as modified defines not just the particular undertaking of the management of a real estate property but also the particular undertaking that the partnership would terminate when 60% of the partnership voted to do so. As already noted above, however, the Modification explicitly stated both that the Partnership was affirmed by the Modification

-18-

and that the original Agreement was to be continued in full force and effect, indicating that the 30-year term was very much alive and well through the Modification. The 60% provision -- which states merely that the Partnership "can" be terminated by a 60% interest vote, not that this alone will allow its termination -- does not replace that term either as a time limitation or a particular undertaking under the terms of Mass. Gen. Laws § 23.

Hence, the Partnership was an "at will" partnership when plaintiffs announced their decision to retire. As such, it was subject to the provisions of Massachusetts law relative to such partnerships, including the absolute right of one or more of the partners to retire and dissolve the partnership at will. Mass. Gen. Laws ch. 108A, § 31(1), supra. Meehan, 404 Mass. at 428.

### iii. Whether the Partners "Otherwise Agreed."

The district court concluded that, notwithstanding the Partnership's at will status, it remained subject to the special requirements agreed to in the Modification, i.e., that the valuation of the share of a partner opting out with less than the 60% vote required for dissolution be determined under the third-party sale provision of paragraph 6 of the Modification (sale or assignment to a close family member under paragraph 5 not being involved). Paragraph 6 does not, however, address the Partnership's purchase or valuation of a retiring partner's share but rather merely gives

-19-

it refusal and veto rights over the sale of a partner's share to a third party.

> Under Mass. Gen. Laws ch. 108A, § 42,

[w]hen any partner retires or dies, and the business is continued . . . without any settlement of accounts . . . <u>unless otherwise agreed</u>, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest . . . . (emphasis supplied).

Defendants, like the district court, focus on the "unless otherwise agreed" language, asserting that the parties here "otherwise agreed" on a way other than that outlined in § 42 for establishing the value of a retiring partner's share. According to defendants, only dissolution pursuant to the 60% vote in clause 4 would allow a distribution at the full valuation provided in section 42. In support of their position, defendants cite to case law.  <u>See</u> <u>Diranian</u> v. <u>Diranian</u>, 773 N.E.2d 462, 466, 55 Mass. App. Ct. 605, 609-10 (2002) ("Partners may use a written partnership agreement to provide for different distributions from those required pursuant to the statutory provisions of G.L. c. 108A, §§ 29-43, in the event of a dissolution."); <u>Devlin</u> v. <u>Rockey</u>, 295 F.2d 266, 268 (7th Cir. 1961) ("It is implicit in Section 42 of the [Uniform Partnership Act], in the use of the words 'unless otherwise agreed,' that partners may provide by agreement the amounts to be paid to retiring partners by the surviving partnership.").

But while we have no doubt that, even where there exists, as here, a partnership at will, apt language in the original agreement may still control the character and amount of the distribution upon dissolution, we do not believe the cited paragraphs in the Modification, in particular paragraph 6, reflect an agreement that falls within the "otherwise agreed" proviso of § 42. Paragraph 6 deals with a partner's limited right, while the Partnership continues, to assign or sell his interest to others than the family members cited in paragraph 5. The partner must first offer the interest to the remaining partners at presumably the same price, and if they do not accept the offer, the assignment or sale to the third party shall be made only with the partners' consent, which will not be unreasonably withheld. Nowhere in paragraph 6 is it suggested that that procedure is to be followed in the event an at-will partner retires, thus effecting a dissolution of the Partnership as a matter of law. The only paragraph pertaining to share valuation upon dissolution and termination of the Partnership is paragraph 8, which calls for pro-rata distribution to all partners.

Defendants argue that paragraph 4, providing for termination of the Partnership by 60% or more of the partners, does not necessarily rule out termination by other means. This may be so. But the absence of any other express avenue to terminate, coupled with the very limited options for sale or assignment of

shares in paragraphs 5 and 6,[2] suggest that, except for dissolution of the Partnership by a super-majority vote, no other means to withdraw or to dissolve were actively contemplated when the Modification was drafted. No right is mentioned for individual partners to opt out and sell their shares back to the remaining partners, nor is a means of valuation provided for such an occurrence. To hold that paragraph 6, which gives partners a very constricted right, subject to partnership first refusal and veto, to offer their shares to third parties, should now be read as the agreed means to value the shares of partners retiring as of right under the at will provisions of the UPA, reads more into paragraph 6 than is there.

