UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTON, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST, and CAPTAIN PARKER ARMS PARTNERSHIP, <br><br> Defendants. | CIVIL ACTION <br> NO. 03-CV-12231-RGS |

## OPPOSITION TO PLAINTIFFS' MOTION FOR REAL ESTATE ATTACHMENT

The Defendants hereby oppose Plaintiffs' Motion for Real Estate Attachment, in the amount of $8,772,145.13, of real estate owned by the T&N Realty Trust (the "Realty Trust"). Plaintiffs' Motion should be denied because they are not entitled to attach the assets of the Realty Trust. Furthermore, Plaintiffs are not even able to establish a likelihood of recovery against the other Defendants in the amount requested.

First, the Court lacks subject matter jurisdiction over the case, and thus Plaintiffs are not entitled to any relief in this Court whatsoever. Second, Plaintiffs' claims are not properly asserted against the Realty Trust, and do not permit them to attach the assets of the Realty Trust. Third, an attachment is not necessary. Finally, even if the Court is inclined to permit an attachment in some amount, the attachment sought by Plaintiffs is grossly excessive.

I.  **THE COURT LACKS SUBJECT MATTER JURISDICTION, AND THUS PLAINTIFFS ARE NOT ENTITLED TO ANY RELIEF IN THIS COURT.**

Plaintiffs contend that this Court has subject matter jurisdiction over this case based upon diversity of citizenship pursuant to 28 U.S.C. §1332 (Amended Complaint, ¶¶13-14). A federal court has diversity jurisdiction only when complete diversity exists between the parties. 28 U.S.C. §1332(a); Rodrigues v. Genlyte Thomas Group LLC, 392 F. Supp. 2d 102, 108 (D. Mass. 2005) (citing Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 673 (1st Cir. 1994)). "Thus, if any plaintiff and any defendant share citizenship of the same state, diversity is incomplete and federal jurisdiction is lacking." Id. Because Plaintiffs and the Defendant Realty Trust are all citizens of the Commonwealth of Massachusetts, diversity is not complete. Accordingly, the Court lacks subject matter jurisdiction, and the case should be dismissed. Id.

Plaintiffs allege that the Defendant Realty Trust is a Massachusetts trust created by written instrument, filed on the Middlesex County Registry of Deeds, with a principal place of business in Lexington, Massachusetts (Amended Complaint, ¶¶8 & 14(d)). Citizenship of a trust is determined by the citizenship of its trustees. Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 464 (1980); Johnson v. Columbia Properties Anchorage, LP, 437 F.3d 894, 899 (9th Cir. 2006); Homfeld II, L.L.C. v. Comair Holdings, Inc., 53 Fed. Appx. 731, 773, 2002 WL 31780184 (6th Cir. 2002); May Dept. Stores Co. v. Federal Ins. Co., 305 F.3d 597, 599 (7th Cir. 2002); E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925, 931 (2d Cir. 1998).

In stating facts to support their jurisdictional claims under 28 U.S.C. §1332, Plaintiffs misleadingly list only the Dorman Defendants as the Trustees of the Defendant Realty Trust (Amended Complaint, ¶¶9, 14(b)). In fact, there are seven trustees of the Realty Trust, including Plaintiffs Philip L. Tropeano and Peter Tropeano and non-party Mary Carol Tropeano (see

Exhibits I & J to the Affidavit of Leslie Crossley ("Crossley Aff."), submitted herewith).[1]

Plaintiffs admit that both Philip and Peter Tropeano are residents of Massachusetts (Amended Complaint, ¶¶1 & 2). The last known address of Mary Carol Tropeano is 12 Eddel Avenue, Wenham, Massachusetts (Crossley Aff., Ex. I). Because three of the Trustees of the Realty Trust are citizens of Massachusetts, the Realty Trust is a citizen of Massachusetts for diversity purposes.

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3); see also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982) ("a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings"); Fafel v. Dipaola, 399 F.3d 403, 410 (1st Cir. 2005); In re Boston Regional Medical Center, Inc., 328 F. Supp. 2d 130, 143 n.2 (D. Mass. 2004). Here, the parties are not diverse and Plaintiffs are not entitled to any relief in this Court.

