UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTON, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST, and CAPTAIN PARKER ARMS PARTNERSHIP, <br><br> Defendants. | CIVIL ACTION <br> NO. 03-CV-12231-RGS |

**OPPOSITION TO PLAINTIFFS' MOTION TO EXTEND DISCOVERY
FOR 90 DAYS AND CONTINUE TRIAL**

Defendants hereby oppose Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial. Plaintiffs' motion should be denied because it is Plaintiffs' recent change to their discovery strategy that has caused scheduling issues for Plaintiffs' counsel. Plaintiffs repeatedly agreed that the trial date would be maintained despite extensions to expert deadlines. After exchange of expert rebuttal reports, Plaintiffs had a change of heart, and served significant discovery just seventy-three (73) days before trial.

Plaintiffs' suggestion that additional discovery time is needed because Defendants' expert reports revealed previously unknown legal positions is just plain wrong. All of the purportedly newly raised defense positions – that minority and marketability discounts are applicable in the determination of Plaintiffs' partnership interests, valuation of the subject property based upon a

R

condominium conversion theory must consider the costs of complying with accessibility and other building code regulations, and the interest rate applicable in this matter is 6% pursuant to Mass. Gen. Laws ch. 107, § 3 – were raised more than one year ago and were also discussed at length in motion papers filed with the Court and argued in December 2006.  Plaintiffs now argue that discovery cannot proceed until the Court resolves these legal disputes, even though Plaintiffs have not filed any pre-trial motions.  Plaintiffs, however, have served numerous deposition notices and discovery requests since October 5, 2007.  Thus, it appears that Plaintiffs can proceed without the Court's guidance on the disputed issues.

Perhaps most importantly, Plaintiffs' Motion should be denied because, unlike Plaintiffs, Defendants will suffer significant detrimental consequences if the trial is delayed.  After four years of litigation, the interest on the value of Plaintiffs' partnership shares has accumulated into a significant amount of money.  Plaintiffs advocate that a 12% interest rate should be applied, outpacing any interest rate they could obtain in the marketplace.  It is no wonder that further delay does not worry Plaintiffs.

Additionally, Plaintiffs sought and received a Standstill Order that significantly limits Defendants' ability to refinance the subject Property while this action is pending.  Two mortgage loans undertaken by the Captain Parker Arms Partnership before Plaintiffs withdrew will mature in January 2008.  As it is already mid-October, Defendants, in reliance on the December trial date, have been negotiating with the current mortgage lender for a six-month extension of the mortgages.  A change in the trial date will render these efforts useless.

Accordingly, as more fully explained below, Plaintiffs' Motion should be denied and the trial should commence on December 17, 2007, as scheduled.

## I. PLAINTIFFS' DISCOVERY STRATEGY LED TO THEIR SCHEDULING ISSUES.

Plaintiffs chose to wait until the final weeks of the discovery period, and just seventy-three (73) days before trial, to initiate the bulk of their discovery (Affidavit of Attorney Christine O'Connor, "O'Connor Aff.", at ¶¶14-17). While Plaintiffs are free to establish and follow their own litigation strategy, they are not entitled to a change of the trial date because they have decided to change that strategy.

### A. Expert Deadline Extensions Were Conditioned on Maintaining the Trial Date.

Plaintiffs seek an extension to the discovery deadline in a four-year old case, in part, because "expert reports were exchanged just two months ago (and rebuttals just *two weeks* ago)" (Memo[1] at 2, original emphasis). Plaintiffs, however, repeatedly agreed that extensions to expert discovery deadlines would not impact the scheduled trial date each time the parties discussed such extensions.

