# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTEN, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN and TODD DORMAN, Individually and as they are Trustees of T&N REALTY TRUST and Partners of CAPTAIN PARKER ARMS PARTNERSHIP, <br><br> Defendants. | DOCKET NO. 03-CV-12231-RGS |

## FIRST AMENDED COMPLAINT

### Nature of the Action

In this action, Plaintiffs seek, inter alia, a declaratory judgment confirming their right to withdraw from the defendant partnership, a determination of the value of their respective interests in the partnership, the immediate payment of the value of their respective partnership interests, the payment of interest or partnership proceeds (as provided for in G.L. c.108A, § 42), and a full accounting of the partnership's assets, liabilities, revenues, and expenditures.

### Parties

1.    Plaintiff Philip L. Tropeano is a resident of Beverly, Essex County, Massachusetts.

2.    Plaintiff Peter Tropeano is a resident of Lexington, Middlesex County, Massachusetts.

3.    Plaintiff Carolyn Patten is a resident of Marshfield, Plymouth County, Massachusetts.

4.    Defendant Charlene Dorman is a resident of Menlo Park, California. Charlene Dorman is named individually and as she is a trustee of T&N Realty Trust and a partner of Captain Parker Arms Partnership.

5.    Defendant Bianca Dorman is a resident of Menlo Park, California. Bianca Dorman is named individually and as she is a trustee of T&N Realty Trust and a partner of Captain Parker Arms Partnership.

6.    Defendant Lydia Dorman is a resident of Menlo Park, California. Lydia Dorman is named individually and as she is a trustee of T&N Realty Trust and a partner of Captain Parker Arms Partnership.

7.    Defendant Todd Dorman is a resident of New York, New York. Todd Dorman is named individually and as he is a trustee of T&N Realty Trust and a partner of Captain Parker Arms Partnership.

8.    T&N Realty Trust is a Massachusetts nominee trust created by written instrument dated June 26, 1962, as amended, filed in the Land Registration Office of the Commonwealth of Massachusetts, Middlesex County Registry of Deeds, Southern District, as Document No. 401177. The principal place of business of T&N Realty Trust is in Lexington, Middlesex County, Massachusetts.

9.    The trustees of T&N Realty Trust are the defendants Charlene Dorman, Bianca Dorman, Lydia Dorman and Todd Dorman.

10.    The sole beneficiary of T&N Realty Trust is Captain Parker Arms Partnership.

2

11.    Captain Parker Arms Partnership is a Massachusetts partnership created by written instrument dated January 8, 1964, as amended. The principal place of business of Captain Parker Arms Partnership is in Lexington, Middlesex County, Massachusetts.

12.    The partners of Captain Parker Arms Partnership are the defendants Charlene Dorman, Bianca Dorman, Lydia Dorman and Todd Dorman.

<u>Jurisdiction and Venue</u>

13.    Jurisdiction in this Court is appropriate pursuant to 28 U.S.C §1332, which governs diversity jurisdiction. The citizenship of the parties is completely diverse and there is more than seventy-five thousand ($75,000.00) dollars in controversy in this matter.

14.    The Court has subject matter jurisdiction over the present case because:

(a)    Defendants Charlene Dorman, Bianca Dorman, Lydia Dorman and Todd Dorman are the partners of Captain Parker Arms Partnership, a Massachusetts partnership, the only business of which is to own and operate a 96 unit residential complex in Lexington, Massachusetts;

(b)    Defendants Charlene Dorman, Bianca Dorman, Lydia Dorman and Todd Dorman are the trustees of T&N Realty Trust, a Massachusetts nominee trust the only asset of which is real estate (the 96 unit residential complex) located in Lexington, Middlesex County, Massachusetts;

(c)    Defendant Captain Parker Arms Partnership is a Massachusetts Partnership, the only business of which is to own and operate the 96 unit residential complex in Lexington, Massachusetts. On information and belief, all of the Partnership's assets and business operations are located within Massachusetts; and

(d)    Defendant T&N Realty Trust is a Massachusetts nominee trust, the only purpose of which is to hold bare legal title to the land and buildings (the 96 unit residential complex) in Lexington, Massachusetts for the benefit of Captain Parker Arms

Partnership.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because the primary underlying asset, the value of which is to be ascertained, is located in Lexington, Middlesex County, Massachusetts. In addition, venue is proper inasmuch as one focal matter of the underlying dispute involves the business of Captain Parker Arms Partnership which, directly or through its agents, operates a 96 unit residential complex located in Lexington, Middlesex County, Massachusetts.

Facts Common To All Counts

16.    On or about January 8, 1964, Captain Parker Arms Partnership (the "Partnership") was created by agreement of the then five partners (the "Partnership Agreement"). A true and accurate copy of the Partnership Agreement is attached hereto as Exhibit A.

17.    Pursuant to the terms of the Partnership Agreement, the purpose of the Partnership was to acquire a certain parcel of land in Lexington, Massachusetts (the "Real Estate") and to "construct apartments on said land." See Exhibit A, ¶1.

18.    The Partnership Agreement also provided that title to the Real Estate was to be taken in the name of a nominee realty trust, T&N Realty Trust (the "Trust"), which was to hold the Real Estate in trust for the benefit of the Partnership. See Exhibit A, ¶4.

19.    The Real Estate remains an asset of the Trust and the Partnership remains the Trust's sole beneficiary.

20.    The Partnership Agreement, by its express terms, was to exist only for a term of "thirty years from the date hereof." See Exhibit A, ¶1.

21.     In addition, the Partnership Agreement expressly incorporated by reference "all applicable provisions and sections of General Laws Chapter 108A...." See Exhibit A, ¶7.

22.     In March of 1987, following the death of one of the original partners (Joseph C. Tropeano), the surviving partners entered into a modification of the original Partnership Agreement (the "Modification"). A true and accurate copy of the Modification is attached hereto as Exhibit B.

23.     The Modification reaffirmed the original terms of the Partnership Agreement and declared that the death of Joseph Tropeano had not dissolved or terminated the Partnership Agreement. See Exhibit B, ¶1.

24.     The Modification also provided that Joseph Tropeano's interest in the Partnership was to be paid or distributed as provided for in his will allowed for probate, an issue not addressed by the original Partnership Agreement. See Exhibit B, ¶2.

25.     The Modification also allowed the remaining original partners (and their successors) to designate beneficiaries of their partnership interests in the event of their deaths, another issue which had not been addressed by the original Partnership Agreement. See Exhibit B, ¶¶ 3, 5 and 9.

26.     The Modification also delineated the percentage vote necessary to terminate the Partnership (¶4); a partner's right to sell or assign his interest in the partnership to his spouse, children or grandchildren without the consent of the other partners (¶5); the rights of the Partnership (including a right of first refusal) prior to the sale or assignment by a partner of his partnership interest to a party other than the partner's spouse, children or grandchildren (¶ 6); the voting rights of minors (¶7); and the

process for distribution of partnership assets upon termination of the partnership (¶8). <u>See</u>
<u>Exhibit B</u>.

27.    Other than the modifications described above, the Modification did not
alter the Partnership Agreement in any way. To the contrary, the Modification reaffirmed
all of the other original terms of the Partnership Agreement.

