# EXHIBIT A

BOS111 12211327.2

Princeton Properties by Andrew Chaban

|    |                                                          |
|----|----------------------------------------------------------|
|    |                                                     1    |
| 1  |                              Volume:   I                 |
| 2  |                              Pages:    1-80              |
| 3  |                              Exhibits: 1-20              |
| 4  | UNITED STATES DISTRICT COURT                             |
| 5  | DISTRICT OF MASSACHUSETTS                                |
| 6  | Civil Action No. 03-12231 (RGS)                          |
| 7  | - - - - - - - - - - - - - - - - - - - - - - - - x       |
| 8  | PHILIP L. TROPEANO, PETER TROPEANO and CAROLYN           |
| 9  | PATTON,                                                  |
| 10 |           Plaintiffs,                                    |
| 11 |    v.                                                    |
| 12 | CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD       |
| 13 | DORMAN, T&N REALTY TRUST, and CAPTAIN PARKER ARMS        |
| 14 | PARTNERSHIP,                                             |
| 15 |           Defendants.                                    |
| 16 | - - - - - - - - - - - - - - - - - - - - - - - - x       |
| 17 | DEPOSITION OF ANDREW M. CHABAN, Individually and as      |
| 18 |     Rule 30(b)(6) Designee of PRINCETON PROPERTIES       |
| 19 |             Monday, November 12, 2007                    |
| 20 |             10:21 a.m. to 12:20 p.m.                     |
| 21 |                Princeton Properties                      |
| 22 |                1115 Westford Street                      |
| 23 |                Lowell, Massachusetts                     |
| 24 |     Reporter:  Marianne R. Wharram, CSR/RPR              |

JONES REPORTING COMPANY
617-451-8900

15

1    A.   We have a document somewhere in our file,
2  and I don't recall which document, but in reviewing
3  the documents in preparation for today, I believe
4  that number -- that range is accurate.
5    Q.   Okay.  I gather from your testimony that
6  Mr. McDowell notified somebody at Princeton
7  Properties other than yourself that there might be
8  an interest in selling all or a portion of Captain
9  Parker Arms?
10    A.   I don't remember who on staff he contacted.
11  It would be one of the folks in our development
12  department.  It very well could have been me as
13  well.  Mr. McDowell works on a variety of survey
14  work and engineering work.  I do not remember
15  whether he contacted me or someone on staff.
16    Q.   Do you remember what your first involvement
17  was with Captain Parker Arms?
18    A.   No.
19    Q.   At some point, did you meet Mr. Tropeano or
20  any of his representatives?
21    A.   Yes.
22    Q.   Who did you meet?
23    A.   I met with Mr. Tropeano, I believe I met
24  with Mr. Tropeano's brother, and I met with

16

1  Mr. Ciampa.
2      Q.  Do you remember the brother's name?
3      A.  Only from reviewing the documents.  I
4  believe it's Philip.
5      Q.  Okay.  About how old would you say Peter
6  Tropeano is?
7      A.  Older than I.
8      Q.  And how about Philip Tropeano?
9      A.  Older than I.
10     Q.  Okay.  And on how many occasions did you
11 meet Peter Tropeano?
12     A.  One.
13     Q.  How many times did you meet Philip
14 Tropeano?
15     A.  Once.  I believe it was the same meeting.
16     Q.  And how many times did you meet Mr. Ciampa?
17     A.  One.
18     Q.  Was that also at the same meeting?
19     A.  Yes.
20     Q.  Where was the meeting?
21     A.  At Mr. Ciampa's office, downtown Boston.
22     Q.  And when did that occur?
23     A.  I don't recall.
24     Q.  Was it before or after Princeton Properties

