UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTON, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) | DOCKET NO. 03-CV-12231-RGS |
| CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST and CAPTAIN PARKER ARMS PARTNERSHIP, | ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE TO DETERMINE THE APPLICABILITY OF A MINORITY INTEREST AND/OR LACK OF MARKETABILITY DISCOUNT IN DETERMINING THE VALUE OF PLAINTIFFS' FORMER PARTNERSHIP INTERESTS**

*The question now on appeal is whether, under Mass. Gen. Laws ch. 108A, § 42, each of the plaintiffs is entitled to receive <u>the full value of his or her share in the partnership as determined upon liquidation</u>, or rather must accept the much-reduced value offered by the remaining partners ....*

– First Circuit Court of Appeals[1]

Background

    The Captain Parker Arms Partnership (the "Partnership") was created by a two-page written agreement dated January 8, 1964. The original partnership agreement provided for an express term of thirty (30) years, which term expired on January 8, 1994. The original partnership agreement also provided that legal title to the real property that was to be the primary asset of the Partnership (situated at the intersection of Waltham Street and Worthen Road, in Lexington, Massachusetts) would "be taken in the name of

---

[1] <u>Tropeano v. Dorman</u>, 441 F.3d 69, 75 (1st Cir. 2006)(emphasis added).

the partners' nominee," the trustees of the T&N Realty Trust, who would hold legal title to such "real estate for the benefit of this partnership." [2]  The original partnership agreement further provided that the trustees of the T&N Realty Trust, each of whom was also a partner of the Partnership, would amend the T&N Realty Trust "to designate that they will hold the real estate in trust for the benefit of the partnership" and that they "will not further amend said Trust to designate any beneficiaries other than this partnership." Finally, the original partnership agreement specifically incorporated by reference "all applicable provisions and sections of General Laws Chapter 108A of the Commonwealth of Massachusetts."[3]

The original partnership agreement was subsequently amended by a written modification dated March 11, 1987, though not in a manner that affected any of the provisions of the original partnership agreement described above.  The modification did, however, reaffirm the purpose of the T&N Realty Trust as being the "title holder of the partnership assets," and also set forth that the partners were required "in the event of the dissolution and termination of the partnership" to instruct the trustees "to proceed to the liquidation of the partnership."[4]

By letter dated August 21, 2003, the plaintiffs in this matter, Philip L. Tropeano, Peter Tropeano, and Carolyn Patten (together, "Plaintiffs"), lawfully withdrew from the Partnership, effective October 1, 2003, and sought to be paid by the Partnership, or the

---

[2] The T&N Realty Trust had been created approximately eighteen months prior by a Declaration of Trust dated June 26, 1962.  A true and accurate copy of that Declaration of Trust is attached hereto as <u>Exhibit A</u>.
[3] A true and accurate copy of the original partnership agreement is attached hereto as <u>Exhibit B</u>.
[4] A true and accurate copy of the modification, dated March 11, 1987, is attached hereto as <u>Exhibit C</u>.

remaining partners, the value of their respective partnership interests as of that date

(collectively, 42.86%).[5]

What remains to be determined in this case is the "value" of Plaintiffs' respective

partnership interests as of October 1, 2003. The defendants contend that a determination

of those values must include application of a "minority interest" and "lack of

marketability" discount. Plaintiffs, on the other hand, believe that they are entitled to the

full value of their respective interests in the Partnership as determined upon liquidation,

effective October 1, 2003, and that the Court should not apply a minority interest or lack

of marketability discount.

Argument

A.    The First Circuit Has Already Ruled That Plaintiffs Are Entitled To
      Receive the Liquidation Value of their Respective Partnership Interests.

At all times following January 8, 1994, the Partnership was "at will," and each

partner had the absolute right to lawfully dissolve or terminate the Partnership at any time

and for any reason. Tropeano v. Dorman, 441 F.3d 69, 75-78 (1st Cir. 2006)(citing

M.G.L. c. 108A, § 31(1)). Because Plaintiffs did lawfully dissolve the Partnership,

effective October 1, 2003,

> [e]ach partner, as against his co-partners and all persons claiming through
> them in respect of their interests in the partnership, unless otherwise
> agreed, may have the partnership property applied to discharge its
> liabilities, and the surplus applied to pay in cash the net amount owing to
> the respective partners.

Id. at 76 (quoting M.G.L. c. 108A, § 38(1))(emphasis in original).

