UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTON, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST and CAPTAIN PARKER ARMS PARTNERSHIP, <br><br> Defendants. | DOCKET NO. <br> 03-CV-12231-RGS |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF SUBSEQUENT MARKET ACTIVITY AND OPINIONS OF VALUE BASED UPON SUCH DATA**

In a motion that rushes headlong against long-standing Massachusetts precedent and basic common sense, the defendants seek to prevent the Court from even considering what is perhaps the most probative evidence regarding the value of the Captain Parker Arms Apartments ("CPA") as of October 1, 2003 – an offer by Princeton Properties to purchase CPA for $16,450,000, and information regarding the sales of two comparable apartment complexes in Lexington, Massachusetts which took place within a year of October 1, 2003.[1]

Because the defendants' motion ignores the controlling law of Massachusetts, mischaracterizes the single foreign decision that it cites for support, and misrepresents the

---

[1] The Captain Parker Arms Apartments are located at 125 Worthen Road, Lexington, Massachusetts.

circumstances surrounding the Princeton Properties offer, there is little question but that it must be summarily denied.

Argument

    A.    Under Massachusetts Law, Courts May Consider Subsequent Market Transactions in Determining the Prior Value of Real Property.

For more than one-hundred years, it has been the position of the Supreme Judicial Court that subsequent market transactions may be considered in determining the prior value of real property. See Roberts v. City of Boston, 149 Mass. 346, 354 (1889)(sales of comparable properties – one occurring approximately five months after the valuation date and the other more than twenty months after – appropriately considered in valuing the subject property); Burchell v. Commonwealth, 350 Mass. 488, 489 (1966)(per acre price at which portion of the subject property sold thirteen months after valuation date appropriate basis for expert's appraisal).

Recently, the SJC reaffirmed its position in this regard in Lattuca v. Robsham, 442 Mass. 205 (2004). In Lattuca, the trial court had adjudicated various claims between parties who were co-trustees and/or beneficiaries of a trust established to hold legal title to multiple lots of a residential subdivision. The trial court determined, inter alia, that the defendant Robsham had breached the covenant of good faith and fair dealing when he purchased a subdivision lot from the trust for less than fair market value. Id. at 206. On appeal, Robsham argued that the trial court erroneously credited the testimony of plaintiffs' expert regarding the lot's fair market value. Id. at 215. Specifically, Robsham challenged as unreliable the expert's valuation methodology because she considered as part of her analysis the price at which Robsham sold the lot two years later. Id.

In affirming the trial court's acceptance of the methodology used by plaintiffs' expert, the SJC stated that:

> The witness began her valuation by considering the price at which lot four was sold in 1994 in an arm's-length transaction and adjusted that price by three per cent to account for the inflation that occurred in Framingham between January, 1992, and the fall of 1994 and thereby determined the value of the lot to have been $406,800 in January, 1992. She made no other adjustments after determining that there were no improvements made since 1992 that would have affected the sale price in 1994. She also examined public records to rule out any other explanation for the difference between the price Robsham paid for lot four and the price at which he sold it.

Id. at 215.  The SJC thus found that the trial judge was correct in crediting the expert's consideration of the subsequent sale because "the expert relied on market data in establishing the fair market value of lot four according to a method that considered a subsequent sale and then reasonably adjusted for factors that could have contributed to a price increase."  Id. at 216.

The Princeton Properties offer and the two subsequent Lexington sales are therefore clearly admissible and probative in determining the value of CPA as of October 1, 2003.  Should the defendants believe that the price of the Princeton Properties offer or the Lexington sales were affected by intervening forces, such as inflation, property improvements, or an improved real estate market, obviously they are free to offer evidence at trial in favor of an appropriate downward adjustment.  However, there appears to be no reason at law why the Court cannot consider the Princeton Properties offer and the Lexington sales in attempting to determine what a willing buyer would have paid for CPA on October 1, 2003.

      B.    The Single, Foreign Decision Cited By the Defendants Does Not Support Their Argument.

Faced with more than a century of contrary Massachusetts precedent, the defendants tie their argument to a single case from the U.S. District Court of Rhode Island. Unfortunately for the defendants, however, that case, Bogosian v. Woloohojian, 831 F. Supp. 47 (1995), not only relies upon the law of a different jurisdiction, but also fails to lend any support to the defendants' position.