This is not to say that had plaintiffs sought to retire during the 30-year term of the partnership, paragraphs 4, 5, and 6 might not have limited the valuation of their shares as now claimed. Liability in the form of reduced or even no value under paragraph 6 might, arguably, be imposed for what paragraph 4 suggests would be the premature withdrawal by partners absent the 60% vote. Once, however, the term expired and the Partnership became a partnership at will, it is considerably harder to argue that paragraph 6 can

_____

[2]Paragraph 3 of the Modification, providing for disposition of Partnership assets upon the death of a partner, set out a fourth way of disposal, albeit one presently irrelevant. It is noteworthy that the death provision is written so as to preclude termination of the Partnership. Rather the designees of the deceased will continue to hold his or her shares as members of the ongoing partnership.

-22-

reasonably be read to serve the purpose defendants now contend. While perhaps a suitable vehicle to sharply curtail partnership withdrawal during the term of the Partnership, it is not worded as a yardstick to value the shares of retiring at-will partners, who are now legally entitled both to withdraw and to dissolve the partnership.

In the latter situation, the provisions of the Modification seem capable of only two interpretations, neither of which helps defendants. The first is that paragraph 6, by its terms, is simply irrelevant to the valuing of a retiring partner's interest here. Paragraph 6 nowhere mentions the retirement or withdrawal of a partner, much less the dissolution of the Partnership. It provides a method for a partner to sell or assign his interest to persons other than the close relatives listed in section 5: to do so, the partner must first offer his interest to the remaining partners at an equivalent price, and even if they refuse to purchase it, they may veto the sale or assignment to another, although in so doing they must act reasonably. On its face, paragraph 6 was not written so as to determine the value for purchase by the remaining partners of the interest of a partner retiring as of right. Thus we believe it cannot reasonably be interpreted as coming within the "otherwise agreed" language of § 42.

-23-

Alternatively, one can, with greater confidence perhaps, read paragraph 8 of the Partnership Agreement as providing an express basis for valuing the plaintiffs' shares where plaintiffs' action has the legal effect of lawfully dissolving the Partnership.[3]  That paragraph says in part,

> Distribution on Termination.  In the event of the dissolution and termination of the partnership, the Trustees shall be instructed to   proceed to the liquidation of the partnership and the proceeds of the liquidation shall be applied and distributed in the following order of priority . . .
>                        *      *      *
> (d)  Balance  .   .   . to be distributed among all partners  .   .   . according to their percentage holding . . .

Paragraph 8 deals specifically with distribution on termination. Its method of valuation, however, appears substantially the same as that outlined in § 42.  While arguably intended to be used following termination by 60% vote under paragraph 4, it is not so limited by its own terms and is on its face the most relevant provision in the Modification for distribution where, as here, dissolution of the

---

[3]Defendants make much of the fact that in the letter from their former counsel, plaintiffs initially distinguished their plans to retire from an attempt to terminate the partnership, which former counsel at one point seemed to acknowledge required the 60% vote of the partners.  This statement had no binding effect on the plaintiffs, who, after they acquired new counsel, filed an amended complaint expressly seeking a declaration that they could terminate the partnership as of right.   To the extent that the former counsel's letter can be interpreted to acknowledge that termination could be brought about only upon a 60% vote, it simply reflected an unrelied-upon misapprehension of the law.   Meehan, 404 Mass. at 428.

-24-

partnership at will can be and was effectuated as a matter of legal right.

Hence, given that the plaintiffs, as a matter of law, are entitled to retire and force the dissolution of the partnership at will notwithstanding their non-compliance with the 60% voting requirement of paragraph 4, we do not believe that paragraph 6, which is part of the same restricted regime imposed by paragraphs 3, 4, and 5, can reasonably be regarded as the partners' agreement for valuing plaintiffs' interests in these very different circumstances. Only by vastly stretching its language can paragraph 6 be read to govern the valuation of partners' interests in an at-will retirement situation such as the present one. We are unable to find that it reflects an express agreement to value plaintiffs' shares differently from the accounting called for in § 42.[4]

_____

[4]Section 23(1) of Mass. Gen. Laws ch. 108A reinforces our position in this regard. It provides that, after termination of a fixed-term partnership, as here, "the rights and duties of the partners remain the same as they were upon such termination, so far as is consistent with a partnership at will" (emphasis added). Paragraphs 4 (super-majority can vote to dissolve) and 6 (sale of partner's interest to third party subject to partners' first refusal and veto), if applied to the valuation of an at-will partner's retirement share, may well be provisions that would not be consistent with a partnership at will, hence contrary to § 23(1). A partner at will is legally entitled to retire without the vote of his partners and, except as otherwise agreed, to receive full value for his interest. It thus might seem questionable-- although we do not decide--whether a provision like paragraph 6, tailored to the concept that a partner is not free to retire except following a super-majority vote, can properly be imposed to value a retiring at-will partner's share. Given, however, that the language of paragraph 6 does not in any event aptly apply to valuation of a partner's interest in the present situation, we need