## II.   THE TRUST ASSETS WHICH PLAINTIFFS SEEK TO ATTACH ARE NOT SUBJECT TO ATTACHMENT.

Plaintiffs explicitly seek to attach only the real property owned by the Realty Trust (Motion, at p. 1), but their claim is against the Captain Parker Arms Partnership and its partners, not against the Realty Trust. The Plaintiffs' suit is under G.L.c. 108A, §42 (Amended Complaint, ¶ Nature of Action). The First Circuit reinstated Plaintiffs' claim only after conducting a thorough analysis of the Uniform Partnership Act ("UPA") as adopted by

---

[1] A Trustee cannot resign without recording his or her resignation at the Registry of Deeds (Crossley Aff., Ex. B, Article VII). As is clear from the Crossley Affidavit (see ¶3 and Ex. K), none of Philip L. Tropeano, Peter Tropeano or Mary Carol Tropeano have resigned as Trustees. It is also clear that Plaintiffs seek the benefit of this Court's jurisdiction, while they attempt to retain control over the assets of the Realty Trust through their positions as Trustees.

Massachusetts, and concluding that, under the UPA, the Captain Parker Arms Partnership was a partnership at will, and that the partners did not "otherwise agree", pursuant to G.L.c. 108A, §42, to limit the rights of retiring partners. See generally Tropeano v. Dorman, 441 F.3d 69 (1st Cir. 2006). Therefore, under the plain language of §42, Plaintiffs are "ordinary creditor[s]" with rights "as against such persons or partnership" continuing the partnership's business. The statute does not give Plaintiffs a claim against the Realty Trust, which is not a "person or partnership continuing the [partnership's] business."

The Captain Parker Arms Partnership runs its business on land owned by the Realty Trust, but the Realty Trust is not an asset of the partnership. Accordingly, a judgment against the Captain Parker Arms Partnership would not justify an attachment of the Realty Trust's assets.

The Dorman Defendants are Trustees of the Realty Trust and are also partners of Captain Parker Arms, but that does not entitle Plaintiffs to attach the real estate owned by the Realty Trust. When a party obtains a judgment against a person who also happens to serve as trustee of a trust, that does not entitle the plaintiff to recover out of the assets of the trust. See Gardiner v. Rogers 267 Mass. 274, 277-78 (1929). The mere fact that the trustee is also a beneficiary of the trust does nothing to obviate this rule. See id. at 277 (holding that a real estate attachment was inappropriate where defendant was both a trustee and a beneficiary under a trust instrument which provided that the "trustee may take for his own use any part of the principal"). Furthermore, in those rare situations in which property held by trustees may be attached as security for a claim against the trust beneficiaries, the beneficiaries were entitled to present conveyance – a condition which is not met in the present case. See Cunningham v. Bright, 228 Mass. 385 (1917); Lyons v. Urgalones, 189 Mass. 424 (1905); Richmond v. Tankenow, 2000 WL 1298769 (Mass. Super.).

### A.     The Realty Trust is Not a Nominee Trust.

The Realty Trust is not a nominee trust, notwithstanding the Plaintiffs' contention to the contrary. Massachusetts courts have distinguished nominee trusts from "true trusts," such as the Realty Trust. See Morrison v. Lennett, 415 Mass. 857, 860 (1993) citing R. BIRNBAUM AND J. MONAHAN, *The Nominee Trust in Massachusetts Real Estate Practice*, 60 MASS. L.Q. 364 (1976). The hallmark of the nominee trust is that "the trustees have no power to deal with any property subject to the trust except as directed by the beneficiaries." BIRNBAUM, 60 Mass. L.Q. at 364. In a nominee trust, "trustees are frequently seen as agents for the principals' convenience rather than as trustees in the more familiar fiduciary sense." Apahauser Lock & Security Corp., v. Carvelli, 26 Mass. App. Ct. 385, 388 (1988); see also Morrison, 415 Mass. at 860 (observing that nominee trustee "may only act at the direction of . . . the beneficiaries" and citing Johnston v. Holiday Inns, Inc., 595 F.2d 890, 893 (1st Cir. 1979) (describing trustees in a nominee trust as having only "perfunctory duties").