The December 17, 2007 trial date was established in May of this year. On May 10, 2007, the Court issued an Order Regulating Non-Jury Trial Before Stearns, DJ, which scheduled the trial to commence on Monday, December 17 (docket entry #68). At all times thereafter, Defendants have attempted to accommodate scheduling issues raised by the parties while maintaining the trial date (O'Connor Aff., ¶¶ 14-17). For example, when the parties discussed submitting a Joint Motion to Modify the Scheduling Order to Adjust the Deadlines for Exchange of Expert Reports and Expert Discovery, Plaintiffs agreed that the proposed modification would not require an adjustment to the trial date (id., ¶8). The Court endorsed the Revised Scheduling Order on June 28, 2007 (docket entry #70), specifically noting that the trial date was not

---

[1] The Memorandum in Support of Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial is referred to herein as "Memo" and Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial is referred to herein as "Mtn".

modified.

Similarly, the parties agreed to an informal adjustment of the date for exchange of initial expert reports in July (O'Connor Aff., ¶9). During the telephone conference in which the parties discussed extending the date for such exchange, Plaintiffs' counsel agreed that Plaintiffs would not seek to delay the trial because of the adjustment in the date for exchange of initial expert reports (id.). When, in September, Plaintiffs sought to extend the date for exchange of rebuttal expert reports, Plaintiffs' counsel again agreed that such extension would not effect the scheduled trial date (id., ¶11 & Ex. E). As the correspondence between counsel demonstrates, when the date for exchange of rebuttal expert reports was adjusted, Plaintiffs agreed that they were "prepared to stay on track with respect to the trial date", and were made aware of the prejudicial effect of further delay on the Defendants (id.).

Because Defendants specifically conditioned extensions of the dates the exchange of expert reports on maintaining the December 17 trial date and relied on Plaintiffs' assurances to that effect, Plaintiffs cannot now argue that delays in expert report exchanges necessitate a change of the trial date.

### B.   Plaintiffs, Not Defendants, Seek Extensive Expert Discovery.

It is Plaintiffs, not Defendants, who are undertaking significant expert discovery. Plaintiffs served notices of deposition for two of Defendants three experts whose reports were submitted on August 10, 2007 (O'Connor Aff., ¶16 & Exs. F & G).[2] Plaintiffs also have

---

[2] During a September conference concerning an extension of the rebuttal report deadline and Plaintiffs' yet to be filed motion opposing the application of minority and lack of marketability discounts, Plaintiffs' counsel stated that he did not plan to obtain a rebuttal expert to address the topic of discounts unless the Court ruled against his proposed motion (O'Connor Aff., ¶10). He further stated that if his motion was not successful, he would then seek an extension of time to allow him to obtain a rebuttal expert (id.). Counsel for Plaintiffs was specifically informed at that time that Defendants would oppose any alteration of the schedule which would delay the trial (id.).

demanded production of documents by such experts, specifically including "<u>documents and information otherwise subject to attorney-client privilege and attorney work-product protection</u>" (id., Ex. F & G, Schedule A, Instruction 12 (original emphasis)).  Plaintiffs have not explained why they did not seek to depose Defendants' experts after their expert reports were exchanged on August 10, 2007, despite the fact that they were permitted to do so as soon as their reports were provided.  Fed. R. Civ. P. 26(b)(4)(A).  Instead, Plaintiffs waited until October 9, 2007 to notice any expert depositions (id., ¶16 & Exs. F & G).

In contrast, within days of receiving the appraisal report of Plaintiffs' rebuttal expert, which states that it relies upon Plaintiff Peter Tropeano's attempt in 2004 to solicit an offer to purchase CPA, Defendants noticed the depositions of two third-party companies that were involved in that attempt (O'Connor Aff., ¶18).  Because Plaintiffs' original appraisal expert and their rebuttal appraisal expert disagree with one another, Defendants also served two sets of interrogatories, comprising a total of only five (5) questions, seeking clarification as to what expert testimony Plaintiffs anticipate presenting at trial (id.).  Defendants have not sought the deposition of any of Plaintiffs' experts (id.).

Because Plaintiffs chose to serve no expert discovery until October, Plaintiffs are responsible for the discovery crunch they now face.  Accordingly, Plaintiffs' lament concerning the remaining expert discovery (Memo at 2 & ¶11) is unavailing.