28.    Neither the Partnership Agreement nor the Modification provided for an
extension of the Partnership Agreement after its original 30 year term, nor did the
partners choose to renew the Partnership Agreement at any time prior to its expiration on
January 8, 1994.

29.    By the express terms of the Partnership Agreement and the Modification,
then, the Partnership Agreement terminated on January 8, 1994. Nevertheless, the
partners continued to operate as a partnership at will pursuant to G.L. c. 108A, §23.

30.    As of August 1, 2003, the partners of the Partnership (and their respective
partnership interests) were as follows:

| | |
|---|---|
| Charlene Dorman | 36.14% |
| Bianca Dorman | 7.00% |
| Lydia Dorman | 7.00% |
| Todd Dorman | 7.00% |
| Philip L. Tropeano | 21.43% |
| Peter Tropeano | 10.715% |
| Carolyn Patten | 10.715% |

31.    By letter dated August 21, 2003, Plaintiffs, through their then-counsel,
notified Defendants of their intent to withdraw from the Partnership, effective October 1,
2003 (the "Withdrawal Letter"). A true and accurate copy of the Withdrawal Letter is
attached hereto as <u>Exhibit C</u>.

32.    The Withdrawal Letter also invoked the Plaintiffs' right to a valuation of assets and treatment as a creditor pursuant to G.L. c. 108A, §42.

33.    The Withdrawal Letter did not insist (as it might have done) upon the liquidation of the Partnership's assets. Instead, recognizing that the remaining partners might wish to continue the business of the partnership at will, the Withdrawal Letter requested only that the withdrawing partners be paid their portion of the value of the Partnership's assets (primarily, though not exclusively, the Real Estate).

34.    Included with the Withdrawal Letter was an appraisal of the Real Estate conducted by a certified appraiser (the "Appraisal"). The Appraisal concluded that the gross value of the Real Estate was $18,800,000.00. A true and accurate copy of the Appraisal is attached hereto as Exhibit D.

35.    Despite Plaintiffs' right to dissolve and terminate the existing partnership at will, Defendants have insisted that the Plaintiffs cannot dissolve or terminate the Partnership. Defendants have also asserted that certain purportedly implied terms of the Partnership Agreement continue to control, despite the clear expiration of the term of the Partnership Agreement.

36.    Defendants have further asserted that Plaintiffs are not entitled to be compensated for their portion of the liquidated value of the Partnership assets, but rather are only entitled to that amount which Defendants (as majority shareholders) are willing to pay for Plaintiffs' interests.

37.    Although Plaintiffs remained partners of the Partnership from January 1, 2003 until October 1, 2003, they have not been paid their pro rata share of the Partnership's profits for that period of time, nor have they been provided with an

accounting of the Partnership's assets, liabilities, revenue and expenditures for that time period, despite Plaintiffs' requests for the same.

38.    Although Plaintiffs' demand for the value of their Partnership interest has not been paid, Defendants have not paid Plaintiffs their pro rata share of the Partnership's profits from October 1, 2003 to the present, nor have Defendants paid Plaintiffs interest on the value of Plaintiffs' partnership interests for the relevant time period.

39.    Defendants have failed and refused to provide Plaintiffs an accounting of the Partnership's assets, liabilities, revenue and expenditures for the period of October 1, 2003 to date (and continuing), despite their requests for the same.

### COUNT I – DECLARATORY JUDGMENT (Partnership At Will)

40.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

41.    Despite the clear language of the Partnership Agreement and the Modification, an actual controversy exists between the parties with regard to the termination of the Partnership Agreement by virtue of the Agreement having passed its specified term.

42.    Despite the clear language of G.L. c. 108A, §23, an actual controversy exists between the parties with regard to the Partnership's status as a partnership at will.

43.    Plaintiffs have legal rights which will be affected by the adjudication of this controversy.

### COUNT II – DECLARATORY JUDGMENT (Right of Dissolution)

44.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

45.    Even assuming that the Partnership is now a partnership at will, an actual controversy appears to exist between the parties as to Plaintiffs' right under common law and statutory law to dissolve the partnership.

46.    Plaintiffs have legal rights which will be affected by the adjudication of this controversy.

### COUNT III – DECLARATORY JUDGMENT (Liquidation of Partnership Assets)

47.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

48.    An actual controversy exists between the parties as to Plaintiffs' right to require the liquidation of the Partnership's assets, assuming that the Partnership is now a partnership at will.

49.    Plaintiffs have legal rights which will be affected by the adjudication of this controversy.

### COUNT IV – DECLARATORY JUDGMENT (Right to Withdraw and Retire)

50.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

51.    Plaintiffs assert that, even if the Partnership were not a partnership at will, Plaintiffs would nevertheless be entitled to withdraw and retire from the Partnership, pursuant to the provisions of G.L. c. 108A, §42, and to enjoy all of the protections afforded to withdrawing or retiring partners.

52.    An actual controversy exists between the parties as to the applicability of G.L. c. 108A, §42.

53.    Plaintiffs have legal rights which will be affected by the adjudication of this controversy.

## COUNT V – DECREE OF DISSOLUTION

54.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

55.    As is described in detail above, the Partnership Agreement expired by its own terms in 1994 and was not renewed.  Accordingly, the Partnership exists only as a partnership at will.

56.    Although a partnership at will can be dissolved by any partner for any reason, Defendants have refused to acknowledge the dissolution of the Partnership resulting from Plaintiffs withdrawal and retirement.

57.    Even if the Partnership was not a partnership at will at the time that Plaintiffs withdrew and retired, a dissolution of the Partnership would still have occurred pursuant to G.L. c. 108A, § 29.

58.    Under the circumstances, dissolution of the Partnership is equitable.

## COUNT VI – WINDING UP/LIQUIDATION OF ASSETS

59.    The Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

60.    Pursuant to G.L. c. 108A, §§29-30, 37, upon the dissolution of the Partnership, the Partnership is to wind up all partnership business.

61.    In addition, pursuant to the terms of the Modification, upon dissolution and termination of the Partnership, the Partnership assets are to be liquidated and the amounts received distributed to the partners.

10

62.    Because Defendants have declined to wind up the affairs of the

Partnership, the Court should appoint a receiver to wind up the Partnership's affairs.

## COUNT VII – VALUATION OF INTERESTS/TREATMENT AS CREDITORS

63.    Plaintiffs repeat and reallege the allegations of the above-numbered

paragraphs as if set forth in full herein.

64.    Plaintiffs have properly withdrawn and retired from the Partnership.

65.    There has been no settlement of the accounts as between Plaintiffs and the

Partnership.

66.    If the Partnership assets are not liquidated, the Plaintiffs are entitled under

G.L. c. 108A, §42 to have their interest in the Partnership valued as of the date of their

withdrawal and retirement from the Partnership.

67.    Defendants have failed to properly value the Plaintiffs' interests in the

Partnership.

68.    Plaintiffs are entitled to receive, as ordinary creditors, the value of their

interests in the Partnership as of the date of their withdrawal and retirement.

69.    Plaintiffs are also entitled to receive, as ordinary creditors, and at their

election, either the profits attributable to their portion of the Partnership from the date of

their withdrawal and retirement until the date on which the value of their partnership

interest is paid in full, or, in the alternative, interest on the value of their interest in the

Partnership from the date of their withdrawal and retirement until the date on which the

value of their partnership interest is paid in full.