23

1  Princeton Properties willing to buy the Tropeano
2  minority interest?
3      A.  We would have considered it, yes.
4      Q.  At any time, did Princeton Properties make
5  an offer for the Tropeanos' minority interest?
6      A.  I don't recall if we made an interest on
7  the minority.
8              (Exhibit 5 marked for identification.)
9      Q.  Mr. Chaban, I show you what we've marked as
10  Exhibit 5, which is a three-page document.  The
11  first page is a fax, apparently from yourself to
12  Attorney Ciampa, on December 13, 2004 and attached
13  is a two-page letter dated December 13th, 2004.
14  Why was Exhibit 5 faxed to Mr. Ciampa?
15      A.  I'm not sure I understand your question.
16      Q.  Well, you knew that Mr. Ciampa's clients
17  represented a minority interest in Captain Parker
18  Arms?
19      A.  Yes.
20      Q.  And so why was an offer for the entirety
21  directed to him?
22      A.  I don't think we had any knowledge at that
23  time of who the majority was.  The opportunity had
24  been brought to us by Mr. Tropeano and that's why

Princeton Properties by Andrew Chaban

24

1  we sent it here.
2      Q.  Okay.  In the process of gathering
3  information about the property, Princeton
4  Properties had interacted with a management company
5  called Dolben; is that correct?
6      A.  It is.
7      Q.  Why was the December 13, 2004 offer not
8  directed to Dolben as property manager?
9      A.  I don't -- I don't recall.
10     Q.  Okay.  If you could look at the offer
11 letter part of Exhibit 5, the price indicated is
12 more than three and a half million dollars less
13 than the $20 million number indicated in Exhibit 4.
14 Why the difference?
15     A.  I think you need to be more specific,
16 counsel.
17     Q.  Sure.  Exhibit 4 had indicated that
18 Princeton Properties believed that a $20 million
19 price was achievable.  Less than two months later,
20 a letter is being sent proposing a price that is
21 less than $16.5 million, and I'm asking why the
22 difference.
23     A.  Again, this is quite some time ago.  The
24 only thing I could surmise would be that we

25

1   received additional information either from the
2   market or from Dolben that would have led us to a
3   price like this, but I -- this is many, many years
4   ago, counsel, and I don't -- I don't recall the
5   specifics.
6       Q.  When you spoke with Mr. Collins within the
7   last 60 days, did you tell Mr. Collins that the
8   events were a number of years ago and you didn't
9   remember the details?
10      A.  I certainly remember telling Mr. Collins
11  that this was many years ago, yes.
12      Q.  And did you tell him that because it was
13  many years ago, you didn't remember all of the
14  details?
15      A.  I don't -- I don't recall the exact
16  conversation I had with Mr. Collins.
17      Q.  Okay.  Exhibit 5, did you consider this a
18  letter which could be accepted by the owners of
19  Captain Parker Arms?
20      A.  In the letter, it says please note that
21  this offer will not bind either party legally until
22  we've executed a mutually acceptable purchase and
23  sale agreement.  I think that's -- we certainly
24  wanted the owners of Captain Parker Arms to see

Princeton Properties by Andrew Chaban

26

1  this letter and react to this letter.
2      Q.  Okay, but if the owners had said it's a
3  deal, I gather that you would not have considered
4  yourself bound at that point?
5      A.  We would not have considered ourselves
6  bound at that point.
7      Q.  On the first page of the letter, second
8  page of the exhibit, there's a heading called
9  diligence --
10     A.  Mm-hmm.
11     Q.  -- indicating that there would be a 60-day
12 due diligence period.
13     A.  I see that.
14     Q.  What sort of due diligence did Princeton
15 Properties contemplate undertaking?  If the owners
16 had said we're interested, what sort of due
17 diligence did Princeton Properties have in mind?
18     A.  Environmental, structural, market,
19 physical, things of that nature.
20          MR. BROWN:  Can I ask you to clarify?
21 Is there something specific about Captain Parker
22 Arms, or are you describing generally what we do in
23 due diligence?
24     A.  I'm describing generally what we would do