In Tropeano, the First Circuit determined that the partners of the Partnership had

not "otherwise agreed," and, therefore, the value of Plaintiffs' former partnership

---

[5] A true and accurate copy of Plaintiffs' letter of August 21, 2003 is attached hereto as Exhibit D.

interests must be determined in accordance with the method outlined in the Uniform

Partnership Act.  See Tropeano, 441 F.3d at 82 ("Without such a provision, the UPA

valuation provisions dictate the value of the withdrawing partners' shares").  In this

regard, the First Circuit held that Plaintiffs' should receive the "liquidation value" of their

respective partnership interests, as of October 1, 2003, in accordance with M.G.L. c.

108A, § 38(1).  See Id. at 76 ("if a partner withdraws from a partnership at will … the

partner is entitled under § 38(1) to his full share of the partnership net assets unless

otherwise agreed")(emphasis in original); Id. ("If [the Partnership] was at will,

withdrawal was lawful, and the withdrawing partners were entitled to their net shares

unless some other method of distribution could be found to have been otherwise agreed

to"); Id. at 79 ("… distribution at the full valuation provided in section 42"); Id. at 80

("Paragraph 8 [of the partnership agreement] deals specifically with distribution on

termination.  Its method of valuation, however, appears substantially the same as that

outlined in § 42"); Id. at 81 n.4 ("A partner at will is legally entitled to retire without the

vote of his partners and, except as otherwise agreed, to receive the full value of his

interest")[6].

Although courts have, under other, very different circumstances, found a minority

discount and/or lack of minority discount appropriate, the rationale of those cases only

strengthens Plaintiffs' argument that no such discounts should be applied here.  In

Anastos, the plaintiff dissolved the partnership at issue in contravention of a written

partnership agreement, the term of which was not set to expire until 2010.  Id. at 147.  In

---

[6] It was presumably in light of these statements by the First Circuit that this Court issued its Order on
Motion for Scheduling Conference, dated June 30, 2006, in which it "authorize[d] a ninety (90) day period
in which discovery to determine the liquidation value of the partnership assets" should take place.
(emphasis added).

affirming the determination of the Superior Court that, under such circumstances of wrongful dissolution, a minority discount should apply in valuing the interest of the wrongfully dissolving partner, the Supreme Judicial Court stated that:

> Because the plaintiff cannot compel liquidation of the business at the point of dissolution, we read [M.G.L. c. 108A,] § 38(2)(c)(II) as offering a nonliquidation based method of calculating the value of his partnership interest. The statute's exclusion of good will from the valuation of the wrongfully dissolving partner's interest supports this reading, as good will is an asset only if the partnership business is a going concern. Were it meant to regard the partnership business as assets to be liquidated, good will need not have been mentioned.[7]

Anastos, 443 Mass. at 152.(emphasis added)[8]

Clearly, the SJC affirmed application of a minority discount in Anastos based upon the fact that the plaintiff had not, and could not, lawfully dissolve the partnership, the express term of which was not due to expire until 2010. Id. at 154 ("The plaintiff's departure from the partnership in contravention of the partnership agreement is not the equivalent of a legitimate retirement under § 42"). As such, the "value" of the wrongfully dissolving partner's interest at dissolution was the amount that he could reasonably have expected to receive on the open market at the time of dissolution for a minority interest in a general partnership that had little prospect of being lawfully dissolved for at least another fourteen years.[9]

The situation in Anastos bears no resemblance to this case, in which Plaintiffs lawfully withdrew from an "at will" partnership that they could have, as a matter of right, terminated. See Tropeano, 441 F.3d at 80 n.3 (citing Meehan v. Shaughnessy, 404 Mass.

---

[7] It bears noting that neither M.G.L. c. 108A, § 38(1) nor § 42 make mention of "good will".

[8] See also Tierney v. John Hancock Mutual Life Ins. Co., 58 Mass. App. Ct. 571, 577 n.8 (2003)(lack of marketability discount "adjusts for lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation").

[9] Plaintiff filed his complaint in September 1996 seeking dissolution of the partnership pursuant to M.G.L. c. 108A, § 32.