In Bogosian, the plaintiff sought dissolution under Rhode Island law of a real estate corporation in which she owned a one-third interest. Id. at 48. When the corporation elected to purchase the plaintiff's shares of stock, a Special Master was appointed to value the shares. Id. Since the primary assets of the corporation were real estate, the determination of share value was necessary based upon a valuation of the underlying real property. Id. After hearing the parties, the Special Master submitted a report which the District Court criticized for its apparent reliance upon certain expert testimony that was clearly predicated on a subsequent, dramatic decline in the Rhode Island real estate market that was not reasonably foreseeable on the date of dissolution. On this point, the Court stated that:

> Further, what happened after January 19, 1989 has absolutely no bearing on a determination of fair market value on January 19, 1989. Much of the testimony referred to the cataclysmic effects of the collapse of real estate values, not only in Rhode Island but in all of New England resulting in the insolvency of banks and credit unions who along with real estate developers had wrongly predicted the future. The important factor is the future prediction actually made on the valuation date, not what in fact did happen thereafter. That the pundits turned out to be very wrong is a fact which must be entirely excluded in order to properly determine fair value on January 19, 1989.

Id. at 50 (emphasis added).

4

> There can be no doubt that the accuracy of hindsight played a major role in Mr. Coyle's somber view of the market place in real estate on January 19, 1991. The determination of value is to be made as of the valuation date and not at some other time.

Id. at 51.

Contrary to what the defendants' motion suggests with its truncated quote, the import of Bogosian is not that subsequent market transactions should not be considered in determining the prior value of a property. Instead, the Bogosian Court merely confirms that the prior value of a property should be determined without considering market dynamics that were not reasonably foreseeable on the valuation date.

Clearly the Princeton Properties offer and the Lexington sales are not the type of unforeseeable market dynamic discussed by Bogosian, nor have the defendants argued that the price in any of these instances was predicated, in whole or in part, upon market events unforeseeable on October 1, 2003. Thus, even if Bogosian was the law of Massachusetts, which it clearly is not, it would provide absolutely no support for the defendants' argument.

What Bogosian does offer is a compelling argument that, in valuing real property, Courts should give the most weight to what actually happens in the market, and less weight to valuation methods that rely more heavily on hypothetical calculations. In making this point, the Bogosian Court quoted extensively from the Rhode Island Supreme Court, which had held that:

> the availability of evidence of comparable sales of similar lands operates to exclude from evidence testimony as to other methods for determining the fair market value. In taking this view, we are persuaded that evidence of comparable sales of similar properties is the best evidence of market value because of its probative force on that issue. . . . Such sales, when made under normal and fair conditions, are necessarily a better test of the

5

>market value than the <u>speculative opinions of witnesses</u>; for truly, here is where 'money talks'.

<u>Id</u>. at. 51 (emphasis added)(<u>quoting</u> <u>Lataille v. Housing Authority</u>, 109 R.I. 75 (1971)).

Thus, instead of supporting the exclusion of the Princeton Properties offer and the subsequent Lexington sales considered by Plaintiffs' experts, <u>Bogosian</u> clearly and convincingly extols their reliability as being superior to the purely mathematical speculations of experts (i.e., the income capitalization approach)[2]. And, while the Princeton Properties offer did not ultimately result in a sale of CPA, this failed consummation must be viewed in the appropriate context. <u>First</u>, the Princeton Properties offer was a legitimate, arms-length offer, made by one of the premier real estate firms in the Commonwealth. <u>Second</u>, the defendants summarily rejected the offer, without so much as a counteroffer, presumably because they believed that the subject property was worth so much more than Princeton Properties offer of $16,450, 000 that a counteroffer was not warranted. <u>Third</u>, unlike "comparable" transactions considered under the sales comparison approach, the Princeton Properties offer requires no adjustment for differences in location, physical characteristic of the complex, number and size of units, amenities, etc., with each such adjustment injecting more and more speculation into the overall mix of information. The Princeton Properties offer has the undeniable benefit of being a <u>real</u> offer by a <u>real</u> industry professional to purchase the <u>actual property</u> at issue. As the <u>Bogosian</u> Court might say "this is where money talks".

---

[2] <u>See</u> <u>Bogosian</u>, 831 F. Supp at 57 ("Granted that the determination of a capitalization rate is something quite less than an exact science …").

6

      C.      The Defendants Have Completely Misrepresented The Princeton Properties Offer and How it Came About.

In a series of leading questions, counsel for the defendants solicited from Andrew M. Chaban, CEO of Princeton Properties, select testimony with which the defendants now seek to marginalize the Princeton Properties offer. However, a more complete recitation of Mr. Chaban's testimony leaves no doubt but that the Princeton Properties offer cannot be ignored.