The defendants cite a number of cases to support the proposition that the terms of a partnership agreement may trump the valuation provisions of the UPA. We do not dispute that, on appropriate facts, that is so. But all of the cited cases, save one, which we discuss below, involved agreements where there were provisions specifically governing how the partnership interest of a deceased or withdrawing partner was to be valued, which is not the case here. See Devlin, 295 F.2d at 267 (article providing for withdrawal of partners and division of earnings); Robbins v. Salem Radiology, 764 A.2d 885, 888, 145 N.H. 415, 418 (2000) (article limiting any departing partner's interest to the accumulated and undistributed fees of the partnership); Wood v. Gunther, 201 P.2d 874, 876, 89 Cal. App. 2d 718, 721-22 (1949) (agreement explicitly stated that "[s]hould any of the partners desire to sell his interest in the partnership or to withdraw from the partnership, . . . he shall do so only upon the following terms . . . ."); In re Eddy's Estate, 49 N.E.2d 628, 290 NY 677 (1941) (agreement contained specific formula for setting price at which surviving partner could buy interest of deceased partner); Heath v. Spitzmiller, 663 S.W.2d 351, 354-55 (Mo. App. S.D. 1983) (agreement provided that withdrawing partner was entitled to his share of partnership assets, valued "by multiplying the billings to

---

not decide the legality of such a provision were it expressly applicable.

-26-

clients for the twelve months preceding the date of withdrawal times 150% and adding it to the fair market value of the partnership's 'equipment' and 'Capital Investment'").

The defendants also cite Balafas v. Balafas, 117 N.W.2d 20, 263 Minn. 267 (1962), where the court held that the UPA provisions did not preclude an agreement between partners to dispose of partnership assets in a manner contrary to the UPA provisions which would have been controlling in the absence of the agreement. That case involved the court's implying an "otherwise agreement" into an oral partnership agreement on the basis of extrinsic evidence demonstrating that two brothers in a partnership had clearly intended to have the share of the first deceased partner become the property of the surviving partner. Id. at 277. It is easily distinguished from the instant case because of the unique facts in Balafas and because we are dealing here with a written agreement, not an implied oral partnership. The court in Balafas implied a contract in fact from the absence of a written partnership agreement involving two immigrant brothers who were not familiar with partnership law and, the court found, considered their property to be joint between the two of them. Here we are dealing with a written partnership agreement which specifies a valuation provision for dissolution comparable to that in § 42 but did not demonstrate an "otherwise agreement" for withdrawal or retirement.

-27-

### iv.  Whether the Intent of the Parties in the Agreement is a Triable Issue of Fact

As we have agreed with the plaintiffs' first argument on appeal, we need not reach their claim in the alternative that the Modification was ambiguous and thus that we should reverse so that a jury could rule on the factual issue of the parties' intent regarding the issue of partners' withdrawal. We note briefly, however, our agreement with the district court that the Modification was not ambiguous.

As noted above, the intent of contracting parties is "generally [] deemed a material issue of fact" precluding summary dismissal. Blanchard, 958 F.2d 488.  See also Boston Five Cents Sav. Bank v. Department of Housing & Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985) ("an argument between parties about the meaning of a contract is typically an argument about a 'material fact,' namely the  factual  meaning  of  the  contract").   Only  in  limited circumstances is it appropriate for a court to choose one meaning of a disputed agreement over another.  Such limited circumstances occur only where "no 'reasonable person' could differ about what the contract means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided." Boston Five Cents Sav. Bank, 768 F.2d at 8.  On the other hand, "the words of a contract may be so clear themselves that reasonable people could not differ over their meaning." Id.

The Modification clearly expressed the will of the partners to continue the Partnership after the death of one of the founding partners and, as part of that affirmation of the continued Partnership, expressly delineated the ways in which the Partnership and individual Partnership interests could be terminated but failed to provide a valuation provision for either dissolution prior to the 60% vote of the partnership or withdrawal. Without such a provision, the UPA valuation provisions dictate the value of the withdrawing partners' shares. The Modification is not ambiguous, and there is no occasion for a jury to resolve its meaning.

## III.  Conclusion

The district court's judgment is therefore **reversed**, and the case remanded for further disposition in accordance herewith.