In contrast, the trust instrument for the Realty Trust takes great pains to expressly state that its trustees and beneficiaries shall not have such an agency relationship: "The Trustees shall have no power to act as agent for beneficiaries hereunder" (Crossley Aff., Ex. B, Art. IV). Furthermore, unlike the agent-trustee of a nominee trust, the trustees of the Realty Trust have extensive discretionary powers. Article IX grants the trustees the power to "alter or add to this Trust Indenture or terminate this Trust if they deem it judicious to do so." Id. Article II(d) instructs the trustees "to do any and all of the things as Trustees to the same extent and as fully as natural persons might or could do as principals, agents, contractors, trustees, developers, even though said express powers do not explicitly appear in this Declaration of Trust." Id. And nothing in the Realty Trust limits the trustees to acting only when they receive explicit instructions from the beneficiaries. Accordingly, the trustees of the Realty Trust clearly have

power to perform more than the "perfunctory duties" envisioned by the Morrison and Johnston courts.

### B. Property Held by a Trustee May Be Attached Only where the Beneficiary Has a Right to "Present Conveyance."

Only when the beneficiary has the right to presently convey the trust asset to himself can a creditor attach land held in trust for the beneficiary. See Lyons v. Urgalones, 189 Mass. 424, 427 (1905). Even when beneficiaries have extensive power to direct the trustees, courts do not conclude that the beneficiary has a right to a present conveyance. See, e.g., Gardiner v. Rogers 267 Mass. 274, 275-79 (1929). In Gardiner, the property in question was in held in trust, naming the same person as the trustee and a beneficiary, and providing that the property be put "in trust to hold, manage and invest the same, with power to sell, mortgage or convey the same, and to pay over the net income thereof semi-annually or oftener in the discretion of the trustee, to her said son during his life, with power to pay to him any part of the principal when in the opinion of the trustee and wholly at his discretion such payment was necessary for his comfortable support and maintenance." Id. at 275. The Court concluded that although the trustee-beneficiary had nearly limitless powers, he did not have a right of present conveyance. Id. at 277-78. Moreover, the Court refused to "presume that a trustee will act in bad faith in the administration of the trust. There is nothing to show that the trustee in the present case has or ever will exercise his power to take over any part of the principal." Id. at 278.

Applying Gardiner, the beneficiaries of the Realty Trust cannot fairly be characterized as having a right of present conveyance. Moreover, most cases which find that the trust beneficiaries can affect present conveyance of the trust property, do so based on evidence of fraudulent conveyances or an attempt by the debtors to hide assets from their creditors. See, e.g., Cunningham v. Bright, 228 Mass. 385, 388 (1917); Lyons, 189 Mass. at 426; Robinson v. Foster,

2000 WL 1298766, at *1 (Mass. Super.); Richmond v. Tankenow, 2000 WL 1298769, at *5 (Mass. Super.). No one suggests that the Dorman Defendants have engaged in underhanded dealings, fraudulent conveyances, or an attempt to hide assets from their creditors. Nor, as the Gardiner case instructs, is it proper to presume that the trustee-beneficiaries of the Realty Trust will act in bad faith.

Accordingly, the Plaintiffs are not entitled to an attachment of the Realty Trust's land to secure a future judgment against Captain Parker Arms of the Dormans.

## III. THE ATTACHMENT SOUGHT IS NOT NECESSARY AND IS EXCESSIVE.

### A. Plaintiffs Do Not Need the Attachment Sought by this Motion.

Plaintiffs do not allege, nor can they, that the business of the partnership has been mismanaged since their resignation. The Dormans have hired an experienced management company to manage Captain Parker Arms (Affidavit of Nicolas P. Schmaltz of The Dolben Company, Inc. ("Dolben Aff."), ¶¶1, 3-4). Nor is it alleged that the Dormans have attempted to conceal their assets, or suffered waste of the Realty Trust's asset. There is no suggestion that without an attachment Plaintiffs will be unable to recover their judgment.