### C. Plaintiffs Chose to Delay Discovery Concerning Defendants' Counterclaim.

Defendants' Counterclaims were filed in December 2006 (docket entry #60).  There was no reason to delay taking discovery with respect to Defendants' first counterclaim, alleging that

Plaintiff Peter Tropeano breached his fiduciary duties when he was CPA's property manager.[3] This discovery was not contingent on expert reports. Nor did Plaintiffs seek to depose any of the Defendants before serving notices of deposition of Defendants Charlene and Todd Dorman on October 5, 2007 (O'Connor Aff., ¶15). Similarly, Plaintiffs did not seek to depose Dolben, the property management company that took over for Peter Tropeano, or any of its employees, before serving notices of those depositions on October 5, 2007 (id., ¶14).

At all times, Defendants have attempted to alleviate scheduling pressures on Plaintiffs' counsel, by agreeing to informally extend various deadlines, including the discovery deadline (O'Connor Aff., ¶¶ 8-9, 11-12). As recently as the parties' Local Rule 7.1 conference about this Motion, Defendants attempted to alleviate the scheduling pressures on Plaintiffs' counsel by agreeing to informally extend the discovery deadline until the end of November, thus allowing Plaintiffs to obtain the depositions they seek during the weeks normally set aside for final trial preparation (id., ¶12).

## II. DEFENDANTS' POSITIONS WERE DISCLOSED MANY MONTHS, AND IN SOME CASES YEARS, BEFORE THE EXCHANGE OF EXPERT REPORTS.

Plaintiffs incorrectly state that "[t]he exchange of expert reports . . . revealed for the first time the defendants' position regarding a host of key issues, both factual and legal. . . ." (Mtn, ¶2; Memo, ¶11). Similarly, Plaintiffs' suggestion that they had not been aware of Defendants' arguments concerning (1) minority and marketability discounts, (2) application of Massachusetts regulations, and (3) the applicable interest rates (Memo, ¶¶11-21) is simply untrue.

The applicability of minority and marketability discounts was first raised by predecessor counsel for the Defendants not later than October 2003, before the Plaintiffs even initiated this

---

[3] Although Plaintiffs note that Defendants filed a three count counterclaim, only one count requires factual discovery, a point implicitly conceded by Plaintiffs (Memo, ¶8).

BOS111_12210367_1.DOC

action (O'Connor Aff., ¶10 & Ex. D).  Defendants also pointed out their position that discounts should be taken to account for Plaintiffs' minority interests in Defendants' Opposition to Motion for Real Estate Attachment, filed on December 8, 2006 (docket entry #50) ("December 2006 Opp.", at 8 n.2 and 14 & n.6).

Defendants first raised their concern about the failure of Plaintiffs' appraiser to address the application of architectural barrier (accessibility) regulations in July 2006 (O'Connor Aff., ¶3 & Ex. B).   If this were not enough to alert Plaintiffs of the need to evaluate accessibility and similar regulations in a valuation based on condominium conversion, Defendants raised the issue again in their opposition to Plaintiffs' Motion for Real Estate Attachment (December 2006 Opp. at 11, 12-13).  At that time, Defendants disclosed that they had obtained an expert on these issues (id.) and that expert filed an Affidavit with the Court (Affidavit of Norton Remmer, docket entry #54).

Similarly, Defendants first alerted Plaintiffs that they were mistaken as to the interest rate that would be applied in this matter, including providing a case citation, in July 2006 (O'Connor Aff., ¶3 & Ex. B).  Again, Defendants provided a fulsome description of their position on this issue in their opposition to Plaintiffs' Motion for Real Estate Attachment (December 2006 Opp. at 16-17).