## COUNT VIII – ACCOUNTING

70.    Plaintiffs repeat and reallege the allegations of the above-numbered paragraphs as if set forth in full herein.

71.    Because a full and complete accounting will be necessary to properly value Plaintiffs' interests in the Partnership, Plaintiffs are entitled to an accounting, and the circumstances render such an accounting both just and reasonable under G.L. c. 108A, §22.

72.    By statute, the Plaintiffs also became entitled to a full accounting as of the date of their withdrawal and retirement from the Partnership, pursuant to G.L. c. 108A, §43.

73.    Despite repeated requests, Defendants have refused to provide the requested accountings.

**WHEREFORE, Plaintiffs pray for the following relief:**

1.    That the Court enter judgment in favor of Plaintiffs on all Counts of this Complaint;

2.    That the Court enter a Declaratory Judgment in favor of Plaintiffs, declaring that the Partnership became a partnership at will as of January 8, 1994;

3.    That the Court enter a Declaratory Judgment in favor of Plaintiffs, declaring that the Partnership was dissolved as of October 1, 2003;

4.    That the Court enter a Declaratory Judgment in favor of Plaintiffs, declaring that, even if the Partnership were not a partnership at will, the Plaintiffs would nevertheless be entitled to withdraw and retire from the Partnership, pursuant to the provisions of G.L. c. 108A, §42, and to enjoy all of the rights afforded to withdrawing and retiring partners;

5.    That the Court issue a decree of dissolution, formally dissolving the Partnership;

6.    That the Court value Plaintiffs' interest in the Partnership as of

the date of their retirement from the Partnership;

7.  That the Court award to Plaintiffs, as general creditors of the Partnership, an amount equal to the value of their interest in the Partnership;

8.  That the Court award to Plaintiffs the greater of either (a) interest due to the Plaintiffs on the amount equal to their interest in the Partnership from the date of their withdrawal and retirement until the date on which the value of their partnership interest is paid in full, or (b) a pro rata share of profits from the Partnership from the date of Plaintiffs' withdrawal and retirement until the date on which the value of their partnership interest is paid in full;

9.  That, in the alternative, the Court order the Partnership to wind up and liquidate its assets for distribution to Plaintiffs and the remaining partners and that the Court appoint a receiver for the purpose of conducting such a wind up, liquidation and distribution of assets;

10. That the Court order Defendants to provide Plaintiffs with a complete accounting as of the date of their withdrawal and retirement from the Partnership;

11. That the Court order Defendants to provide Plaintiffs with a complete accounting from the date of their withdrawal and retirement from the Partnership to the present, and then monthly until such time as Plaintiffs have been paid the value of their partnership interest in full; and

12.    That the Court award such other and further relief as is just and proper, including, but not limited to, attorney's fees, costs, and expenses.

**A TRIAL BY JURY IS DEMANDED FOR ALL COUNTS SO TRIABLE.**

Respectfully submitted,

PHILIP L. TROPEANO, PETER TROPEANO and CAROLYN PATTEN

By their attorney,

Thomas M. Ciampa (BBO# 566898)
Ciampa & Associates
33 Mount Vernon Street
Boston, MA 02108
(617) 742-5955

Dated: March 31, 2004

14

# AMENDED COMPLAINT
# EXHIBIT A

<u>PARTNERSHIP AGREEMENT</u>

WHEREAS Torsten H. Reenstierna of Arlington, Middlesex County, Commonwealth of Massachusetts, and Alfred P. Tropeano, of Lexington, in said County and Commonwealth, are co-partners under an agreement dated January 5, 1955, and the owners of certain lands situated in said Lexington, and being the land referred to in said partnership as "Partnership A"; and

WHEREAS Torsten H. Reenstierna is desirous of selling his interest in said land, and Wilbur C. Nylander, of Belmont, Louis Tropeano, Joseph C. Tropeano and Philip L. Tropeano, all of said Lexington, are desirous of purchasing the said Reenstierna's interest;

NOW, THEREFORE, THIS PARTNERSHIP AGREEMENT.

This partnership agreement is made on this 8 day of January, 1964.

1. Alfred P. Tropeano, Wilbur C. Nylander, Louis Tropeano, Joseph C. Tropeano and Philip L. Tropeano will become and remain partners in the business of acquiring the title to the land situated at the intersection of Waltham Street and Worthen Road, in said Lexington, and to construct apartments on said land, for the term of thirty years from the date hereof.

2. The firm name of the partnership shall be "Captain Parker Arms".

3. The business of the partnership shall be carried on in the Town of Lexington, Middlesex County, Commonwealth of Massachusetts, and at such other place or places as the partners shall hereinafter determine.

4. In order to dispense with the necessity of obtaining signatures of the partners' respective wives and of all of the partners' signatures to deeds, mortgages, leases and other documents, the title to the real estate

shall be taken in the name of the partners' nominee, and in accordance with

G. L. Chapter 108A, Section 10 (4), namely, Wilbur C. Nylander and Alfred P.

Tropeano, Trustees of the T & N Realty Trust under a Declaration of Trust

dated June 26, 1962, which Trust has not been recorded and has no present

assets and is to be amended by the Trustees thereof to designate that they

will hold the real estate in trust for the benefit of this partnership.  The

said Wilbur C. Nylander and Alfred P. Tropeano by signing this Agreement of

partnership covenant and agree that they will not acquire any other property

in the name of said Trust excepting that which pertains to this partnership

and that they will not further amend said Trust to designate any beneficiaries

other than this partnership.

    5.  All net income to the Trust and all losses resulting to the

Trust or any deficiencies shall be borne by the partners in the following

percentages:  Alfred P. Tropeano - 40% - Wilbur C. Nylander, Louis Tropeano,

Joseph C. Tropeano, and Philip L. Tropeano - 15% each.

    6.  The parties hereto agree that in the event any lending

institution requires personal signatures on any mortgage note or mortgage

deed that he will affix his signature to such documents.

    7.  All applicable provisions and sections of General Laws Chapter

108A of the  Commonwealth of Massachusetts are herein incorporated by reference

and made a part hereof.

_____          _____
Alfred P. Tropeano                 Louis Tropeano

_____          _____
Wilbur C. Nylander                 Joseph C. Tropeano

                                   _____
                                   Philip L. Tropeano

A -2-

# AMENDED COMPLAINT
# EXHIBIT B

## MODIFICATION

WHEREAS, Alfred P. Tropeano, Wilbur C. Nylander, Louis Tropeano, Joseph C. Tropeano (now deceased), and Philip Tropeano entered into a Partnership Agreement dated January 8, 1964, a copy of which is hereto attached; and

WHEREAS, Joseph C. Tropeano is now deceased.

NOW, THEREFORE, this Modification and affirmation of the Partnership by the surviving partners.

Alfred P. Tropeano, Wilbur C. Nylander, Louis Tropeano and Philip Tropeano agree:

Definitions -

Partner: Shall be the named partner and if he assigns or sells to his wife, children or grand-children, the said successors as their interest may appear.

Trustee: The Trustees of the T & N Realty Trust, title holder of the partnership assets.