Princeton Properties by Andrew Chaban

27

1  in due diligence.
2      Q.  (BY MR. RIKLEEN)  Had anybody from
3  Princeton Properties actually toured the site
4  before the December 13, 2004 letter was issued?
5      A.  I don't remember if any of our folks saw
6  the site before or after.
7      Q.  Okay.  Do you recollect what response, if
8  any, Princeton Properties received from the owners
9  of Captain Parker Arms subsequent to the December
10 13, 2004 letter which we've marked as Exhibit 5?
11     A.  In reviewing the file, I believe there is a
12 response for -- from counsel to what I guess should
13 be referred to as the majority in interest of
14 owners that I think rejected our -- our offer.
15          (Exhibit 6 marked for identification.)
16     Q.  I'm going to ask you some questions about
17 this document --
18     A.  Okay.
19     Q.  -- but some of the documents that I'm
20 showing you I have brought with me precopied.  Your
21 counsel has given me copies; for example, the
22 December 13 letter I have here and the December 16
23 letter I have from your file.
24     A.  Okay.

33

1    A.  No.

2    Q.  Exhibit 7 makes reference to certain problems with the physical plant at Captain Parker Arms; basement flooding, central air system, lighting and security, sound between floor levels. Is this the type of information which, if true, would have affected Princeton Properties' interest in purchasing the property or the amount of money it would have been willing to pay?

10   A.  Any defect in a property would certainly affect how much money any buyer would pay any seller.

13   Q.  Okay. And I gather the particular document that I've given to you is not one that you have previously seen?

16   A.  I've never seen this document.

17   Q.  Do you know if the Uncle Phil referred to at the bottom is Philip Tropeano?

19   A.  I don't.

20   Q.  Okay. And did the offer which Princeton Properties made on December 13, 2004 include adjustments for the type of physical plant issues which are described in Exhibit 7?

24   A.  I don't recall.

34

1    Q.  Would there be some way of determining
2  that?
3    A.  Some way of determining -- can you be more
4  specific?
5    Q.  The amount that was offered in the letter
6  of December 13, 2004 must have considered various
7  factors -- market value, capital improvements that
8  Princeton Properties might be planning to make and
9  the like -- and what I'm asking is whether the
10 price that Princeton Properties put in that letter
11 took into account the specific issues which are
12 described in Exhibit 7.
13   A.  Certainly not with any specificity.  I
14 reference the December 13th letter.  Look under
15 diligence, and it says upon acceptance, we will
16 formally introduce our due diligence professionals
17 and those of our lender to the site for review, so
18 that leads me to believe that we had certainly not
19 gone through and looked extensively at the property
20 enough to --
21   Q.  To get to these kind of issues?
22   A.  -- enough to -- yes.  We certainly -- this
23 was still at a -- I would consider a generalized
24 level.  Certainly your comment referenced -- your

35

1  question referenced the word specific. We, I don't
2  think, based on what I'm reading here, would have
3  gotten into any specificity at that point.
4      Q. Okay. And as part of the due diligence
5  process, would the appropriate professionals have
6  been tasked to go out to the site and figure out if
7  there are any site-specific issues, and if so, are
8  they repairable, and if so, at what price. And
9  then you decide should that adjust your price or
10 maybe your interest in the property in its
11 entirety?
12     A. Certainly if the offer was accepted, we
13 would have introduced the appropriate due diligence
14 professionals to the site.
15     Q. If the appropriate due diligence
16 professionals came back and reported that there
17 were site conditions that you were not previously
18 aware of, what impact would that have on either the
19 price you were willing to pay or your willingness
20 to do a deal at all?
21     A. Speaking generally, any defect would have
22 been reviewed for its severity. Speaking
23 specifically to Captain Parker Arms, it would be
24 impossible to at this stage determine any specific