419, 428 (1989)).  Because Plaintiffs' respective interests in the Partnership were <u>entirely liquid</u> at the time of their withdrawal, Plaintiffs must receive the full value of those interests based upon a liquidation of the Partnership assets effective October 1, 2003, without the application of any minority interest or lack of marketability discount.  <u>See Johnson v. Kennedy</u>, 350 Mass. 294, 298 (1966)(where minority partner dissolved at-will partnership in unseemly but lawful manner  – by absconding with partnership assets days before partners were scheduled to execute a 25-year written partnership agreement – the Court ruled that "[w]hen, as here, the dissolution was not wrongful, the partners are entitled to an equal share of the firm's assets").  <u>See also</u> <u>Anastos</u>, 443 Mass. at 150 (identifying M.G.L. c. 108A, § 38(1) as the appropriate method of valuation when "the dissolution [is] proper").

Thus, there can be no doubt but that Plaintiffs are entitled to receive the full value of their respective interests in the Partnership as determined upon liquidation, effective October 1, 2003.

B.    Massachusetts Courts Have Reached the Identical Conclusion
      In Comparable Cases Dealing with Massachusetts Business Corporations.

Though Plaintiffs believe that the First Circuit and the Supreme Judicial Court have made clear that no minority interest or lack of marketability discount should apply in valuing Plaintiffs' respective partnership interests, Plaintiffs' argument in this regard finds <u>additional</u> support in the way that Massachusetts courts interpreted the appraisal rights of stockholders under M.G.L. c. 156B, § 1 <u>et</u> <u>seq.</u>, the Massachusetts Business Corporation Law (the "MBCL").[10]  Pursuant to the MBCL, a stockholder who disagreed with certain proposed corporate actions could receive from the corporation the "fair

---

[10] The MBCL was in effect until July 1, 2004, at which time it was superseded and replaced for most purposes by the Massachusetts Business Corporation Act, M.G.L. c. 156D, § 1.01, <u>et seq</u>.

value" of his or her stock and disassociate from the corporation.  See M.G.L. c. 156B, §

86.  If the stockholder and the corporation were unable to agree on the fair value of the

stockholder's shares, the stockholder could file an equitable action to have the Court

determine the fair value of his stock and order payment in that amount by the corporation.

See M.G.L. c. 156B, § 90.  Specifically, the appraisal provision of the MBCL provided

that:

> After hearing the court shall enter a decree determining the fair value of
> the stock of those stockholders who have become entitled to the valuation
> of and payment for their shares, and shall order the corporation to make
> payment of such value, together with interest[11], if any, as hereinafter
> provided, to the stockholders entitled thereto …. For this purpose, the
> value of the shares shall be determined as of the day preceding the date of
> the vote approving the proposed corporate action and shall be exclusive of
> any element of value arising from the expectation or accomplishment of
> the proposed corporate action.

M.G.L. c. 156B, § 92.

As for what the legislature intended by "fair value," the Massachusetts Court of

Appeals specifically answered this query when it stated that:

> [t]he task assigned to the court by § 92 is not to reconstruct the 'intrinsic
> value' of each share of the enterprise but, rather, to determine what a
> willing buyer realistically would pay for the enterprise as a whole on the
> statutory valuation date.

BNE Massachusetts Corp. v. Alvin Jack Sims, 32 Mass. App. Ct. 190, 197 (1992).

---

[11] Exercising their equitable powers, courts determined what rate of interest to apply under § 92 on a case-by-case basis and, where circumstances warranted, would award compound interest.  See Sarrouf v. New England Patriots Football Club, 397 Mass. 542, 551 (1986)(affirming Superior Court award of interest under § 92 at a rate of 9% compounded annually); Piedmonte v. New Boston Garden Corp., 377 Mass. 719, 735 (1979)(affirming Superior Court award of interest under § 92 at a rate of 8% compounded annually); BNE Massachusetts Corp. v. Alvin Jack Sims, 32 Mass. App. Ct. 190, 197 (1992)(affirming Superior Court award of interest under § 92 at a rate of 12% compounded annually).  See also Berman v. B.C. Associates, 219 F.3d 48, 50 (1st Cir. 2000) (acknowledging that compound interest is permitted "in certain proceedings in equity" such as appraisals and accountings).  Plaintiffs respectfully refer the Court to these cases in its consideration of the defendants' pending Motion in Limine to Establish Interest Rate.