Princeton Properties is in the business of owning and managing real property and has "always had a specialization in multifamily residential." (Ciampa Aff., Ex. A, at 11:12-11:17). Princeton Properties first became aware of CPA through Malcolm McDowell, who had been a consulting engineer for Princeton Properties since the late 1970s or early 1980s. Id. at 12:3-12:15. Mr. McDowell informed Princeton Properties that there might be an opportunity for Princeton Properties to purchase some or all of CPA. Id. 14:1-15:15. Princeton Properties subsequently "provided an initial offer". Id. at 18:13-18:23. The "initial offer" was a letter dated October 18, 2004 directed to Peter Tropeano (as a trustee of T&N Realty Trust) that indicated Princeton Properties' belief "that a $20,000,000 price is achievable" for CPA, and formally requested a rent roll, income and expense statements, environmental reports, and other pertinent information so that it could "solidify a final offer price." Id. at Ex. B. In closing, the initial offer letter stated "We deem this potential acquisition as a top priority for us." Id.

Under a cover letter dated December 6, 2004, The Dolben Company, whom the defendants engage to professionally manage CPA, provided Daniel Endyke[3] at Princeton

---

[3] Mr. Endyke has personal knowledge regarding the due diligence performed by Princeton Properties beyond that possessed by Mr. Chaban, and would be a witness called by Plaintiffs if the Court deems the Princeton Properties offer admissible.

Properties with a packet of information regarding CPA including a rent roll, a Five Year Capital Plan Summary, copies of all property-related contracts, and a property site plan. Id. at Ex. A, 38:16-39:17, and Ex. C.  After receiving this information, Mr. Endyke and Timothy White, Controller of Princeton Properties Management, Inc., drafted a one page memorandum, dated December 9, 2004, to Mr. Chaban and James Herscot, Chairman of Princeton Properties Management, Inc., with a "brief overview of [their] research," that described CPA as "94 units in a terrific location," and "well maintained," but requiring "necessary upgrades to the kitchens and baths of all units," the expected cost of which Messrs. Endyke and White agreed was accurately reflected in the Five Year Capital Plan Summary provided by Dolben.  Id. at Ex. A, 41:15 and Ex. D.  Princeton Properties also created financial models based upon the information that it had received and calculated the value of CPA on a per unit and enterprise basis using various capitalization rates.[4]

On December 13, 2004, having completed an initial site review as well as the above-described due diligence, Princeton Properties communicated a written offer to purchase CPA for $16,450,000 "all cash at closing."  Id. at Ex. E.  By letter dated December 16, 2004, the defendants, through their then counsel, summarily rejected the Princeton Properties offer, presumably of the view that the offering price was so deficient as to not warrant a counteroffer. Id. at Ex. F.

While the defendants would have this Court believe that the Princeton Properties offer was but some casual expression of interest, certainly it was not.  Based on nothing more than Mr. Chaban's brief deposition testimony and the documents produced by Princeton Properties, it is clear that Princeton Properties: (1) gathered appropriate

---

[4] At the request of Princeton Properties, these documents are not being filed with the Court at this time, but will be available at trial should the Court deem them admissible.

financial information regarding the operation of CPA, (2) completed an initial site review, and (3) used this information to construct financial models to arrive at an offer price.  Had further due diligence revealed to Princeton Properties certain capital needs not addressed in the Five Year Capital Plan Summary, it is possible that Princeton Properties would have sought to reduce the final price that it paid for CPA. Defendants can certainly make that argument at trial, and they can offer any evidence that exists of capital improvements not considered by the Five Year Capital Plan Summary.

Ironically, the defendants have designated two separate experts who are expected to testify regarding the value of a leased fee simple in CPA as of October 1, 2003.  Walter Pennell, who performed an appraisal of CPA assuming the completion of what the defendants claim are "necessary" capital improvements, and Norton S. Remmer, who has analyzed the expected cost of these capital improvements as of the valuation date.

Certainly if the defendants are allowed to have Mr. Pennell theorize what a willing buyer would pay for an improved CPA and then subtract Mr. Remmer's calculations, the Court can be no worse off –and indeed, stands to be far better off – starting with what an actual buyer actually offered to pay and then deciding if there should be a deduction for necessary capital repairs not considered by the offer.

**CONCLUSION**

To borrow a phrase from the defendants, "In this jury-waived proceeding, the Court is more than capable of determining, after hearing the evidence, what weight, if any, to give the opinions of the [ ] experts."[5] For this, and all of the other reasons described above, Plaintiffs request that this Honorable Court deny the defendants' motion.

>PHILIP L. TROPEANO, PETER
>TROPEANO and CAROLYN PATTEN
>
>/s/ Thomas M. Ciampa
>_____
>Thomas M. Ciampa (BBO#566898)
>Ciampa & Associates
>20 Park Plaza, Suite 804
>Boston, MA 02116
>(617) 742-5955

Dated: December 5, 2007

**Certificate of Service**

I, Thomas M. Ciampa, hereby certify that on this 26th day of December 5, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

___/s/ Thomas M. Ciampa__

---

[5] Defendants' Opposition to Plaintiffs' Motion to Extend Discovery for 90 Days and Continue Trial, p. 12, Section III.B.