In contrast, an attachment will interfere with refinancing of the mortgage loan on the Realty Trust's property, which loan must be paid not later than January 2008 (Affidavit of Charlene Dorman ("Dorman Aff."), ¶9). Under these circumstances, Plaintiffs' request for an attachment is particularly inappropriate.

### B. If the Court is Inclined to Allow the Attachment, the Amount Sought Should be Reduced Because it is Excessive and Unwarranted.

For all the reasons discussed above, the Court should deny Plaintiffs' Motion for Real Estate Attachment. If, however, the Court is inclined to allow the attachment, the amount sought by Plaintiffs significantly exceeds their potential recovery, and will hinder the trustees' ability to

preserve the trust assets' value.

Plaintiffs support their request for an attachment of nearly $9 million dollars by valuing the property as if it were converted to condominiums (Plaintiffs' Memorandum in Support ("Plaintiffs' Memo"), ¶6 and Ex. A to the Affidavit of Peter Tropeano ("Tropeano Aff."), at 10 & 14), using the assets and liabilities of Captain Parker Arms as reflected in a monthly financial statement dated September 30, 2003 (Id., ¶7 and Ex. B) and adding interest at the rate of twelve percent (12%) per annum (Id., ¶11). As demonstrated more fully below, Plaintiffs' valuation methodology and calculations are flawed.

1. **Plaintiffs' Reliance on the "Condominium Conversion Approach" to Determine the Value of their Partnership Interests is Unavailing.**

Plaintiffs rely on an appraisal they obtained from Eric Reenstierna Associates, which in turn considered not the value of Plaintiffs' partnership interests (the issue in this case),[2] but instead the market value of the fee simple estate held by the Realty Trust (Plaintiffs' Memo, ¶6 and Tropeano Aff. Ex. A). Plaintiffs contend, based upon Reenstierna's "Condominium Conversion Approach," that estimated value of the Realty Trust's property in mid-2003 was $18,800,00. Id. Plaintiffs' approach to valuing their interests is flawed in numerous ways, not the least of which is their assumption that Plaintiffs could have compelled the sale of the Realty Trust's property.

(a) **Plaintiffs could not have compelled the sale of a fee simple estate, as presumed by Reenstierna.**

In 2003, Plaintiffs could not have required the trustees to sell the assets of the Realty Trust. Pursuant to the trust instrument and subsequent amendments, only the trustees have the power to sell the trust assets (Crossley Aff., Ex. B, Arts. II (a) & (d), IX; Ex. C, Art. IX).

---

[2] The Reenstierna appraisal makes no attempt to determine the value of Plaintiffs' minority Partnership interests in the marketplace.

Although the trust instrument is silent as to whether the vote of a majority or all trustees is required to authorize the sale of the trust's assets, the subsequent amendments require at least a majority of the trustees to sign all deeds, mortgages, loans, contracts and other instruments relating to the conduct of the business of the Realty Trust (Crossley Aff., Exs. D, G & J). Similarly, even the most generous reading of the February 12, 1965 Amendment to the Trust (Crossley Aff., Ex. C) (the "1965 Amendment"), makes it clear that no less than a majority of the Trustees would be needed to terminate the Realty Trust, and thus require the sale of the trust assets.[3] In October 2003, when the First Circuit has held that the Plaintiffs withdrew from the Captain Parker Arms Partnership (the "Partnership"), there were seven trustees, four of whom are the Dorman Defendants. Therefore, Plaintiffs could not obtain the requisites trustee votes needed to sell the trust assets (Dorman Aff., ¶1; see also Amended Complaint, ¶¶ 9, 14(b)).