Finally, Plaintiffs' contention that they could not conduct discovery as to the condition of Captain Parker Arms Apartments ("CPA") at the time Plaintiffs withdrew from the partnership and the "actual and estimated costs figures" for correcting defects in the property's condition until after rebuttal reports were exchanged (Mtn, ¶2) is unavailing.  Not only were many of the facts concerning the deferred maintenance and outdated conditions at CPA described in the Affidavits of Nicholas Schmalz (docket entry #55) and Mr. Remmer (docket entry #54) that

accompanied the December 2006 Opposition, Defendants outlined the impact of the cost of correcting such conditions in the opposition (December 2006 Opp. at 11-13).  Additionally, Defendants' first counterclaim describes deferred maintenance issues in some detail (Defendants Answer to First Amended Complaint and Counterclaims, docket entry #60, at 16-19).  Moreover, Plaintiffs' counsel, accompanied by Plaintiff Peter Tropeano and an expert appraiser, conducted an on-site inspection of CPA at least twice, on May 23, 2007 and August 28, 2007, with the stated purpose of examining the property defects and deferred maintenance items raised by Defendants in their various papers (O'Connor Aff., ¶13).  Finally, prior to the exchange of expert reports, Defendants had produced the documents which reflected the condition of CPA in October 2003, including the actual costs incurred and bids received by Defendants to correct numerous problems with the property (id.).

Accordingly, Plaintiffs were not caught by surprise by the contents of Defendants' expert reports.  Plaintiffs instead changed their discovery strategy at the last moment, having made assurances to Defendants that delays in the exchange of expert reports and rebuttal reports would not become the basis for arguing that the trial should be delayed.

### III. PLAINTIFFS COULD HAVE ANTICIPATED ALL PRE-TRIAL MOTION PRACTICE.

When the parties submitted a joint proposed schedule in June, which was adopted by the Court, the parties agreed to November 9, 2007 as the discovery deadline and maintained the Court's previously scheduled trial date of December 17, 2007 (docket entry #69).  As discussed in the preceding section, all of the topics which Plaintiffs now assert require the Court's pre-trial attention – application of minority discounts, application of accessibility and similar regulations, and determination of the applicable interest rate to which Plaintiffs are entitled (Mtn, ¶1; Memo at 1-2, 5-8) – were previously raised by Defendants and described in some detail.  Presumably,

Plaintiffs' counsel carefully assessed the time that he would need for any pre-trial motion practice before the joint proposed schedule was submitted in June, and again each time he agreed, as discussed in section I.A above, that expert report extensions would not require a change in the trial date.[4]

### A. Plaintiffs' Partnership Interests Are Subject to Minority and Marketability Discounts.

Plaintiffs have known at least since December 2006 that Defendants would argue that determination of the value of their former interests in the Captain Parker Arms Partnership would require consideration of minority and marketability discounts (see section II, above).  They have had plenty of time to seek the Court's guidance on this issue.  Plaintiffs' counsel apparently determined soon after his August 10, 2007 receipt of Defendants' expert report on this issue, if not before, that he would seek a pre-trial determination as to whether such discounts are appropriate (O'Connor Aff., ¶10).  Plaintiffs have yet to file their proposed motion and decided not to engage a rebuttal expert or timely file a rebuttal report, gambling that they could do so only after the Court denied their yet-to-be-filed motion (id.).

Moreover, contrary to Plaintiffs' assertions, the First Circuit has not remanded this matter for determination of the "liquidation value" of CPA, nor has any court determined that minority and marketability discounts are inapplicable in this case (Plaintiffs' Memo, ¶14).  Although Plaintiffs have quoted one sentence from the First Circuit decision correctly, any reading of the

---

[4] Plaintiffs' assertion that the Court must resolve legal issues "before the parties can intelligently proceed with discovery" (Mtn, ¶1) is belied by Plaintiffs' recently served deposition notices for two Defendants, CPA's property management company and three of its employees (O'Connor Aff., ¶¶14-15).  Each such witness and the topics of which he/she has knowledge have been known since at least December 2006, yet Plaintiffs do not explain why they waited until October 2007 to notice these depositions.  Plaintiffs also served a second set of interrogatories on October 10, 2007 (id., ¶17 & Ex. H).  This onslaught of last minute discovery must be seen as a change in tactics by Plaintiffs.  It is clear that even though Plaintiffs have not yet filed any motions seeking pre-trial legal rulings, they are able to proceed with discovery.