1. Co-Partners.

That the partnership agreement dated January 8, 1964, was not dissolved or terminated by the surviving partners when Joseph C. Tropeano died, has been and is in full force with exception of Joseph's interest.

2. Rights of Deceased Former Partner.

The 15% interest of the late Joseph C. Tropeano is to be paid or distributed as provided in his will allowed for probate.

3. Death of an Existing Partner.

The death of an existing partner shall not terminate the partnership and his interest will be held by the persons or entities set forth on the deceased partner's schedule attached and made a part hereof which bears his signature and they shall have all the rights of the deceased partner. Said person or entitles shall be to those set forth in 5 hereunder.

Upon the death of a partner, the partners herein agree and so instruct the Trustees to execute whatever documents may be necessary to permit said representative to borrow money to pay estate taxes.

If there is sufficient cash held by the Trustees, the partners agree that the Trustees may loan monies to the representative of the deceased partner who have or will file Federal and State Estate Tax forms bearing interest at the then prime interest rate of Shawmut Boston plus 1%. Said loan shall be paid back to the Trust or deducted from the distributive share of said deceased partner.

4. Termination.

The partnership can be terminated by a vote of not less than 60% interest of 100% and upon such vote the partners shall so notify the Trustees to liquidate the assets and distribute the net principal and accumulated income as provided by number 8 hereunder.

5. Partner's Rights to Assign or Sell to Certain Individuals.

Any partner shall have the right to assign or to sell any portion of his interest to his wife or his children or grandchildren, without the consent of the other partners, who may take title in their own name or a separate entity in which they will be the sole beneficiary.

6. Partners Right to Assign or Sell to Others.

Prior to any assignment or sale of any partner's interest or those having his interest to others than the aforesaid, the assigning or selling partner shall offer the same in writing with a certified copy of the terms offered to him by the proposed assignee or purchaser. The partners shall have thirty (30) business days to accept or reject the offer. If they do not accept the offer, the assignment or sale to the third party shall only be made with the consent of the other partners and those claiming through them which consent will not be unreasonably withheld.

7.  Voting Minors Interest .

If any holder of an interest in the partnership is a minor, his interest during minority shall be voted by his father and if no father, by his mother and if no mother, by his legal guardian.

8.  Distribution on Termination

In the event of the dissolution and termination of the partnership, the Trustees shall be instructed to proceed to the liquidation of the partnership and the proceeds of the liquidation shall be applied and distributed in the following order of priority:

(a)  Debts.  To the payment of the debts and liabilities of the partnership (other than any loans or advances that may have been made by the partners to the partnership) and the expenses of liquidation.

(b)  Reserves.  To the setting up of any reserves which the partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the partnership arising out of or in connection with the operation and liquidation of the partnership. Any reserves shall be held by the Trustees as "Escrowee", to be held by them for the purpose of disbursing the reserves in payment of any of the contingencies, and, at the expiration of the period the partners shall deem advisable and have so instructed the Trustees to disburse the balance thereafter remaining to the partners.

(c)  Partner loans.  To the repayment of any loans or advances that may have been made by any of the partners to the partnership, but if the amount available for such repayment shall be insufficient, then pro rata on account thereof.

C.  -3-

(d)  Balance.  Any balance remaining shall be distributed among all partners as follows   according to their percentage holding:

(aa)  Cash.  In the event that the partnership assets shall have been sold, the net proceeds shall be distributed to each partner in satisfaction of his interest in the partnership.

(bb)  The percentage of distribution as to each partner is as follows:

| | |
|---|---|
| Alfred P. Tropeano | 40% |
| Wilbur C. Nylander | 15% |
| Louis Tropeano | 15% |
| Philip Tropeano | 15% |

In addition, distribution to the holders of Joseph C. Tropeano interest:    15%

9.  Modification of Partners Schedule.

Any partner or successor as set forth in his schedule, may modify or amend his "Schedule" referred to in 3 above and hereto attached, by delivering a signed copy to the other partners, but said modification shall be limited to the category of individuals or entitles referred to in 5 above.

Except as herein modified, the said partnership is hereby affirmed, dated this ___11___ day of March, 1987.

_____
Alfred P. Tropeano

_____
Wilbur C. Nylander

_____
Louis Tropeano

_____
Philip Tropeano

# AMENDED COMPLAINT
# EXHIBIT C

LAW OFFICES OF FREDERICK J. CONROY

THE PROFESSIONAL BUILDING
114 WALTHAM STREET
LEXINGTON, MASSACHUSETTS O2421
(781) 862-8060

FREDERICK J. CONROY, P.C.
ed@conroyandconroy.net

August 21, 2003

TELECOPIER
(781) 861-091;

To:

Charlene Dorman
320 Arlington Way
Menlo Park, CA 94025

Bianca Dorman
320 Arlington Way
Menlo Park, CA 94025

Lydia Dorman
320 Arlington Way
Menlo Park, CA 94025

Todd Dorman
25 W. 70th Street - Apt 2A
New York, NY10025

Re: Retirement from Captain Parker Arms Partnership

Please be informed that we, Philip Tropeano, Peter Tropeano and Carolyn Patten wish to retire from the Captain Parker Arms Partnership effective October 1, 2003.

Pursuant to the provisions of M.G.L. Ch 108A, Sec. 29, the change in our relationship effected by our retirement from the partnership is to be treated as dissolution of the partnership.

Pursuant to the provisions of Chapter 108A, Section 42, as retiring partners we wish to have the value of our interests ascertained as of the date of dissolution (that is, October 1, 2003).

There is enclosed herewith an Appraisal by Eric Reenstierna Associates showing the value of the land and buildings of $18,800,000.00. The partnership accountants, using generally recognized accounting principals, can determine the value of our partnership shares based upon all assets less all liabilities of the partnership as of that date. We have selected the date of the first of the month for easier calculation of the various accounts of the partnership.

Charlene Dorman, et als
August 21, 2003
Page 2

As of October 1, 2003 Philip Tropeano, Peter Tropean and Mary C. Tropeano will submit resignations as Trustees of T & N Realty Trust, the entity holding title to the real estate of the partnership for the benefit of the partners.

We recognize that in order to terminate the partnership, a vote of 60% of the partners is required. In the absence of this 60% vote, you will of course continue the partnership as the sole partners and we will be general creditors of the partnership for our partnership interest. In this respect, your attention is invited to the provisions of Chapter 108A, Section 42 for the rights of a retired partner (that is, when any partner retires, and the business is continued, unless otherwise agreed, he or she may have the value of his or her interest ascertained as of the date of dissolution and shall receive as an ordinary creditor an amount equal to the value of his or her interest in the dissolved partnership with interest, or at his or her option, in lieu of interest, the profits attributable to the use of his or her rights in the property of the dissolved partnership). We desire of course to be paid in full.

If you wish to vote to terminate the partnership, we would participate in that vote in the affirmative. In that event, there would be a winding up of the affairs of the Partnership.

Respectfully,
Philip Tropeano,
Peter Tropeano, and
Carolyn Patten
By their attorney,

Frederick J. Conroy

FJC:f
Enclosure

# AMENDED COMPLAINT
# EXHIBIT D

# ERIC REENSTIERNA ASSOCIATES

*Real Estate Appraisers and Consultants*

24 Thorndike Street, Cambridge, MA 02141

617 577-0096

August 5, 2003

Mr. Peter Tropeano
19 Revere Street
Lexington, MA 02420

Dear Mr. Tropeano,

In accordance with your request, we have made an analysis of the property located at 125 Worthen Road, Lexington, Massachusetts, the Captain Parker Arms apartment complex, for the purpose of estimating the Market Value of the Fee Simple Estate in the property, "as is," as of July 21, 2003.