Princeton Properties by Andrew Chaban

36

1  one, how that would have affected pricing. As I
2  said, I don't think we had any level of specificity
3  at that point, so would any defect affect any
4  buyer? Yes. Could I comment on any one specific
5  defect or a grouping of defects? No.
6      Q. So let's talk in general terms. In general
7  terms, during that due diligence process, if -- if
8  a property defect or a condition at the property is
9  brought to your attention, you ask the
10 professionals what's it cost to fix and what do you
11 think this impact should be on our interest. Is
12 that fair?
13     A. We would ask professionals and use our own
14 professional judgement, yes.
15     Q. And that might result in a modification of
16 purchase price or it might result in Princeton
17 Properties deciding it did not want to go forward
18 with the transaction; is that true?
19     A. Anything's possible. It may; it may not.
20 It would depend on its severity. It would depend
21 on what the professionals thought it might cost to
22 correct, if it could be corrected, what the lender
23 thought. There are a variety of different
24 variables.

46

1   A.  I do not.

2   Q.  Was the cost of compliance --

3       (Witness conferring with Mr. Brown.)

4   Q.  (BY MR. RIKLEEN)  Would the cost of
5   compliance with existing electrical codes have been
6   factored in to the price that was placed in the
7   December 13, 2004 so-called offer letter?

8   A.  The December 13, 2004 offer letter says
9   that we would introduce due diligence professionals
10  to the site if our offer was accepted.  Due
11  diligence professionals were not utilized prior to
12  December 13th, 2004, because there was no offer, so
13  therefore, we would have no reason to know or not
14  know if electrical codes were -- were -- if the
15  electrical system was up to code or not as of
16  December 13th, 2004.

17  Q.  Would the due diligence tasks to be
18  performed, if you had gotten to that stage, have
19  included looking at such things as compliance with
20  electrical codes, handicapped accessibility and the
21  like?

22  A.  Yes.

23  Q.  In December 2004, were you -- strike that.
24  In December 2004, was Princeton Properties aware

47

1  that there had been a failure of a foundation in at
2  least one of the buildings at Captain Parker Arms?
3         MR. CIAMPA:  Objection.  You can
4  answer.
5         MR. BROWN:  Only if you know.
6    A.  I don't recall.
7    Q.  (BY MR. RIKLEEN)  In December of 2004, was
8  Princeton Properties aware that there was at least
9  one basement at Captain Parker Arms which flooded
10 on a regular basis?
11   A.  I don't recall.
12   Q.  In December 2004, was Princeton Properties
13 aware that there was generalized settling of the
14 land at Captain Parker Arms?
15        MR. CIAMPA:  Objection.  You can
16 answer.
17   A.  I don't recall.
18        (Off the record.)
19   Q.  (BY MR. RIKLEEN)  In December of 2004, was
20 Princeton Properties aware that some of the
21 buildings were heated by central boiler facilities
22 which then had underground piping which went out to
23 other buildings?
24   A.  Again, prior to December 13th, 2004, I do

48

1  not believe that we had -- I know we did not
2  introduce due diligence professionals to the site,
3  and therefore, I don't believe we would have
4  received any professional judgement on that. I
5  don't have any specific recollection of that.
6     Q.  Okay. Would it be fair to say that if the
7  owners of Captain Parker Arms had expressed
8  interest in the price set forth in the December 13,
9  2004 letter that you then would have had the
10 professionals look into the kinds of things I've
11 just been asking you about?
12    A.  If there was acceptance of the offer, yes.
13    Q.  Okay. And if the professionals reported
14 back issues of the type I've been asking you about,
15 what impact, if any, would their report have had on
16 either the price being offered or perhaps Princeton
17 Properties' willingness to go forward at all?
18    A.  In any due diligence, generally, we would
19 have looked at the severity or lack of severity of
20 the comments of the due diligence professionals and
21 our own professional judgement, looked at our offer
22 and adjusted accordingly.
23    Q.  Okay. And in your professional experience,
24 have there been times when the due diligence report