A recent Superior Court decision provides additional insight into why, as a matter of equity, it would be wholly inappropriate to apply a minority interest or lack of marketability discount in this case. In <u>Petro Group, Inc. v. Premier Petroleum Distributors, Inc.</u>, Civil Action No. 03-4420 BLS (van Gestel, J.)("<u>Petro</u>")[12], the Business Litigation Session had before it a Stock Purchase and Sale Agreement (the "P&S Agreement") requiring Petro Group and Premier Petroleum Distributors, Inc. ("PPD") to obtain an appraisal of "the value of PPD's Petro Group shares on the basis of a desired sale by a willing Buyer and a willing Seller …." <u>Id</u>. at 1. Pursuant to a separate but related agreement, PPD was required to sell its one-third interest in Petro Group to Petro Group pursuant to the P&S Agreement. <u>Id</u>. PPD and Petro Group disagreed as to whether the appraiser should apply a minority interest and/or lack of marketability discount in his valuation of PPD's one-third interest, and the parties sought a declaration on the issue by the Court. <u>Id</u>.

While the Court was clear in its memorandum that it was not dictating the manner in which the appraiser should conduct his appraisal, it did speak directly to how the Court would value PDD's interest if the parties had not contractually assigned the task to the appraiser. The Court stated that:

> To the extent that this Court, if it were performing the appraisal itself, might have significant discretion and exercise a broad range of equity powers in addressing compensation in circumstances like that faced here, it would be inclined to conclude that equity would dictate that no minority discount should be applied.

<u>Id</u>. at 3. Specifically, the Court held that:

> This Court believes, and declares, that what was meant was that the enterprise value of Petro Group was to be determined as if 100% of its

---

[12] A true and accurate copy of the Memorandum and Order on Application for Declaration Regarding Appraisal Basis in <u>Petro</u> is attached hereto as <u>Exhibit E</u>.

> stock was being sold at a specific time to a willing buyer by a willing
> seller. Thus, there should be no minority interest or lack of marketability
> discount in arriving at that enterprise value. The value of 33 1/3% then
> should be arrived at, again with no minority discount or marketability
> discount, by a simple mathematical exercise.

Id. at 4. In reaching its conclusion that a minority discount should not apply, the

Court considered, among other things, that:

> Petro Group, the buyer, is not a stranger in some hypothetical marketplace.
> Rather, Petro Group is buying back its own stock. Thus, while it is buying
> a minority interest, Petro Group is in actuality strengthening its majority
> interest and control of itself.

Id.

In similarly rejecting the application of a lack of marketability discount, the Court

noted that the transaction at issue was "dictated by an agreement," and therefore would

not be affected by the "market-influenced delay" that might occur were PPD forced to

sell its one-third interest alone on the open market. Id.

The case at bar (though a partnership dispute) matches up with Petro on all

material issues relating to valuation. As in Petro, the effective buyer in this case is not

some stranger in a hypothetical marketplace, but instead the majority partners of the

Partnership. Like Petro Group, the defendants were lawfully required to purchase

Plaintiffs' interests and, in doing so, strengthened their majority interest. Indeed, when

Plaintiffs withdrew, the defendants became the sole partners, and assumed absolute

control of the Partnership.

Moreover, as was the case with PPD, Plaintiffs were never in a position of having

to sell just their minority interest on the open market. Instead, Plaintiffs, at the time of

their withdrawal, had the absolute right to terminate the Partnership. Had they done so,

the Partnership would have been required to wind up its business, liquidate its assets, pay

all of its debts, and then distribute all net proceeds, in cash, to the partners in accordance with their respective ownership interests.

As a result, neither a minority interest nor a lack of marketability discount can be applied in this case because the value of Plaintiffs' respective interests must be determined in the context of the termination and liquidation that they could have lawfully affected.

C.     The T&N Realty Trust Did Not Cause Plaintiffs' Respective Partnership Interests to be Any Less Liquid on October 1, 2003.

Earlier in this litigation, the defendants advanced an argument that, despite the Partnership being "at will," Plaintiffs were nonetheless unable to cause its termination or the liquidation of its assets because the defendants, as a majority of the trustees of T&N Realty Trust, would not have allowed it.[13]  This argument was dropped from the defendants' most recent filing in which they asserted that a minority interest and lack of marketability discount should apply[14], presumably because it lacks any support in fact or law.  Nevertheless, given the very short time between this filing and the scheduled commencement of trial, and wanting the Court to have all that it requires to expeditiously rule upon their motion, Plaintiffs address the defendants' earlier argument in the event that it should reemerge.