Similarly, Plaintiffs did not represent a majority of the beneficiaries, either in number or percentage interest, as of September 30, 2003. Pursuant to the 1965 and 1982 Amendments, a majority of the beneficiaries could vote to terminate the Realty Trust. Article X of the trust instrument provides that upon termination of the Realty Trust, the trustees must either convey the property or distribute the proceeds of its sale to the beneficiaries (Crossley Aff., Exs. A, B, C). Thus compelling termination of the Realty Trust was the only means by which the beneficiaries could compel a sale of the assets of the Realty Trust. Since the Plaintiffs' total collective partnership interest (and therefore beneficial interest in the Realty Trust (Crossley Aff., Ex. D,

---

[3] The relevant language can be found in the last paragraph on the first page of the 1965 Amendment. This paragraph amends Article IX – Alteration of the Trust, and states "[b]y a majority vote of the shareholders having attained the age of 21 or more the Trustees may alter or add to this Trust Indenture or terminate this Trust if they deem it judicious so to do." A subsequent amendment, dated February 5, 1982 (Crossley Aff, Ex. D) (the "1982 Amendment"), replaced the word "shareholders" with "beneficiaries".

¶B)) was 42.86% (Amended Complaint, ¶30), they never constituted a majority of the beneficiaries and could not compel a sale of trust assets.

At the time of Plaintiffs' purported withdrawal from the Partnership, the Dorman family would not have agreed to sell the Realty Trust's assets, or the Partnership, either in their capacity as trustees and beneficiaries of the Realty Trust, or as members of the Partnership. The Dormans would not have authorized the sale for the personal and financial reasons described in the Affidavits of Charlene Dorman and Michael W. Keane, submitted herewith (Dorman Aff., ¶¶6-9; Keane Aff., ¶9). Plaintiffs, whose collective interests were insufficient to compel a sale of the trust property or Partnership's business, would not have been able to obtain the necessary trustee or partner votes.

Accordingly, any method for determining the value of Plaintiffs' partnership interests cannot rest upon the sale of the entire fee simple assets of the Realty Trust, or the entire business of the Partnership. Two of the valuation methodologies used in the Reenstierna appraisal – the "Sale Comparison Approach" and the "Condominium Conversion Approach" – incorrectly presume the sale of the Realty Trust's real estate, which they define as "an absolute ownership unencumbered by any other interest or estate . . . ." (Tropeano Aff., Ex. A, at 2, 3-6, 10-11). Plaintiffs simply did not have the ability to sell "an absolute ownership" interest in the Realty Trust's property. Therefore, the "Sale Comparison Approach" and the "Condominium Conversion Approach" utilized by the Reenstierna appraisal must be ignored.

    **(b) Even if Plaintiffs could base a valuation of their Partnership interests on the sale, as condominiums, of the Realty Trust assets, Reenstierna's value is significantly overstated.**

Even if Plaintiffs could base a valuation of their Partnership interests on the sale, as condominiums, of the Realty Trust assets, Reenstierna's value is significantly overstated for the following reasons: it is based on a comparison to only one other property that is not comparable;

it fails to adjust the value for the costs of repairs and renovations any buyer for the purpose of condominium conversion would have incurred; and it admittedly does not take into account the handicap accessibility regulations which would be triggered by the renovations required to convert the property to condominiums.

Reenstierna relies upon only one "comparable" property in its Condominium Conversion Approach – Emerson Gardens (Tropeano Aff., Ex. A, at 10-11). Emerson Gardens has 150 condominium units, 112 of which are townhouse style (Id.; Crossley Aff., Exs. M&N).[4] The townhouse units are two-stories with private entrances (Crossley Aff., Ex. M). Emerson Gardens also has "Cape" style units which have private entrances (Id.). Only a small number of units appear to be similar to those at Captain Parker Arms – single story units which require owners to use common hallways to gain access to their property[5] (Id.; Dolben Aff., ¶13). Additionally, Emerson Gardens has a community pool, a feature that Captain Parker Arms does not offer (Crossley Aff., Ex. N; Dolben Aff., ¶15). Despite the fact that the two properties are not truly comparable, Reenstierna makes no effort to adjust its estimate of average unit price or the upgrade expenditures to address these differences between the properties. Accordingly, the anticipated average unit price of $310,000 estimated by Reenstierna is overstated.