First Circuit decision in its entirety makes clear that the case was remanded to this Court for a determination of the value of Plaintiffs' former partnership interest pursuant to section 42 of the Massachusetts Uniformed Partnership Act ("MUPA") (Mass. Gen. Laws ch. 108A, §42). Tropeano v. Dorman, 441 F.3d 69, 78-82 (1st Cir. 2005) (discussing §42 at length). Indeed, from the outset, Plaintiffs have sought determination of the value of their former partnership interests pursuant to section 42 (O'Connor Aff., ¶2 & Ex. A at 2; Complaint (docket entry #1), ¶15).

Section 42 of the MUPA provides for determination of a withdrawing partner's interest in a continuing partnership. Specifically, section 42 provides:

> **§ 42. Rights of retiring or deceased partner against person or partnership continuing business**
>
> When any partner retires . . ., and the business is continued . . . [the retiring partner] may have the value of his interest at the date of dissolution ascertained, and shall receive . . . an amount equal to the value of his interest in the dissolved partnership . . . with interest, or, at his option . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; . . .

Because section 42 concerns an ongoing partnership enterprise, it simply does not provide for liquidation. The Supreme Judicial Court of Massachusetts has held that when the remaining partners choose to exercise their right to continue the partnership business, the continuing enterprise must be treated as a going concern. Anastos v. Sable, 443 Mass. 146, 152 (2004) (affirming application of minority and marketability discounts when valuing the withdrawing partner's interest in a continuing partnership pursuant to §38 the MUPA[5]).

In Anastos, the SJC held that the withdrawing partner could not compel liquidation of the partnership property and that §38 instead offered "a nonliquidation based method of calculating

---

[5] Mass. Gen. Laws ch. 108A, §38(2)(b) provides for payment to a partner who has wrongfully withdrawn from a continuing partnership "the value of his interest in the partnership at the dissolution". In contrast, Mass. Gen. Laws ch. 108A, §42, applicable in this case, concerns dissolution of a continuing partnership following a permitted withdrawal by a partner. Section 42 provides, in nearly identical language, for payment to the withdrawing partner "the value of his interest at the date of dissolution".

the value of his partnership interest." Id.  The Anastos Court affirmed the trial judge's use of the going concern method of valuation, including the application of minority discounts, when the remaining partners choose to continue the business.

      **B.    Pre-Trial Determination of the Applicability of Building Code Regulations Is Not Necessary.**

Despite Plaintiffs' assertion to the contrary (Memo, ¶¶16-18), the Court cannot determine the applicability of accessibility and fire suppression regulations in a vacuum.  Plaintiffs' expert appraiser first raised the issue by pointing out, in his August 5, 2003 letter, that non-compliance with the Americans with Disabilities Act "may adversely affect the property's value", and that when investigating the value of CPA he did not ascertain whether the property was compliant with "zoning and use regulations" (Tropeano Affidavit, docket entry #40, attachment A at 16, ¶ 18).  Furthermore, he based his valuation of CPA on a methodology that required subtraction of capital expenditures and renovation costs, which would include the costs associated with building code compliance (id. at 10-12).  Accordingly, the impact of various code requirements directly affects the value of CPA, the valuation opinions of the parties' experts, and therefore the issue to be determined at trial – the value of Plaintiffs' former interests in the Captain Parker Arms Partnership.  Plaintiffs' suggestion that the Court make out of context legal rulings as to which codes are applicable and must be taken into account by the parties' expert appraisers, before hearing any testimony, is nonsensical.