Courts and appraisal organizations make use of different definitions of "Market Value" or "Fair Market Value." All refer to a hypothetical sale in which the seller offers property in a competitive market and accepts the highest price offer made. That price, as estimated by the appraisers, is the most probable selling price and the Market Value. An exchange of property for cash to the seller is typically presumed, unless other terms are standard in the market and are available for the subject property. If seller financing, an assumable mortgage, tax credits, or other such terms are taken into account, they are made explicit in this report.

The definition of Market Value applied here follows.

*Market Value* means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) buyer and seller are typically motivated;
(2) both parties are well informed or well advised, and acting in what they consider their own best interest;
(3) a reasonable time is allowed for exposure in the open market;
(4) payment is made in terms of U.S. dollars or in terms of financial arrangements comparable thereto; and
(5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Source: Rules and Regulations, Federal Register, Vol. 55, No. 165, Page 34696)

Mr. Peter Tropeano                                                                    2

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

A *Fee Simple Estate* is absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

(Source:   *The Appraisal of Real Estate*, Twelfth Edition, The Appraisal Institute, Chicago, 2001, p. 68)

The subject property is a 94 unit apartment complex located about 1/2 mile south of Lexington Center, at the southeast corner of Worthen Road and Waltham Street. The complex sits on 8.98 acres of land, which is more or less level. It has long frontage on Waltham Street and Worthen Road. There is an access road that begins and ends on Worthen Road with asphalt berms and paved sidewalks. There are several parking lots on the property with a total of about 157 parking spaces according to plans. The land is attractively landscaped with trees, shrubs, a well-kept lawn, and flower beds.

The complex has eleven garden style apartment buildings with a mix of one-, two- and three-bedroom units (30 one-bedroom units, 6 one-bedroom end units, 38 two-bedroom one-bath units, 12 two-bedroom two bath units, and 8 three-bedroom two bath units). The complex was constructed about 1965. The buildings are two- and three-stories with brick exterior walls, wood framing, concrete foundations, and hip style and gable style roofs with asphalt shingles. There are some building mounted security lights. The buildings have gutters and metal down spouts. Reportedly the roofs are less than ten years old. The buildings are accessed by way of asphalt walkways to concrete steps finished with bricks and metal railings. The front entry doors are wood with glass lights on either side of the doorway. The door leads to a small vestibule with mailboxes for the units and access to the intercom. There is a second secure door that leads into the building to a stairway and central, carpeted, corridor. There is a second stairway at the rear of the building. Units are accessed by way of the corridor. The living units each have two doors to the central corridor, typically one from the living room and another from the kitchen. The units are typically finished with wood parquet floors (some have recently been replaced with carpeting and some basement units have Pergo flooring), painted drywall walls and ceilings, painted wood trim, natural finish, hollow core wood doors, and several closets. The kitchens have vinyl flooring, formica counter tops with ceramic tile back splashes, Vermont maple formica cabinets, dishwashers, disposals, a refrigerator, and four burner electric stoves. Reportedly all appliances have been replaced within the past three years. Bathrooms typically have ceramic tile floors, painted drywall walls, a vanity sink, a toilet, and a tub with a shower. In units with two bathrooms the second bathroom is off the master bedroom and has a shower stall instead of a tub. Heat is provided by gas fueled forced hot water supplied by four main boilers (one to six years old) for the entire complex. Cooling is provided by central units reportedly two to three years old. The buildings each have a common laundry area in the basement. The buildings also have one to three storage units each, some of which may have potential for conversion to additional residential units. There are newer thermopane windows

Mr. Peter Tropeano                                                                          3

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

throughout the complex.  Each unit has a separate electric meter.  Each unit has 60 ampere electric service.  There are smoke detectors throughout the complex.

The subject property is located in a residential neighborhood, about 1/2 mile south of Lexington Center.  It is located on the southeast corner of Worthen Road and Waltham Street.  Waltham Street is a heavily traveled two-way paved street, which runs from Lexington Center to the north to Waltham, where it becomes Lexington Street, to the south.  Worthen Road is a two-way paved street that carries light local traffic in the vicinity of the subject property.  It runs from Bedford Street to the northwest to Sherburne Road just east of the subject property.  There is a set of traffic signals at the intersection of the two streets.  The neighborhood is improved with two-story, wood-frame, single family houses of varying ages (mostly from the 1960s and 1970s).  Lexington High School and its associated recreational facilities are located at the northwest corner of the intersection of Waltham Street and Worthen Road, diagonally across from the subject property.  Both streets have overhead electric and telephone service and underground water, sewer, and gas.  Abutters to the subject property include single family houses.

The valuation that is presented here is of the real estate only.  Furnishings, fixtures, and equipment are not part of the real estate.  Stoves and refrigerators are part of the real estate.

The assessment for Fiscal 2003 is $8,262,000.  The tax is $90,468.90.  The assessment is low in comparison with the value of the property as estimated in this report.

The property is in Flood Plain Zone C of FEMA Map #250198 0005 C.  Zone C is outside the 100- and 500-year flood zones.

The zoning is RM.  The highest and best use of the subject site as if vacant is for residential development.  The highest and best use of the subject property as improved is as the site of the existing improvements, to be used as apartments or residential condominiums.

One useful method of valuation is the Sales Comparison Approach to Value.  The Income Capitalization Approach is useful in this case as well because apartments are typically purchased to produce an income stream from rents.  The Cost Approach is not applied because it does not test the subject property in the competitive market.  The Condominium Conversion Approach is useful and is applied.

*Sales Comparison Approach* – To estimate the value of the subject property through the Sales Comparison Approach, we have made an extensive survey of sales of properties in the subject's competitive market and have compared these to the subject

Mr. Peter Tropeano                                                                                  4

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

property on the basis of the most common unit of measure, in this case, the price per apartment unit. The following sales are judged most useful for comparison.

136-140 Lyman Street, Waltham, July of 2002, $85,400,000 - This is the sale of a large apartment complex located in Waltham, about 1/2 mile north of downtown Waltham. The complex, known as Gardencrest Apartments, contains 696 garden style units in 64 buildings that were constructed between the late 1940s and early 1970s. Meredith & Grew brokered the sale. The price per dwelling unit is $122,701.

249 Main Street, Watertown, May of 2002, $36,530,000 - This is the sale of Whitney on Main Apartments in the Watertown Square section of Watertown. The complex sits on a 4.23 acre parcel of land and has studio, one-bedroom, and two-bedroom units in brick, mid-rise buildings constructed in the mid 1960s. Units have parquet floors, raised panel cabinets, ceramic tile baths, private balconies, and walk-in closets. There are a total of 268 units. Rents in the complex include heat and hot water. There are a fitness center, reserved parking, and an outdoor pool. The price per dwelling unit is $136,305.