49

1   has come back such that Princeton Properties,
2   instead of adjusting its offer, says, you know,
3   there are more problems than we want to undertake?
4           MR. BROWN:  Perhaps you can explain
5   what our typical due diligence language is and how
6   we work through it.
7       A.  Sure.
8           MR. BROWN:  Not on this one.
9       A.  No, I understand.
10          MR. BROWN:  In general terms.
11      A.  Understood.  Understood.  It may be
12  helpful, counsel, to give you a brief synopsis of
13  how any asset would be looked at by Princeton for
14  due diligence.  Structural -- structural review, a
15  review of the environment, a review of the market
16  conditions at the time, a -- a look at the general
17  demographics of the area, as well as the general
18  demographics of the existing resident population,
19  all of those things would be taken into account
20  during a formal due diligence process and would
21  determine whether we would move forward with the
22  offer or request an adjustment to the offer.
23      Q.  Okay.  And would it be fair to say that
24  Princeton -- as of December 2004, Princeton

Princeton Properties by Andrew Chaban

51

```
 1      Q.  Okay.  And at the end of the due diligence
 2  process, the choices would be modify the purchase
 3  price, leave it the same, or walk away?  Would that
 4  be fair?
 5      A.  Yes, that is correct.
 6      Q.  And in making the offer in the December 13,
 7  2004 letter, you were proposing to maintain your
 8  ability to make each of those choices following due
 9  diligence; is that correct?
10      A.  That is correct.
11      Q.  Okay.
12          MR. BROWN:  That's our typical due
13  diligence.  You didn't specify that in your offer;
14  you just said we'd participate in due diligence.
15      A.  Here's the offer.
16          MR. BROWN:  You're just saying we can
17  extend due diligence, so you're answering in
18  classic due diligence language.
19      A.  I think with respect to Captain Parker
20  Arms, our offer letter is certainly meant to keep
21  all of those due diligence items and contingencies
22  available to us during the proposed 60-day period.
23      Q.  Okay.
24              (Exhibit 13 marked for identification.)
```

Princeton Properties by Andrew Chaban

60

1   A.   Yes.
2   Q.   He contacted you by telephone?
3   A.   He did.
4   Q.   Did he meet with you?
5   A.   He did not.
6   Q.   Okay.  And how did he describe his
7   involvement with Captain Parker Arms?
8   A.   We described his -- his assignment as an
9   appraiser of the property.
10  Q.   Did he tell you what the as-of date was?
11  A.   I don't recall.
12  Q.   Do you have any knowledge of the value of
13  Captain Parker Arms as of October 1, 2003, more
14  than a year before your December 13, 2004 offer
15  letter?
16  A.   Not that I can recall.
17  Q.   At any time, was -- strike that.  When
18  Princeton Properties was considering acquiring
19  Captain Parker Arms, was the contemplation that it
20  would be acquired and held as apartments, or
21  acquired and converted to condominiums?
22            MR. BROWN:  I think you can answer in
23  general terms.
24  A.   We -- I believe that we would have looked

Princeton Properties by Andrew Chaban

63

1    Q.  Do you remember if he asked you about
2 whether Princeton Properties was aware of water in
3 any of the basements?
4    A.  I don't remember -- I don't remember the
5 specifics of what Mr. Collins asked me about the
6 physical -- about the physical constraints. I just
7 know that he did ask me if we looked at a capital
8 improvement program.
9    Q.  And what did you tell him about that?
10    A.  I told him that we would introduce our due
11 diligence professionals to the site if an offer was
12 accepted. An offer wasn't accepted. We didn't
13 have an opportunity to do that, but we had some
14 general thoughts about what we might consider
15 doing, but we didn't have anything -- any
16 specificity.
17    Q.  Okay. You never got that far?
18    A.  We never got that far.
19    (Exhibit 18 marked for identification.)
20    Q.  Mr. Chaban, I hand you what we've marked as
21 Exhibit 18. It is a one-page memo dated December
22 1, 2004, with respect to Avalon at Lexington and a
23 series of attachments. I've given it to you in
24 exactly the condition your attorney gave it to me.