The defendants appear to have based their argument on two equally faulty propositions: (1) that the T&N Realty is not a nominee trust, and (2) that the Partnership has no right of present conveyance.  Clearly, neither of these propositions is correct, nor,

---

[13] See Defendants' Opposition to Plaintiffs' Motion for Real Estate Attachment, pp. 3-5 (Docket No. 50).
[14] See Defendants' Opposition to Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial, pp. 9-10 (Docket No. 77).

if correct, would they prevent the liquidation of the Partnership property upon the lawful

termination of the Partnership.

First, the original partners could not have been clearer in their intent that the T&N

Realty Trust be a nominee trust with the sole purpose of holding, for the convenience of

the partners, legal title to the Partnership property.  Indeed, Paragraph 4 of the original

partnership agreement clearly states that:

> In order to dispense with the necessity of obtaining signatures of the
> partner's respective wives and of all of the partners signatures to deeds,
> mortgages, leases and other documents, the title of the real estate shall be
> taken in the name of the partners' nominee, …, namely Wilbur C.
> Nylander and Alfred P. Tropeano, Trustees of the T&N Realty Trust,
> under a declaration of Trust dated June 26, 1962, which trust has not been
> recorded and has no present assets and is to be amended by the trustees
> thereof to designate that they will hold the real estate in trust for the
> benefit of this partnership.

See Exhibit B. (emphasis added).

The role of the trust as "nominee" is further exemplified in the modification to the

original partnership agreement, which defines the trust as "title holder of the partnership

assets."  See Exhibit C.  Moreover, various provisions of the modification describe what

instructions the Partnership must give the trustees in the event of certain circumstances.

See Exhibit C, ¶ 3 ("Upon the death of a partner, the partners herein agree and so instruct

the Trustees to execute whatever documents may be necessary to permit said

representative to borrow money to pay estate taxes"); Id. at ¶ 4 (… and upon such

[partnership] vote the partners shall notify the Trustees to liquidate the assets and

distribute the net principal and accumulated income as provided by number 8

hereunder"); Id. at ¶ 8 ("In the event of the dissolution and termination of the partnership,

the Trustees shall be instructed to proceed to the liquidation of the partnership and the

proceeds of the liquidation shall be applied and distributed in the following order of priority: …").

In support of their earlier argument, the defendants cherry-picked text from the Declaration of Trust (some of which was presented out of context) in an attempt to cast the trust as more than the "nominee" described in the original partnership agreement.  In addition to advancing an inaccurate picture of the trust, the defendants also ignored the fact that the Declaration of Trust pre-existed the original partnership agreement by some eighteen (18) months, and the modification by some twenty-five (25) years.  Given this chronology, there can be no doubt but that the language of the original partnership agreement and the modification demonstrate the clear intent of the partners and must therefore control.  Dickinson v. Riverside Iron Works, 6 Mass. App. Ct. 53, 55 (1978)("We must interpret the words in a contract according to their plain meaning.  We must also examine the circumstances surrounding the making of the contract to determine the objective intent of the parties"); Johnson v. Cohan, 2000 Mass. Super. LEXIS 45, *14 (Mass. Super. Ct. 2000)("The usual touchstone of contract interpretation, of course, is the intent of the parties").

Clearly, the original partners intended and understood the T&N Realty Trust to be a mere nominee, holding legal title to the real property of the Partnership for its convenience and entirely at its direction.  The fact that this intent could have been more artfully executed had the trustees not sought the convenience of recycling an existing trust document does nothing to change that result.[15]

---

[15] Even if the Court were to determine that the T&N Realty Trust does, in fact, have certain characteristics of a "true" trust, the result would remain the same.  See Penta v. Concord Auto Auction, 24 Mass. App. Ct. 635, 640 (1987)("Where a person is both agent and trustee for another, 'the agency relationship predominates'")(quoting 1 Scott, Trusts § 8, at 95 (4th ed. 1987)).