Moreover, Reenstierna has significantly underestimated the costs of preparing Captain Parker Arms for condominium sales. As described in the Dolben Affidavit, when it took over property management in mid-2003, it encountered numerous maintenance issues with both the rental units and the common areas (Dolben Aff., ¶¶6-8). The cost of rectifying these issues is

---

[4] Of the 150 units, 112 are designated as two-story townhouses with private entrances, 18 are designated as single story Cape-style units with private entrances, and 20 are designated as single story Flat-style units with common hallway entrances (Crossley Aff., Ex. M).

[5] Only six of the 94 Captain Parker Arms apartment units have private entrances.

expected to exceed $ 612,000 (Id., ¶9). It is clear that Reenstierna's total estimate for upgrade costs to the common areas of $163,500 (Tropeano Aff., Ex. A. at 11) is significantly understated, given that the significant maintenance projects Dolben faced, such as boiler replacements, repaving and drainage correction, exceed that estimate (Dolben Aff., ¶¶6-9). These issues would have needed to be addressed in order to prepare the property for condominium sales or would have been uncovered by any potential buyer planning a conversion to condominiums. Other significant projects would have needed to be undertaken, including providing individual metering of gas and water at an estimated cost of $1000 per unit, and in-unit laundry at a minimum estimated cost of $1000, to prepare the property for condominium sales (Id., ¶¶11-12). These costs were not considered by Reenstierna, who included only the cost of renovations to kitchens, baths and electricity, when estimating the per unit upgrade costs (Tropeano Aff., Ex. A at 11). Moreover, Reenstierna's estimated cost for this work, $15,000 per unit, is significantly less than the actual estimate Dolben received to renovate to provide only basic kitchens, baths and electrical (Id., ¶10). The actual renovation costs would have been at least $22,000 per unit. Nor did Reenstierna include the cost of adding amenities, such as recreational facilities and swimming pools, used to attract condominium buyers (Dolben Aff., ¶15), or make a deduction based upon the absence of such features. It is clear that Reenstierna's estimate of $15,000 per unit would have been insufficient to cover the costs that would have been encountered when preparing the units for condominium sales.

Even more problematic is the fact that the valuation done by Reenstierna does not include the costs associated with complying with the Massachusetts handicap accessibility regulations (Tropeano Aff., Ex. A at 16 n.15). If "the work being performed, in a three year period, exceeds 30% of the full and fair cash value of the building," at least 5% of the dwelling units would need

to be renovated to comply with the accessibility regulations. 521 CMR 9.2.2 & 9.5; Affidavit of Norton Remmer ("Remmer Aff."), submitted herewith, ¶8. As of September 30, 2003, the assessed value of the buildings was $7,457,000 (Crossley Aff., Ex. L). Even Reenstierna's grossly understated renovation expenses (estimated total renovation and conversion cost of $1,620,500), which exclude substantially all of the costs discussed above, exceeds 20% of the assessed value (Tropeano Aff., Ex. A at 11). When the true condition of the property and the costs of preparing the units for condominium sale which Reenstierna failed to consider are taken into account, the handicap accessibility regulations would have been triggered (Dolben Aff., ¶¶6-9; Remmer Aff., ¶¶7 & 8). These costs, if not prohibitive, would substantially and negatively impact the market value of the property if a conversion to condominiums (or even a renovation without conversion to condominiums) was attempted (Remmer Aff., ¶8, concluding that the costs would exceed $1 million).

Accordingly, Plaintiffs assertion that their partnership interests should be based on Reenstierna's highest property valuation, derived using a Condominium Conversion Approach, is without merit and should not be accepted by the Court.