Nor is there any merit to Plaintiffs' assertion that opinions of code compliance experts are "clearly inadmissible"[6] (Memo, ¶18).  Any investor considering an investment in CPA would be

---

[6] None of the cases cited by Plaintiffs are relevant to the impact of building code requirements on the valuation of Plaintiffs' former interests in the Captain Parker Arms Partnership.  Three of the cases concerned whether experts could testify about building code violations in tort liability cases.  Toubiana v. Priestly, 402 Mass. 84, 90-91 (1988) (elevator accident); Perry v. Medeiros, 369 Mass. 836, 842 (1976) (fall in apartment building hallway); Davis v. Bledvic,

required to consider whether the property complies with all applicable codes. These questions are a proper subject for testimony from experts experienced in evaluating code compliance issues. Furthermore, where, as here, some of the code provisions in question provide the building inspector with significant discretion in determining whether certain requirements are triggered, the Court would benefit from an expert's opinion, based upon professional experience, as to how that discretion is most likely to be applied in the circumstances presented in this case. In this jury-waived proceeding, the Court is more than capable of determining, after hearing the evidence, what weight, if any, to give the opinions of the code compliance experts.

> C. **Determination of the Appropriate Interest Rate Is Purely Legal and No Fact Discovery Is Necessary.**

Another of the legal issues Plaintiffs discuss – the determination of which interest rate should be applied in this case – is addressed in Defendants' Motion *in Limine* to Establish Interest Rate (docket entry #72). No discovery has been sought with respect to this issue and the fact that this motion has been filed is not a reason to delay the trial.

## IV. UNLIKE PLAINTIFFS, DEFENDANTS WILL SUFFER DETRIMENTAL CONSEQUENCES FROM A TRIAL DELAY.

Unlike Plaintiffs, Defendants will suffer significant detrimental consequences if the trial is delayed. As addressed in Defendants' Motion *in Limine* to Establish Interest Rate (docket entry #72) and supporting Memorandum (docket entry #73), the statute under which Plaintiffs' claims arise, section 42 of the MUPA, entitles the Plaintiffs to interest in addition to the value of

---

1998 Mass. Super. Lexis 675 at *11 (Mass. Super 1998) (fall on staircase). The remaining cases neither addressed building codes, expert testimony or property valuations. Indeed, the remaining cases cited by Plaintiffs stand for the undisputed proposition that when a regulation or statute controls a party's rights in a given case, the Court may interpret the law. See Aponte Melendez v. Ortiz Otero, 964 F.2d 1225, 1227 (1st Cir. 1992) (meaning of agency policy was question of law, not a factual issue); Hernandez Flecha v. Quiros, 567 F.2d 1154, 1157 (1st Cir. 1977) (whether Puerto Rican workers were domestic workers under statute was a question of law, not of fact, for the Court to decide).

their former partnership interests. After four years of litigation, interest has accumulated into a significant amount of money, and by the end of the trial, the 12% interest rate for which Plaintiffs advocate would add over 50% to the amount to which Plaintiffs are entitled for their former partnership interests.[7] Although it is Plaintiffs who seek to delay the trial, only Defendants must bear the financial consequences of the delay.

Furthermore, two mortgage loans undertaken by the Captain Parker Arms Partnership before Plaintiffs withdrew will mature in January 2008 (O'Connor Aff., ¶5). On December 20, 2006, the Court endorsed a Standstill Order which does not permit the trustees of the T&N Realty Trust, which holds the title to the property at issue, to "transfer, convey, assign, pledge, hypothecate, or further encumber the Property. . . ." (docket entry #61 and subsequent electronic endorsement). The Standstill Order was recorded with the Massachusetts Land Registration Office of the Middlesex South Registry of Deeds on December 22, 2006 (O'Connor Aff., ¶6 & Ex. C) and significantly limits Defendants' ability to refinance the Property while this action is pending.