2 Elmwood Avenue, Winchester, November of 2002, $3,800,000 - This is the sale of a 27 unit apartment building located in the downtown area of Winchester. The building is situated on a 19,518 square foot, L-shaped, parcel of land with frontage on Elmwood Avenue, Park Street, and Vine Street. The building has six floors, a steel frame, brick exterior walls, and 19,598 square feet of living area. The building was constructed in 1927. The building is known as Stetson Hall. The price per dwelling unit is $146,175.

122 Main Street, Stoneham, June of 2002, $2,430,000 - This is the sale of a 17 unit apartment building that was constructed in 1974. The building is located on the north side of Main Street, west of downtown Stoneham. The building is four-stories, with a steel frame, a concrete foundation, and brick exterior walls. Interior finishes include painted drywall walls and carpeted floors. The building has a flat roof. The building sits on 23,000 square feet of land and contains 13,769 square feet of living area. The price per dwelling unit is $142,941.

39 Bridge Street, Watertown, September of 2002, $2,200,000 - This is the sale of a garden style apartment building located in a mixed residential and commercial/industrial neighborhood in the southern part of Watertown. The building is located on a four sided more or less level lot about midway between Pleasant Street and Waltham Street. The building was constructed in 1960 with a concrete foundation, a steel frame, brick exterior walls, and a flat roof. The building contains 12,636 square feet. and 16 units. There is one parking space per unit. The price per dwelling unit is $137,500.

Mr. Peter Tropeano                                                                                              5

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

       To derive a value indication for the subject property from each of these sales, it is necessary to consider differences between the property sold and the subject property. Where the subject property is superior or inferior to one of the sales in terms of an important characteristic (location, quality and condition, average unit size, parking), it is necessary to make an adjustment to the price per square foot for that property to reflect the subject property's superiority or inferiority. Each of the sales is adjusted for factors of this kind, to obtain an indication of value. The conclusion from the Sales Comparison Approach is the single value that takes best account of the adjusted indicators from the sales.

       The sales indicate a value for the subject property at the rate of $181,465 per living unit. The indication of value through the Sales Comparison Approach is $17,060,000, as follows:

                    94 living units x $181,465 per living unit = $17,057,667
                                        rounded to $17,060,000

**ADJUSTMENT CHART**
125 Worthen Road, Lexington, Massachusetts

| | SUBJECT | SALE #1 136-140 Lyman St Waltham | | SALE #2 249 Main St Watertown | | SALE #3 2 Elmwood Ave Winchester | | SALE #4 122 Main St Stoneham | | SALE #5 39 Bridge St Watertown | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale Price/Unit | | $122,701 | | $136,305 | | $146,175 | | $142,941 | | $137,500 | |
| Date of Sale | Jul-03 | Jul-02 | 13% | May-02 | 15% | Nov-02 | 9% | Jun-02 | 13% | Sep-02 | 10% |
| Sale Terms | standard | standard | 0% | standard | 0% | standard | 0% | standard | 0% | standard | 0% |
| Financing | standard | standard | 0% | standard | 0% | standard | 0% | standard | 0% | cash | 0% |
| Property Rights | fee simple | fee simple | 0% | fee simple | 0% | fee simple | 0% | fee simple | 0% | fee simple | 0% |
| adjustment | | | 13% | | 15% | | 9% | | 13% | | 10% |
| Price, Adjusted for Terms | | $138,232 | | $156,291 | | $158,622 | | $161,316 | | $151,921 | |
| Location | good | good | 0% | avg-good | 7% | good | 0% | good | 0% | avg-good | 7% |
| Building Quality | good | avg-good | 7% | avg-good | 7% | good | 0% | good | 0% | good | 0% |
| Avg. Unit Size (S.F.) | 1,165 | 900 | -11% | 1,132 | 1% | 725 | 19% | 810 | 15% | 790 | 16% |
| Parking | 1 spaces/unit | 1 space/unit | 0% | 1 space/unit | 0% | 1 space/unit | 0% | 1 space/unit | 0% | 1 space/unit | 0% |
| adjustment | | | 18% | | 15% | | 19% | | 15% | | 23% |
| Price, Fully Adjusted | | $163,630 | | $180,386 | | $188,576 | | $185,894 | | $187,006 | |
| weight (0 = least; 10 = most) | | 6 | | 9 | | 8 | | 6 | | 6 | |

weighted value
for subject:        $181,465

| $181,465 | /unit | x | 94 | units = | $17,057,667 |
|---|---|---|---|---|---|
| | | | rounded to | | $17,060,000 |

Mr. Peter Tropeano

Re:  125 Worthen Road
Lexington, Massachusetts

6

en

Mr. Peter Tropeano                                                                                    7

Re:     *125 Worthen Road*
        *Lexington, Massachusetts*

*Income Capitalization Approach* – In the Income Capitalization Approach using Direct Capitalization, expenses of property operation are deducted from the gross annual income to obtain the net income, which is capitalized at the rate of return that the market indicates investors in properties of this type expect.

Rents at the subject property are comparable to other apartment complexes in the Lexington area after rents in complexes offering free rent and other inducements are adjusted for those factors. Some rental offering from nearby complexes are listed below:

| Complex | Bedrooms | Unit Size | Asking Rent |
|---|---|---|---|
| Charlesbank Garden Apartments | | | |
| Waltham, 200 units | 1 | 650 | $1,175 |
| | 2 | 950 | $1,500 |
| | | | |
| Avalon at Lexington | | | |
| Lexington, 198 units | 1 | 853-1,045 | $1,750-$1950 |
| | 2 | 920-1,350 | $1,850-$2,250 |
| | 3 | 1,298 | $2,240 |
| | | | |
| Katahdin Woods | | | |
| Lexington, 128 units | 1 | 750 | $1,495 |
| | 2 | 920-1,100 | $1,875-$1,925 |
| | 3 | 1,500 | $2,695 |
| | | | |
| Parkway-Mystic Apartments | | | |
| Arlington, 48 units | 1 | 778 | $1,210 |
| | 2 | 1,036 | $1,468 |
| | | | |
| Northgate Apartments | | | |
| Waltham, 207 units | 1 | 648 | $1,300 |
| | 2 | 910 | $1,550 |
| | | | |
| Stonehill Towers | | | |
| Stoneham, 205 units | 1 | 797 | $1,185 |
| | 2 | 1,090 | $1,528 |

Expenses for real estate taxes, insurance, and utilities are taken at their reported rates. Expenses for repairs and maintenance and administration are based on rates reported by The Institute of Real Estate Management's *Conventional Apartments Income/Expense Analysis.* Management is taken at 4.8% of collections, consistent with the rate reported by IREM.

Mr. Peter Tropeano                                                                                      8

Re:    *125 Worthen Road*
        *Lexington, Massachusetts*

    *Capitalization Rate* - The capitalization rate is the relationship between the price
of an investment property and its first-year net income. A capitalization rate is typically
applied to a stabilized net income rather than to the net income that is produced in a year
of abnormally high or low income. The capitalization rate takes account of an investor's
requirement for long-term return, the likely financing (if any), and the expectation of
appreciation or depreciation.