Second, whether intended to provide for a "nominee" trust or a "true" trust, the Declaration of Trust does nothing to put the property at issue outside the reach of the Partnership, which at all times has maintained a right of present conveyance. Indeed, Article IX of the original Declaration of Trust provided that "[t]he shareholders[16] may alter or add to this Trust Indenture or terminate this trust if they deem it judicious to do so." (emphasis added).[17] That the partners exercised pervasive control over the trustees is evident in the various amendments to the Declaration of Trust which make specific reference to the fact that they were affected by a vote of the "shareholders" or "beneficiaries" as opposed to the trustees. See Exhibit F (February 12, 1965 Amendment: "WHEREAS by a meeting of all the shareholders of said Trust the Trustees were duly authorized to amend and alter the Trust as hereunder set forth"); Exhibit G (February 5, 1982 Amendment: "in accordance with Article IX and by vote of the beneficiaries (sometimes referred to in said trust as Shareholders) hereby amend said trust as follows: …"); August 6, 1992 and October 8, 1998 Amendments ("in accordance with Article IX and by vote and assent of the beneficiaries hereby amend said trust as follows: …").[18] Given that the Partnership at all times had the power to alter or amend the trust indenture, indeed, to terminate the trust, it goes without saying that the Partnership also had the right of present conveyance, which could have been affected by either

---

[16] The word "shareholder" was originally used interchangeably with the word "beneficiary" in the trust documents until an amendment, dated February 5, 1982, officially substituted the word "beneficiary(ies)" for the word "shareholder(s)" throughout the trust documents. A true and accurate copy of the February 5, 1982 Amendment is attached hereto as Exhibit G.

[17] The Declaration of Trust was amended on February 12, 1965 to, among other things, specify that any such amendment or termination by the shareholders would require "a majority vote of the shareholders having attained the age of 21 or more". A true and accurate copy of the February 12, 1965 amendment is attached hereto as Exhibit F.

[18] True and accurate copies of the August 6, 1992 and October 8, 1998 amendments are attached hereto as Exhibit H and Exhibit I, respectively.

terminating the trust or by ordering the trustees to liquidate the trust assets and distribute the net proceeds.

Clearly, the defendants are attempting to rewrite the partnership agreement. On June 19, 2003, without any notice or warning, the defendants, constituting a majority interest in the Partnership, amended the T&N Realty Trust by: (a) increasing the number of trustees from 5 to 7, (b) increasing the number of the defendants serving as trustees from 2 to 4, and (c) increasing from 3 to 4 the number of trustee signatures required to execute legal instruments relating to the trust.[19] Obviously, this was intended by the defendants as some form of power play, though it is not entirely certain what was gained. What is certain is that approximately two months later Plaintiffs provided written notice of their withdrawal from the Partnership effective October 1, 2003. What is also certain is that, at that time, Plaintiffs could have terminated the Partnership as a matter of law. What is further certain is that had Plaintiffs done so, Paragraph 8 of the modification would have required the Partnership to instruct the trustees "to proceed to the liquidation of the partnership" and to apply and distribute the proceeds of such liquidation according to said Paragraph 8, and the trustees would have been required to comply. See Exhibit B.

Regardless of whether the defendants constituted two or four of the trustees, regardless of whether or not they held a majority interest in the Partnership, had Plaintiffs terminated the Partnership, the defendants would have been required to sell the property held in the name of the trust. Thus, both law and equity require that Plaintiffs receive the full value of their respective interests in the Partnership as determined upon liquidation, effective October 1, 2003. See Ashley v. Collins, 292 Mass. 67, 71 (1935)(In a

---

[19] True and accurate copies of Vote of Majority of Beneficiaries of the T&N Realty Trust and Amendment and Appointment of Trustees of the T&N Realty Trust are attached hereto as Exhibit J.

proceeding for an accounting, "[e]quitable principles are applicable in order to reach a just result").

## **CONCLUSION**

For all of the reasons described above, Plaintiffs respectfully request that this Honorable Court order that Plaintiffs are entitled to receive the full value of their respective interests in the Captain Parker Arms Partnership based upon the liquidation of all partnership assets, as of October 1, 2003, specifically including, but not limited to, all real property and other assets held in the name of the T&N Realty Trust, without application of any minority interest or lack of marketability discount.

PHILIP L. TROPEANO, PETER
TROPEANO and CAROLYN PATTEN

/s/ Thomas M. Ciampa
_____
Thomas M. Ciampa (BBO#566898)
Ciampa & Associates
20 Park Plaza, Suite 804
Boston, MA 02116
(617) 742-5955

Dated: November 26, 2007

### **Certificate of Service**

I, Thomas M. Ciampa, hereby certify that on this 26th day of November, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

___/s/ Thomas M. Ciampa____