**2.    Use of estimated net income in Reenstierna's Income Capitalization Approach instead of actual net income leads to an overstatement of value.**

Captain Parker Arms always has been an income generating vehicle for the partners of the Partnership (Dorman Aff., ¶¶4 & 7), and thus determining the valuation of Plaintiffs' interests using an income methodology is most appropriate. Moreover, a valuation based on an income methodology more accurately accounts for Plaintiffs' minority interest. Although Plaintiffs' Motion papers do not acknowledge it, Reenstierna provides a valuation of Plaintiffs' interest based on an income methodology in a section entitled "Income Capitalization Approach." (Tropeano Aff., Ex. A at 7-9). Reenstierna's analysis, however, needs to be

corrected because some of the data used by Reenstierna was estimated whereas actual values are available.[6]

Reenstierna employed "assumed" revenue and expense figures (id. at 7), but actual figures are available. According to the 2003 year-end financial statement prepared by Keane, Chiuve & Company, P.C., actual 2003 revenues were $1,524,552, actual expenses were $993,055 and actual net income was $531,497 (Keane Aff., ¶4 & Ex. A). Because Reenstierna incorrectly estimated the expenses at only $556,864 (Tropeano Aff., Ex. A at 9), its value for net income, $963,680 (id.) is significantly overstated. Even if the Court were inclined to accept the capitalization rate of 7.5% selected by Reenstierna, the resulting market value of the real estate assets of the Realty Trust would be nearing $3 million **less** than projected by Reenstierna – the actual net income of $531,497, plus interest expense of $205,112, divided by the capitalization rate of 7.5%, yields a market value of $9,821,453.

### 3. Plaintiffs' calculations of the value of their partnership interests are based on inaccurate data.

Plaintiffs rely upon a monthly financial statement dated September 30, 2006 to provide values for the non-real estate assets and the total liabilities of the Partnership (Plaintiffs' Memo, ¶7 & Tropeano Aff., Ex. B). This financial statement was produced only one month after Dolben became the property manager (Dolben Aff., ¶16). At that time, all financial data had not yet been transferred to Dolben (Id.). Accordingly, some of the data in the report was inaccurate and corrected in subsequent monthly financial statements (Id.). In order to properly calculate

---

[6] Because Reenstierna assumed a sale of the entirety of the Realty Trust's assets, its analysis does not take into account the minority discount which would have been required if Plaintiffs had attempted to sell their minority partnership interests (the interests which must be valued in this case) in the marketplace. The minority discount is required because Plaintiffs' partnership interest was not liquid. An investor who could obtain the same rate of return by purchasing a liquid investment would surely avoid purchasing Plaintiffs' minority partnership interests. Accordingly, an investor would pay less (enhancing its rate of return) to purchase Plaintiffs' minority partnership interests.

Plaintiffs' potential recovery, the Court should use the more accurate data available from the 2003 year-end financial statement. Using the 2003 year-end figures reported by Keane, Chiuve & Company, P.C., the correct value for the Partnership's non-real estate assets was $326,852, and the correct value for partnership liabilities was $3,457,659 (Keane Aff., Ex. A).

As Plaintiffs demonstrate in paragraph 8 of their Memo, in order to calculate the value of the Partnership's assets, the Court needs to add the value of the non-real estate assets to real estate value and then subtract the total liabilities. As discussed in the preceding section, the most accurate real estate market value available, derived from an income methodology, is $9,821,453. As discussed in the preceding paragraph, the non-real estate assets were $326,852 and the partnership liabilities were $3,457,659 at year-end 2003. Thus, application of Plaintiffs' formula leads to $6,690,646 as the value of the Partnership's assets in 2003. Plaintiffs collectively held a 42.87% interest in the Partnership as of September 30, 2003 (Plaintiffs' Memo, ¶8; Amended Complaint, ¶30). Accordingly, the value of Plaintiffs' collective interest was worth $2,868,280.

Each Plaintiff had a negative balance in their individual capital accounts as of September 30, 2003 (Keane Aff., ¶5). The withdrawing partners must reimburse the Partnership for their overdrawn capital accounts (Keane Aff., ¶6). Plaintiffs' collective negative balance in their capital accounts as of September 30, 2003 was $421,212 (Id., ¶5). Subtracting this amount from the value of Plaintiffs' collective interests, the amount due the Plaintiffs, excluding interest, is $2,447,068.