Defendants are negotiating with the current mortgage lender for a six-month extension of the mortgages in anticipation that by the end of June 2008, they will have an indication of the amount due the Plaintiffs, if not a final resolution, and the Standstill Order could be amended, if not lifted altogether (O'Connor Aff., ¶7). Defendants would then be able to refinance the property in a single transaction, including in the refinancing the amount due Plaintiffs, avoiding the unnecessary financing expenses that would be incurred if they had to refinance the property once in January, when the existing mortgages come due, and then refinance the property a second time only a few months later when the Court's decision as to the amount due the

---

[7] As set forth in Defendants' Motion *in Limine* to Establish Interest Rate, Defendants submit that the correct interest rate to be applied is 6%, pursuant to Mass. Gen. Laws ch. 107, §3.

Plaintiffs is issued (id.). Postponing the trial date will most likely render Defendants' current efforts to address the mortgage issues impracticable because the Court's Clerk has indicated that a rescheduled trial likely would not occur before March 2008 (id., ¶10), and thus it is less likely that Defendants will have a determination as to the amount they must pay to buy out Plaintiffs' interests within the proposed six-month mortgage extension. Accordingly, Defendants' time and expense invested in obtaining a six-month extension of the mortgages, in reliance on the December 17, 2007 trial date, will have been wasted.

Because Plaintiffs have long known the date scheduled for trial and Defendants have made every effort to accommodate Plaintiffs' scheduling issues while obtaining assurances from Plaintiffs that such accommodations would not delay the trial, the trial date should not be changed. Furthermore, Defendants alone will suffer the detrimental consequences of further delaying the resolution of this four-year-old litigation if Plaintiffs' Motion is granted.

## Conclusion

For all the reasons stated above, Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial should be denied.

If, however, the Court concludes that the scheduling issues facing Plaintiffs' counsel warrant relief, Defendants respectfully ask the Court to consider the following:

(A) Plaintiffs should not receive any economic benefit from the delay, and any extension should be conditioned upon Plaintiffs agreeing that they will not be entitled to interest or profits pursuant to Mass. Gen. L. ch. 108A, §42 for the period between December 17, 2007 and the date on which the trial actually commences;

(B) To prevent further harm to Defendants, any extension should be conditioned upon an amendment to the existing Standstill Order permitting Defendants to refinance their

existing mortgage loans, and Plaintiffs should be required to record such modified order with the Massachusetts Land Registration Office of the Middlesex South Registry of Deeds immediately upon issuance of the modified Standstill Order;

(C)     To prevent any extension of the discovery period from being used as an opportunity to take still more discovery, any order entered by the Court should provide that any additional discovery period shall be used only for the completion of the already-served discovery, except with respect to disclosed Fed. R. Civ. P. 26(a)(2)(B) experts;

(D)     Defendants' lead counsel is scheduled to start a jury trial in Middlesex Superior Court on January 14, 2007 (maximum two week trial), a jury-waived trial in the Suffolk Superior Court during the week of March 3, 2008 (estimated three day trial), and he is scheduled for an out-of-state vacation with his family, having already purchased tickets, during the week of April 21, 2008 (local public school vacation).  Accordingly, if the trial is to be postponed, it is respectfully requested that those weeks be avoided; and

(E)     Plaintiffs should be required to pay Defendants' costs for responding to this Motion.

                                        Respectfully submitted,

                                        _____/s/ Sander A. Rikleen_____
                                        Sander A. Rikleen – BBO# 420280
                                        Christine M. O'Connor – BBO# 647535
                                        EDWARDS ANGELL PALMER & DODGE LLP
                                        111 Huntington Avenue
                                        Boston, Massachusetts 02199
                                        Ph:  617·239·0100
Dated:  October 24, 2007                Fx:  617·227·4420
                                        Attorneys for the Defendants

**Certificate of Service**

I hereby certify that this document filed through the ECF system pursuant to Local Rule 5.4 will be sent electronically to all other parties.

                                        /s/ Sander A. Rikleen

BOS111_12210367_1.DOC