    The different sectors of the real estate market (office, industrial, retail, and
apartment) support different capitalization rates. Institutional-grade properties support
lower rates than properties of lower quality. However, good-quality, small properties
also support low capitalization rates in acquisitions by local rather than large institutional
investors. The *Korpacz Real Estate Investor Survey* reports capitalization rates for the
major investment sectors nationwide. Korpacz reports for institutional-grade investments
and lower-quality, non-institutional-grade investments. In recent quarters, rates have
declined substantially for all sectors. The rates for Q2 2003 are as follows:

|                                   | institutional | non-institutional |
| --------------------------------- | ------------- | ----------------- |
| strip shopping center             | 9.58%         | 11.17%            |
| central business district office  | 9.40%         | 11.63%            |
| suburban office                   | 9.96%         | 11.79%            |
| industrial (warehouse)            | 8.84%         | 10.00%            |
| apartment                         | 8.14%         | 9.51%             |

    Local data show a steeper decline in capitalization rates for certain property types
than do the national survey data. Apartment buildings in particular have experienced low
capitalization rates, as a result of acquisitions for condominium conversion, low interest
rates for mortgages, and an influx of investors seeking an alternative to the stock market.
Capitalization rates as low as 5% are indicated in recent transactions involving Boston-
area apartments. Buildings with stable lease histories, strong tenants, and prime locations
experience low capitalization rates, as well. These immediate declines appear not to be
fully reflected in the national survey data.

    A capitalization rate of 7.5% is consistent with the range of local and national
indicators and is applied here.

    The indication of value for the subject property through the Income Capitalization
Approach is $12,850,000, as follows.

Mr. Peter Tropeano                                                                                                    9

Re:   *125 Worthen Road*
      *Lexington, Massachusetts*

Income Capitalization Approach
Direct Capitalization

| Rent – | 30 units x $1,200 per month x 12 months | $432,000. |
|---|---|---|
| | 6 units x $1,250 per month x 12 months | 90,000. |
| | 38 units x $1,450 per month x 12 months | 661,200. |
| | 12 units x $1,550 per month x 12 months | 223,200. |
| | 8 units x $2,200 per month x 12 months | 211,200. |

Potential Gross Income                                      $1,617,600.
Vacancy (6%) –                                               -$97,056.

Effective Gross Income -                                    $1,520,544

Expenses –

| real estate tax: | $90,469. |
| insurance: | 19,462. |
| utilities: | 146,737. |
| repairs and maintenance: | 139,108. |
| management (4.8%): | 72,986. |
| administration: | 56,958. |
| replacement reserve: | 29,644. |
| misc. legal: | 1,500. |

                                    $556,864.      - $556,864.

Net Income –                                                $963,680.
Capitalization Rate –                                        / 7.5%

Market Value –                                             $12,849,070.
  rounded to                                               $12,850,000.

Mr. Peter Tropeano                                                                    10

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

*Condominium Conversion Approach* – A third method to consider is the Condominium Conversion Approach. In the Condominium Conversion Approach, the cost of upgrade and conversion, including marketing costs and a profit factor, is deducted from gross sellout to obtain the indication of value "as is." In the case of the subject property, because the number of units is relatively large and sellout will likely not be accomplished over a short period, the analysis is presented as a discounted cash flow, with income from future sales discounted to a present worth.

According to *Banker and Tradesman* there have been sales of about 89 condominium units in Lexington since the start of January, 2002. Emerson Gardens, a development similar to the subject property in terms of size, date of construction, and unit size (although many of the units at Emerson Gardens are townhouse style) had over 12 sales. The sales ranged in price from a low of about $278 per square foot of unit area up to almost $347 per square foot of building area. Most of the sales were around $310 per square foot. The average unit area in the subject property is a little over 1,000 square feet, indicating an average unit price for units at the subject property of $310,000.

The indication of value for the subject property through the Condominium Conversion Approach is $18,800,000, as follows.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| average unit price | $310,000 | | | | | | | |
| rental income at full occupancy | $1,617,600 | | | | | | | |
| operating expense | $556,864 | | | | | | | |
| upgrade cost/s.f. | $10.00 | | | | | | | |
| upgrade cost, k&b & elec., per unit | $15,000 | | | | | | | |
| common areas (s.f.) | 16,350 | | | | | | | |
| area of units (s.f.) | 92,650 | | | | | | | |
| conversion cost | $47,000 | | | | | | | |
| closing cost/unit | $750 | | | | | | | |
| brokerage (%) | 6.00% | | | | | | | |
| developer profit (%) | 15.00% | | | | | | | |
| equity yield rate | 12.00% | | | | | | | |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| quarter | | | | | | | | |
| units sold | | 12 | 24 | 12 | 12 | 12 | 12 | 10 |
| income from sales | | 3,720,000 | 7,440,000 | 3,720,000 | 3,720,000 | 3,720,000 | 3,720,000 | 3,100,000 |
| other income | 404,400 | 323,520 | 220,269 | 168,643 | 117,018 | 65,392 | | |
| gross income | 404,400 | 4,043,520 | 7,660,269 | 3,888,643 | 3,837,018 | 3,785,392 | 3,720,000 | 3,100,000 |
| operating expenses | (139,216) | (121,444) | (85,899) | (68,127) | (50,355) | (32,582) | (14,810) | |
| common area upgrade cost | (81,750) | (81,750) | | | | | | |
| unit upgrade cost | | ($180,000) | ($360,000) | ($180,000) | ($180,000) | ($180,000) | ($180,000) | ($150,000) |
| condominium conversion cost | | (47,000) | | | | | | |
| tenant discount | | (186,000) | (372,000) | | | | | |
| legal/closing costs | | (9,000) | (18,000) | (9,000) | (9,000) | (9,000) | (9,000) | (7,500) |
| brokerage | | (223,200) | (446,400) | (223,200) | (223,200) | (223,200) | (223,200) | (186,000) |
| profit | | (558,000) | (1,116,000) | (558,000) | (558,000) | (558,000) | (558,000) | (465,000) |
| net income | 183,434 | 2,637,126 | 5,261,970 | 2,850,316 | 2,816,463 | 2,782,610 | 2,734,990 | 2,291,500 |
| present worth factor | 0.9709 | 0.9426 | 0.9151 | 0.8885 | 0.8626 | 0.8375 | 0.8131 | 0.7894 |
| present worth | 178,091 | 2,485,744 | 4,815,448 | 2,532,469 | 2,429,506 | 2,330,392 | 2,223,797 | 1,808,931 |
| MARKET VALUE | 18,804,379 | | | | | | | |
| rounded to | 18,800,000 | | | | | | | |

11

Mr. Peter Tropeano                                                                                        12

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*


    *Reconciliation* – The indications of value are $17,060,000 from the Sales Comparison Approach, $12,850,000 from the Income Capitalization Approach, and $18,800,000 from the Condominium Conversion Approach. In the choice of a final value estimate, more weight is accorded the indication from the Condominium Conversion Approach than the indications from the other two approaches, as the condominium market is relatively strong at present.

    On the basis of these considerations, we estimate that the Market Value of the Fee Simple Estate in the subject property, "as is," expressed as cash to the seller in a hypothetical transaction, as of July 21, 2003 is Eighteen Million Eight Hundred Thousand U.S. Dollars ($18,800,000.).