These calculations are summarized as follows:

| | |
|---|---|
| Actual net income | $531,497 |
| Interest Expense | 205,112 |
| Income before interest expense | 736,609 |
| Capitalization Rate | 7.5% |
| Real Estate Value | 9,821,453 |
| Value of Non-Real Estate Assets | 326,852 |

| | |
|---|---|
| Partnership Liabilities | (3,457,659) |
| Total Net Value | 6,690,646 |
| Plaintiffs' share at 42.87% | 2,868,280 |
| Plaintiffs' negative capital accounts | (421,212) |
| Value of Partnership Interests as of Oct. 1, 2003 | $2,447,068 |

### 4. Plaintiffs Calculate Interest at Twice the Rate Available to Withdrawing Partners Under Massachusetts Law.

Plaintiffs' Motion also seeks to include in the attachment amount over two-million dollars for interest (Plaintiffs' Memo, ¶12). While G.L.c. 108A, §42 permits Plaintiffs to receive interest on the value of their partnership interests, they are not entitled to interest at a rate of twelve percent (12%) per annum. Where, as here, a statute provides for interest but does not specify the rate, interest is calculated pursuant to G.L.c. 107, §3. MacCuish v. Volkswagenwerk A.G., 22 Mass. App. Ct. 380, 399-400 (1986) (where statutory rate is unspecified, G.L.c. 107, §3 applies). The applicable statutory interest rate under G.L.c. 107, §3 is six percent (6%) per annum.

The statutory provision on which Plaintiffs rely, G.L.c. 231, §6C, cannot apply here. First, that provision only applies in matters concerning contractual obligations. G.L.c. 231, §6C (establishing the statutory rate of pre-judgment interest in matters arising from contractual obligations). Claims arising under G.L.c. 108A, §42 are not based upon contractual obligations. See Anastos v. Sable, 443 Mass. 146, 155 (2004) (where claim for payment arises under G.L.c. 108A and not from partnership agreement, claim is not based on a contractual obligation). Furthermore, the prejudgment interest rate provided by G.L.c. 231, §6C, cannot apply because a withdrawing partner is entitled to interest even without filing suit. Thus, a statute which applies only in litigation cannot supply the appropriate rate to be used under G.L.c. 108A, §42, which anticipates the application of interest whether or not partnership valuation is resolved through litigation.

As discussed in the preceding section, the value of Plaintiffs' collective interests, the amount due the Plaintiffs, excluding interest, is $2,447,068. To date, accrued interest at 6% per annum is approximately $465,000:

| | |
|---|---:|
| Value of Partnership Interest as of Oct. 1, 2003 | $2,447,068 |
| Interest to Nov. 30, 2006 at 6% | 464,943 |
| Total | $2,912,011 |

Accordingly, if the Court were to conclude that Plaintiffs are entitled to an attachment, the attachment must be limited to $2,912,000.

## Conclusion

This Court lacks subject matter jurisdiction, Plaintiffs are not entitled to any relief against the Realty Trust, and are not entitled to attach the assets of the Realty Trust. Nor do Plaintiffs need an attachment to protect their interests. In fact, the requested attachment would hamstring the Dormans in their efforts to protect the Realty Trust's assets and the continuing business of the Partnership.

If, despite the Defendants' arguments herein, the Court is inclined to allow an attachment, the amount sought by Plaintiffs is grossly excessive and the Court should not grant an attachment greater than $2,912,000.

Respectfully submitted,

/s/ Christine M. O'Connor
Sander A. Rikleen – BBO# 420280
srikleen@eapdlaw.com
Christine M. O'Connor – BBO# 647535
coconnor@eapdlaw.com
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Ph: 617·239·0100  Fx: 617·227·4420

Dated: December 8, 2006          Attorneys for the Defendants

- 18 -

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system pursuant to Local Rule 5.4 will be sent electronically to all other parties.

                      _____/s/ Christine M. O'Connor_____

BOS111_12100280_3.DOC/COCONNOR