    The value reported above is the appraisers' estimate of the most probable selling price for the subject property, presuming a sale on this appraisal's effective date. An exposure time of six months to one year before the date of valuation would likely have been required to achieve the reported price. To produce a sale after a marketing period commencing on this appraisal's effective date, a similar marketing period of six months to one year would likely be required, presuming that the market remains substantially the same as it has been in recent months. If the market continues to appreciate at the current rate of 12% per year, a higher price of $20,490,000 is likely after a nine-month marketing period.

    The value estimate is best understood as the most probable selling price for the subject property within a range of potential selling prices. Valuations of single-family houses, where there are large numbers of similar, competitive properties, large numbers of buyers, and a relatively efficient market, can be made with high confidence of a selling price near the value estimate (often, 90% confidence within 2% to 3% of the value estimate). Valuations of commercial property, where markets are smaller and the data less consistent, produce similar confidence only over a broader range. The 68% confidence interval for the subject property is likely a range within about 6% of the value as estimated here.

    This appraisal report is prepared at the request of Mr. Peter Tropeano. The function is for valuation of an asset for internal planning purposes. The intended users of this report are parties involved in the estate planning. This is a Complete Appraisal that includes a complete investigation of the subject property, its market, and its highest and best use. All of the methods of valuation appropriate to the property have been applied. The investigation of market data is consistent with the requirements for a Complete Appraisal. The results of the appraisal are presented in a Summary Report, in letter format. The information necessary for the completion of a bound, Self-Contained Report is retained in the files of this office.

Mr. Peter Tropeano                                                                                    13

Re:    *125 Worthen Road*
        *Lexington, Massachusetts*


The appraisers are experienced in the valuation of apartments in Eastern New England and are competent to perform this assignment.

To the knowledge of the appraisers, for the past three years, the subject property has not been marketed for sale, placed under agreement for sale, or sold.

William T. Whiting, Jr. inspected the property on July 21, 2003, in the company of Peter Tropeano.  The appraisers made use of published data surveys, community zoning maps and by-laws and flood plain maps obtained through data services, data from the Registry of Deeds and the Assessor's office, conversations with brokers and parties involved in transactions, and information supplied by the client, including unit plans, a June, 2003 rent roll, and expense reports for years 2000, 2001, and 2002.

We certify that, to the best of our knowledge and belief:

- the statements of fact contained in this report are true and correct;
- the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions and conclusions;
- we have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved;
- we have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment;
- our engagement in this assignment was not contingent upon developing or reporting predetermined results;
- our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal;
- our analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*;
- William T. Whiting, Jr. made a personal inspection of the property that is the subject of this report;
- and no one provided significant real property appraisal assistance to the persons signing this certification.


As of the date of this report, I, Eric T. Reenstierna, have completed the continuing education program of the Appraisal Institute.

Mr. Peter Tropeano                                                          14

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

       In our opinion, the Market Value of the Fee Simple Estate in the subject property,
"as is," expressed as cash to the seller in a hypothetical transfer, as of July 21, 2003, is
Eighteen Million Eight Hundred Thousand U.S. Dollars ($18,800,000.).


       If we may be of any further service to you, please do not hesitate to call.




                                       _____
                                       William T. Whiting, Jr., Appraiser




                                       _____
                                       Eric T. Reenstierna, MAI
                                       Mass. Cert. Gen. R.E. Appraiser #343


Assumptions and Limiting Conditions

       An appraisal is an unbiased estimate of the value of a property reached through an
analysis of that property and of data from the marketplace.   An appraisal is not a
certification of the soundness of a building, a survey, or a legal document (for instance, a
title examination), though assumptions regarding these and other matters are made.
Among the major assumptions and limiting conditions of this appraisal are those that
follow.

1. This is a Complete Appraisal.  The appraisers have applied all standard methods of
   analysis that are appropriate to the subject property and have performed research and
   analyses consistent with the standards for a Complete Appraisal

2. This is a Summary Report which is intended to comply with the reporting
   requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of
   Professional Appraisal Practice for a Summary Report.  As such, it may or may not
   include full discussions of the data, reasoning, and analyses that were used in the
   appraisal process to develop the appraisers' opinion of value.   Supporting
   documentation concerning the data, reasoning, and analyses is retained in the
   appraisers' file.  The information contained in this report is specific to the needs of the
   client and for the intended use stated in this report.  The appraisers are not responsible
   for unauthorized use of this report.

Mr. Peter Tropeano                                                                                        15

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*


3.  No responsibility is assumed for legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated in this report.

4.  The property is appraised free and clear of any or all liens and encumbrances unless otherwise stated in this report.

5.  Responsible ownership and competent property management are assumed unless otherwise stated in this report.

6.  The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy.

7.  All engineering is assumed to be correct. Any plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

9.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in this report.

10. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in this appraisal report.

11. It is assumed that all required licenses, certificates of occupancy or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report are based.

12. Any sketch in this report may show approximate dimensions and is included to assist the reader in visualizing the property. Maps and exhibits found in this report are provided for reader reference purposes only. No guarantee as to accuracy is expressed or implied unless otherwise stated in this report. No survey has been made for the purpose of this report.

13. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless otherwise stated in this report.

Mr. Peter Tropeano                                                              16

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

14. The appraisers are not qualified to detect hazardous waste and/or toxic materials. Any comment by the appraisers that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the field of environmental assessment. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The appraisers' value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value unless otherwise stated in this report. No responsibility is assumed for any environmental conditions or for any expertise or engineering knowledge required to discover them. The appraisers' descriptions and resulting comments are the result of the routine observations made during the appraisal process.

15. Unless otherwise stated in this report, the subject property is appraised without a specific compliance survey having been conducted to determine whether the property is or is not in conformance with the requirements of the Americans with Disabilities Act. The presence of architectural and communications barriers that are structural in nature that would restrict access by disabled individuals may adversely affect the property's value, marketability, or utility. It is assumed that the subject may be used as described without adoption of any further program for compliance other than such programs as may be specified here.

16. Any proposed improvements are assumed to be completed in a good workmanlike manner in accordance with submitted plans and specifications.

17. The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

18. This report may not be used for any purpose by any person other than the party to whom it is addressed (or the parties listed as intended users in the Scope of Assignment section of this report, for the function specified) without the written consent of the appraisers and, in any event, only with proper written qualification and only in its entirety. The report is not for use by parties not listed as intended users or for functions other than those specified in the Scope.

19. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or the firm with which the appraisers are connected) shall be disseminated to the public through advertising, public relations, news sales, or other media without prior written consent and approval of the appraisers.

Mr. Peter Tropeano                                                                    17

Re:    *125 Worthen Road*
       *Lexington, Massachusetts*

20. If an income analysis is part of this appraisal, the projections of future cash flow and
    resale value are intended only to reflect the thinking of a typical investor, as modeled
    by the appraisers, as of the appraisal's effective date and are not meant as any form of
    guarantee that such cash flow will actually be achieved or as the appraisers' personal
    opinion regarding the likelihood of future events.   No analysis of future value or
    future cash flow is undertaken here other than that explicitly described in the text.

21. Unless otherwise stated, this appraisal takes no account of the potential for a higher
    price for the subject than that available on the general market that may result from
    buyers such as abutters who may gain special benefits from acquisition. Discovery of
    the identity, motivation, and purchasing power of parties in a position to gain special
    benefits requires information not publicly available and is beyond the scope of this
    appraisal.