UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PHILIP L. TROPEANO, <br> PETER TROPEANO, and <br> CAROLYN PATTON, <br>                Plaintiffs, <br> <br> v. <br> <br> CHARLENE DORMAN, <br> BIANCA DORMAN, <br> LYDIA DORMAN, <br> TODD DORMAN, <br> T&N REALTY TRUST, and <br> CAPTAIN PARKER ARMS PARTNERSHIP, <br>                Defendants. | CIVIL ACTION <br> NO.  03-CV-12231-RGS |

**OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO DETERMINE THE APPLICABILITY OF A MINORITY INTEREST AND/OR LACK OF MARKETABILITY DISCOUNT IN DETERMINING THE VALUE OF PLAINTIFFS' FORMER PARTNERSHIP INTERESTS**

Defendants hereby oppose Plaintiffs' Motion *in Limine* arguing that minority interest[1] and lack of marketability discounts[2] should not be applied in determining the value of Plaintiffs' former interests as partners of the Captain Parker Arms Partnership (docket entry #88). Plaintiffs' Motion should be denied because under Massachusetts law, discounts **are** applicable when valuing illiquid interests, such as those held by Plaintiffs, upon withdrawal from a continuing partnership.

---

[1] Minority interest discounts, or lack of control discounts, apply because "the amount being acquired is not a majority interest, it may lack control for the acquirer and, therefore, may sell for a lower amount." Petro Group v. Premier Petroleum Distrib., Inc., Civil Action No. 03-4420 BLS at *2 (Mass. Super. 2005) (van Gestel, J.) (attached as Exhibit E to Plaintiffs' brief) ("Petro").

[2] "The lack of marketability discount is a discount that takes into account the fact that the [partnership interest] that has no ready market will be harder, and slower, to sell and, therefore, not worth as much." Id.

I.  **MINORITY INTEREST AND LACK OF MARKETABILITY DISCOUNTS ARE APPLICABLE TO WITHDRAWING PARTNERS' INTERESTS IN A CONTINUING PARTNERSHIP**

   A.  **The Partnership has always continued despite changes in the identity of the partners.**

The Captain Parker Arms Partnership (the "Partnership") was established more than 40 years ago and continues to this day. Throughout that period, the interests of former partners leaving the partnership have either been purchased by the remaining partners or passed to their heirs (see Pre-trial Statement, Stipulated Facts ¶¶ 6-12, filed December 10, 2007 ("Pre-trial Stip.")). Until the Plaintiffs withdrew in October 2003, the partners acted in accordance with a partnership agreement which, by its terms, fostered the continuation of the Partnership until such time as a supermajority of the partners voted to terminate the Partnership (Plaintiffs' Memorandum in Support ("Pl. Brief"), Ex. C at 2, ¶4 (requiring a 60% vote of the partners to terminate the partnership[3])).

Plaintiffs' withdrawal letter acknowledged that the Partnership would continue in their absence (id., Ex. D at 2):

> We recognize that in order to terminate the partnership, a vote of 60% of the partners is required. In the absence of this 60% vote, you will of course continue the partnership as the sole partners and we will be general creditors of the partnership for our partnership interest.

Because they understood that the Partnership would continue, Plaintiffs always have sought determination of the value of their former partnership interests pursuant to Mass Gen. Laws ch. 108A, sec. 42, which concerns continuing partnerships (id.; Complaint (docket entry #1), ¶15). Indeed, the First Circuit remanded the case for a determination of the value of Plaintiffs' interests

---

[3]  It is reasonable to infer that this term was adopted to protect partners like the Plaintiffs, who have never held a controlling interest, from a unilateral decision by a simple majority to terminate the Partnership.

pursuant to section 42 of Partnership Act. Tropeano v. Dorman, 441 F.3d 69, 78-82 (1st Cir. 2005) (discussing §42 at length); Pre-Trial Stip., ¶ 13.

It is in this context that Plaintiffs now ask the Court to ignore that the Partnership has continued, as Plaintiffs encouraged, beyond the Plaintiffs' withdrawal.

> **B.    As a continuing partnership, Plaintiffs' former interests in the Partnership are to be valued by the "going concern" methodology.**

The Supreme Judicial Court of Massachusetts has held that when the remaining partners choose to continue the partnership business, the value of a withdrawing partner's former interest is to be determined by valuing the partnership business as a going concern. Anastos v. Sable, 443 Mass. 146, 152 (2004) (affirming application of minority and marketability discounts when valuing the withdrawing partner's interest in a continuing partnership).[4]

In Anastos, the plaintiff alleged that the trial courted erred in applying a minority interest discount when determining the value of his partnership interest. Anastos, 443 Mass. at 149. The SJC rejected Anastos' argument that "inclusion of the words 'interest in the partnership at the dissolution' in [Mass. G.L.c. 108A,] §38(2)(b) . . . indicates that the partnership is no longer a going concern for valuation purposes and that a liquidation valuation method must be used instead." Id. at 151. Instead, the SJC held that the statutory term "at the dissolution" provides "a reference for the point in time in the partnership's history" for valuing a withdrawing partner's interest in the continuing partnership. Anastos, 443 Mass. at 152.

---

[4]    Anastos was decided under Mass. Gen. Laws ch. 108A, sec. 38(2)(b), which provides for payment to a partner who has wrongfully withdrawn from a continuing partnership. Mass. Gen. Laws ch. 108A, sec. 42, applicable in this case, concerns payment to a partner who has made a permitted withdrawal from a continuing partnership. Using language nearly identical to that found in §38, §42 provides for paying to the withdrawing partner the value of his "interest at the date of dissolution."

The SJC reasoned that the use of the word "dissolution" in the statute did not imply the termination or "winding up" of a partnership. Id. The Court concluded that if the partnership business is not winding up, it must be valued as a going concern:

> The method of valuation of a partnership interest in a going concern necessarily differs from the valuation of the same interest at the point of liquidation. The liquidation value looks to the value of the partnership's assets less its liabilities and determines each partner's appropriate share. When valuing a going concern, however, the market value of the partnership interest itself is what is at stake, rather than the percentage of net assets it represents. Depending on circumstances, the market value of the partnership interest may be more or less than the value of the same percentage of net assets.

Id. at 149. The SJC then affirmed the trial court's application of a minority interest discount when determining the value of the withdrawing partner's interest. Id. at 152.

The SJC's reasoning in Anastos is equally applicable here. The Partnership is a going concern. Plaintiffs do not dispute the fact that, at the time of their withdrawal, they fully understood and anticipated that the Partnership business would continue. Accordingly, the Court should value the Plaintiffs' interests in the Partnership at the date of dissolution, October 1, 2003, as minority interests in a "going concern".

Defendants' expert witness will testify that when valuing a minority interest in a "going concern" such as the Partnership, use of minority interest and lack of marketability discounts are appropriate. The Court should admit and consider such testimony, and Plaintiffs' Motion *in Limine* should be denied.

## II. PLAINTIFFS' BENEFICIAL INTERESTS IN THE REALTY TRUST WERE NOT LIQUID, AND THUS SUBJECT TO MINORITY INTEREST AND LACK OF MARKETABILITY DISCOUNTS

Even if the value of Plaintiffs' former interests are to be determined using a "liquidation method," discounts for lack of control and lack of marketability are still applicable. At all times, including when Plaintiffs withdrew from the Partnership, the business of the Partnership has been conducted on real property owned by a separate entity, the T&N Realty Trust (the "Realty

Trust"). On October 1, 2003, Plaintiffs each held, in proportion to their individual partnership interests, a beneficial interest in the Realty Trust.[5] Those beneficial interests are held by individuals, not the Partnership as an enterprise. Accordingly, neither the real property holdings of the Realty Trust, nor each partner's beneficial interest in the Trust are property of the Partnership. Thus, the real estate cannot be "liquidated" pursuant to the Partnership Act.

Moreover, Plaintiffs were never in a position to compel a sale of the Trust assets. They should not be able to compel in this Court something they could not compel as holders of minority interests in Partnership and in the Realty Trust, nor enjoy rights they do not have under the Partnership Act. On October 1, 2003, Plaintiffs did not control a majority of the trustees of the Realty Trust, and did not represent a majority of the Trust beneficiaries, either in number or percentage of interest. Accordingly, under the terms of the Trust Instrument, Plaintiffs lacked the power to compel the sale of the real property.

Defendants do not dispute that each Plaintiff should receive, as part of their partnership buyout amount, the value of their former beneficial interest in the Realty Trust. But they are not entitled to have those interests valued as if the Partnership, instead of the Realty Trust, held title to the real property. The statutory right to liquidate partnership assets under the Partnership Act simply cannot reach assets not held by the partnership. Because Plaintiffs' beneficial interests in the assets of the Realty Trust are not liquid, application of minority interest and lack of marketability discounts in valuing these interests is appropriate.

---

[5] Trust Instrument Article III, as amended, provides: "The beneficiaries are the successors to a partnership . . . named 'Captain Parker Arms'" (Pl. Brief, Ex. G).

> **A.    The Realty Trust is a "true trust" under Massachusetts law, and Plaintiffs cannot simply ignore its existence in their attempt to reach its real property.**

Plaintiffs contend that the T&N Realty Trust is a "nominee trust" and as such was controlled entirely by the partnership (Complaint, ¶ 9(a); Amended Complaint, ¶8, 9(d); Pl. Brief at 11-13).  Plaintiffs are incorrect.

Massachusetts courts have distinguished "nominee trusts" from "true trusts," such as the Realty Trust.  See Morrison v. Lennett, 415 Mass. 857, 860 (1993) citing R. BIRNBAUM AND J. MONAHAN, *The Nominee Trust in Massachusetts Real Estate Practice*, 60 MASS. L.Q. 364 (1976).  The hallmark of the "nominee trust" is that the trustees "have no power, as such, to act in respect of the trust property, but may only act at the direction of . . . the beneficiaries."  Id. (emphasis added).  See also Lattuca v. Robsham, 442 Mass. 205, 207 n.6 (2004) (nominee "trustees hav[e] only perfunctory duties and act[] only at the direction of the beneficiaries) (emphasis added).

The Trust Instrument at issue here expressly states that its trustees and beneficiaries shall not have an agency relationship:  "The Trustees shall have no power to act as agent for beneficiaries [of the Trust] and shall not bind them. . . ." (Pl. Brief, Ex. A, Article IV). Moreover, unlike the agent-trustee of a nominee trust, the trustees of the Realty Trust have very real authority to act at their own discretion.  The Declaration of Trust grants them the authority "[t]o acquire any parcels or parcel of real estate or interest therein, and manage, lease, develop, improve, and hold, mortgage or sell the same" (id., Article II(a)).  Similarly, the trustees have the authority "[t]o enter into, execute, adopt, and fulfill any contract for the erection, alteration, or repair of any structure upon real estate" and "[t]o have, purchase, convey, mortgage, and lease within or without the Commonwealth of Massachusetts such real or personal property as the purposes of the Trust may require" (id., Article II(b) & (d)).  Accordingly, and perhaps most

importantly, the power to sell the trust assets rests entirely with the trustees (id., Article II(a) & (d)).

Additionally, the trustees have the authority to care for and manage the property of the Realty Trust, including funds, securities and "merchandise of every description" (id., Article II(c)). Article II(e) instructs the trustees "to do any and all of the things as Trustees to the same extent and as fully as natural persons might or could do as principals, agents, contractors, trustees, developers, even though said express powers do not explicitly appear in this Declaration of Trust." Article IX, as modified by amendment dated February 12, 1965, grants the trustees the power to "alter or add to this Trust Indenture or terminate this Trust if they deem it judicious to do so" (Pl. Brief, Ex. F at 1). Finally, the trustees "may borrow money in the name of the Trust and give as security therefore notes, mortgages, pledges, security agreements and any and all other instruments that the trustees in their discretion may consider expedient with all terms, provisions and conditions in and to all instruments to be left to the absolute discretion of the Trustees . . ." (id. at 2 (emphasis added)). This full complement of discretionary powers enjoyed by the trustees of the Realty Trust far exceeds the total lack of independent trustee authority that is the hallmark of a "nominee trust".[6] Morrison, 415 Mass. at 860.

The trustees of the Realty Trust clearly had significantly more authority than the "perfunctory duties" entrusted to trustees of a "nominee trust" as discussed in Morrison. Plaintiffs' attempts to overcome this fact fail.

Although the Realty Trust is not ambiguous on its face and was created nearly two (2)

---

[6] Plaintiffs' contention that Defendants "cherry-picked" and presented the trustees' powers out of context in their Opposition to Plaintiffs' Motion for Real Estate Attachment (Pl. Brief at 12) is without merit. As they do above, Defendants cited and quoted Articles of the Trust instrument entitled "Powers of the Trustee" and "Alteration of the Trust."

years before the date of the Partnership Agreement, Plaintiffs seek to have the Court treat the Realty Trust as a "nominee trust" by reference to language appearing in the 1964 Partnership Agreement and a 1987 amendment thereto (Pl. Brief at 11-12).  The single use of the term "nominee" in the Partnership Agreement[7] did not undermine the expansive discretionary powers which the Trust Instrument granted the trustees.  Kerwin v. Donaghy, 317 Mass. 559, 567 (1945) ("As matter of law the trust instruments must be taken as intended to accomplish the very purpose of the so called 'parol evidence rule,' that of fixing beyond all question the rights of the parties to those agreements in accordance with their terms . . ."); Ward v. Grant, 9 Mass. App. Ct. 364, 368 (1980) ("parol evidence rule precludes the introduction of evidence which alters or contradicts an unambiguous writing").

Looking to the Partnership Agreement, which the First Circuit ruled had expired prior to their withdrawal (Tropeano, 441 F.3d at 77), Plaintiffs list three provisions that ostensibly allow the partners to direct the trustees to perform certain acts (Pl. Brief at 11-12).[8]  These provisions simply do not support Plaintiffs' contention that "the partners exercised pervasive control over the trustees"(Pl. Brief at 13). [9]

Plaintiffs next argue that because the original Trust Instrument pre-dated the Partnership Agreement "there can be no doubt that [the Partnership Agreement] . . . demonstrate[s] the clear

---

[7]  The word "nominee" is not again employed in the partnership or the trust documents relied upon by Plaintiffs.

[8]  Notably two of the Partnership Agreement provisions to which Plaintiffs refer concern termination of the Partnership, which required a vote by a supermajority of the partnership interests (by persons holding the same beneficial interest of the Realty Trust).  These are the same provisions that obstructed Plaintiffs' withdrawal from the Partnership and were avoided when Plaintiffs successfully demonstrated at the First Circuit that the Partnership Agreement had expired, and that the Partnership had continued as an at-will partnership.

[9]  Plaintiffs also point out that the beneficiaries had voted and assented to certain amendments to the Realty Trust (id. at 13).  Such amendments are unsurprising because the Trust beneficiaries always had the power to amend the Trust (Pl. Brief, Ex. A, Article IX).

intent of the partners" to create a nominee trust (id. at 12). Not only does the timing of the documents have no impact on whether or not the Realty Trust was intended to be a "nominee trust," Plaintiffs ignore the fact that the Trust Instrument was modified in 1965, a year after the original Partnership Agreement (id., Ex. F), again in 1982 (id., Ex. G) and, less substantially, six other times before the Plaintiffs withdrew from the Partnership. On none of those occasions were the powers of the trustees reduced or was traditional "nominee trust" language added – in fact, the 1965 amendment granted additional powers to the trustees and both the 1965 and 1982 amendments extended the duration of the Trust. If, as Plaintiffs contend, the intent was to create a "nominee trust," the partners had ample opportunity to fix the purportedly "recycled" (Pl. Brief at 12) original Trust Instrument to reflect this intent.

      Finally, Plaintiffs' argument that the Partnership "at all times . . . maintained a right of present conveyance" of the real property of the Realty Trust (Pl. Brief at 13) does not withstand scrutiny. Pursuant to the Trust Instrument, as amended in 1965, a vote representing the majority of the beneficiary interests was required to terminate the Realty Trust (id., Ex. F, at 1, modifying Article IX).[10] Furthermore, even if the required quantum of beneficial interests had voted to terminate the Realty Trust, the trustees, not the beneficial interest holders or the Partnership, determine whether the real property held by the Realty Trust or the balance after a sale of assets and satisfaction of all obligations, was to be conveyed to the beneficiaries (id., Ex. A, Article

---

[10] The Partnership Agreement was modified in 1987 to require a vote of a supermajority of the partnership interests to terminate the Partnership, triggering a notice to the trustees to liquidate the Realty Trust assets (Pl. Brief, Ex. C, ¶4). The Partnership Agreement, including this modification, expired in 1994. Even if the provision had been in effect at the time of Plaintiffs' withdrawal from the Partnership, they did not have the vote necessary to terminate the Partnership or the Realty Trust.

X).[11]  Accordingly, neither the Plaintiffs nor the Partnership ever had the right to require conveyance of the real estate by the Realty Trust to the Partnership.

The Realty Trust is a "true trust" under Massachusetts law.  Morrison, 415 Mass. at 860. As such, Plaintiffs are not entitled to treat the assets of the Realty Trust as Partnership property.

### B.    The Partnership Act does not assist Plaintiffs in reaching the assets of the Realty Trust.

Even if, as Plaintiffs contend, the Partnership Act permits them to have their former partnership interests valued as if the Partnership had wound down in October 2003, that valuation would not reach the assets of the Realty Trust.  As Plaintiffs have shown, at the time of their withdrawal the Partnership was a partnership-at-will and was governed by the provisions of the Partnership Act.  The Partnership Act provides that a partner "may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."  Mass. G.L.c. 108A, §38(1); see also, §40 (defining the partnership assets as the property of the partnership and the contributions of the partners[12]).

As discussed in detail above, the land and buildings are assets of the Realty Trust and not the property of the partnership.  The beneficial interests in the Realty Trust were held by the individual partners, not the Partnership as an enterprise (Pl. Brief, Ex. A, Article III & Ex. G, ¶¶A, B).  Accordingly, not only was the real property distanced from the Partnership through its ownership by the Realty Trust, but the beneficial interests in the Realty Trust were not held by

---

[11]  The 1987 amendment to the now expired Partnership Agreement took away the Trustees' option to convey the real property to the Trust beneficiaries upon Partnership termination (Pl. Brief, Ex. C, ¶8).

[12]  Evidence at trial will demonstrate that at the time of their withdrawal, Plaintiffs' capital accounts held negative balances, meaning that their withdrawals from the Partnership exceeded their partnership contributions plus their shares of partnership profits.

the Partnership. Accordingly, neither the real estate nor the beneficial interests in the Realty Trust can be characterized as "partnership property."

The evidence at trial will demonstrate that as of October 1, 2003, the partnership property included approximately $60,000 in cash, and furniture, fixtures and equipment valued at approximately $175,000. This property is the only property that could be "liquidated" pursuant to the Partnership Act.[13]

Moreover, having sought and received a judicial ruling that the Partnership Agreement expired and continued as a partnership-at-will, Plaintiffs cannot breathe life back into the Partnership Agreement and rely upon a provision of the expired Partnership Agreement (Pl. Brief at 14) to argue for valuation based upon a liquidation of Realty Trust assets. Before the First Circuit, Plaintiffs argued that:

> . . . any restrictions expressed in the Modification to the Partnership Agreement could not affect [Plaintiffs'] ability to retire from, and in effect dissolve, the Partnership, . . . once the partnership became one at will . . . [W]hen a partner in a partnership at will retires, his or her withdrawal triggers an accounting pursuant to the terms of the Uniform Partnership Act ('UPA') as codified in Mass. Gen. Laws ch. 108A, §42.

Tropeano, 441 F.3d at 74. The First Circuit agreed. Id. at 77, 82; see also Pre-trial Stip., ¶ 13.

The First Circuit ruled that the Partnership Agreement, including the 1987 modification upon which Plaintiffs now rely (Pl. Brief, Ex. C), expired in January 1994, nearly ten years before Plaintiffs withdrew from the Partnership. Plaintiffs cannot have it both ways – calling it an at-will partnership when their ability to withdraw from the Partnership is thwarted, and

---

[13] Defendants agree that the valuation by this Court should include a valuation of the Plaintiffs' former beneficial interests in the Realty Trust, which they enjoyed by reason of their status as partners. The beneficial interests in the Realty Trust, however, should not be valued as if the Trust's real estate was sold on October 1, 2003. It is only the minority beneficial interest which are to be valued, and those interests must be valued on a fair market basis, which would include minority interest and lack of marketability discounts.

relying on the expired agreement only when the Partnership Act provides a valuation which is less than they had hoped for.

### C. Plaintiffs could not compel sale of the real property, and thus are not entitled to a valuation that presumes such control.

In October 2003, Plaintiffs were not in a position to compel the Realty Trust to sell its real estate, and thus their beneficial interests should not now be valued as if such real estate had been sold.

Plaintiffs held only a minority of the beneficial interests in the Realty Trust, could not compel the trustees to sell, could not terminate the Realty Trust and could not amend the Trust Instrument in an attempt to achieve the same result. Pursuant to the Trust Instrument, as amended, only the trustees have the power to sell the trust assets (Pl. Brief, Ex. A, Article II(a)). No less than a majority of the trustees were required to authorize a sale of the Realty Trust assets (see, e.g., id., Ex. F, G, J). In October 2003, there were seven trustees – the four individual Defendants[14], the two Tropeano Plaintiffs and a non-party. The four Defendants who served as trustees would not have voted to sell the trust assets (see Dorman Aff., docket entry #52). Because Plaintiffs did not control a majority of the trustees, they could not have compelled a sale of the Realty Trust assets.

Similarly, Plaintiffs did not represent a majority of the Trust beneficiaries, either in number or percentage of interest. As already discussed above, individuals held the beneficiary interests in the Realty Trust, not the Partnership enterprise. On October 1, 2003, there were

---

[14] Plaintiffs contend that Defendants' actions to appoint new trustees in June 2003 was a "power play" (Pl. Brief at 14, referencing Ex. J). Plaintiffs are wrong. The evidence at trial will show that Plaintiffs sent a letter on November 29, 2002 notifying the Partnership that they intended to sell their minority interests. By June 2003, there were conversations amongst all partners about hiring a professional management company. In anticipation of new management and Plaintiffs' withdrawal, a majority of the beneficial interest holders exercised their right under Article IX (Pl. Brief, Ex. F) and amended the Trust Instrument.

seven beneficial interest holders, and the three Plaintiffs' total collective beneficial interest in the Realty Trust was only 42.86% (Amended Complaint, ¶30).  Therefore, Plaintiffs were unable to muster the vote required to terminate or amend the Realty Trust in an effort to trigger sale of the Realty Trust assets.

Being unable to compel a sale of the real estate held by the Realty Trust, Plaintiffs are not entitled to a valuation of their beneficial interests in the Realty Trust that puts them in a better position than they bargained for.  See Brodie v. Jordan, 447 Mass. 866, 872 (2006) (minority shareholder not entitled to a price equal to percent ownership of company because such a valuation left her in a better position than she could reasonably expect for her shares).

> **D.    Plaintiffs' illiquid beneficial interests in the Realty Trust are subject to discounts for lack of control and lack of marketability.**

As demonstrated above, (1) the Realty Trust is not a nominee trust, and its assets were not within the control of the beneficiaries; (2) the real estate held by the Realty Trust is not partnership property subject to liquidation under the Partnership Act; and (3) Plaintiffs could not have compelled a sale of the real property held by the Realty Trust.

Under Massachusetts law, the interest of a partner withdrawing from a continuing partnership is to be valued by the "going concern" methodology.  Anastos, 443 Mass. at 149, 152 (upon withdrawal from a continuing partnership, "a nonliquidation based method of calculating the value of his partnership interest" is to be used).  The SJC explained the difference between the two methodologies as follows:

> The method of valuation of a partnership interest in a going concern necessarily differs from the valuation of the same interest at the point of liquidation. The liquidation value looks to the value of the partnership's assets less its liabilities and determines each partner's appropriate share.  When valuing a going concern, however, the market value of the partnership interest itself is what is at stake, rather than the percentage of net assets it represents.  Depending on circumstances, the market value of the partnership interest may be more or less than the value of the same percentage of net assets.

Id. at 149.  Anastos affirmed the lower court's use of the going concern methodology and the application of a 40% minority interest discount.  Id. at 152.  Plaintiffs here similarly held a non-liquid interest in a continuing partnership.  Accordingly, Plaintiffs' interests should be valued using a going concern methodology, which includes the application of discounts for lack of control and lack of marketability.

Plaintiffs cannot avoid a minority interest discount by invoking the irrelevant statute governing a corporation's forced purchase of stock from a dissenting corporate shareholder (Pl. Brief at 6-10).[15]  Plaintiffs quote from BNE Massachusetts Corp. v. Sims, 32 Mass. App. Ct. 190, 200 (1992) (Pl. Brief at 7), but do not quote the portion of the decision which explains its rationale.  The BNE court found that the price to be paid for a dissenting stockholders' shares is determined in a manner to "assure[] that insiders in control of a company, burdened by conflicting interests, may not purchase the enterprise at a price less than that obtainable in the marketplace of qualified buyers and avoid paying a full and fair price to the minority."  32 Mass. App. Ct. at 197.  Such policy concerns are irrelevant here, where Plaintiffs, not Defendants, are trying to avoid the "full and fair price" which the marketplace would pay for their minority interests.

Plaintiffs continuously fail to distinguish between the assets of the Partnership and those of the Realty Trust, or to account for how the separation of these entities affects the valuation of their former partnership interests.  Where, as here, no statute or contract compels liquidation of

---

[15]   For the same reason the Court must reject Plaintiffs' suggestion that the Court should determine the interest rate to which they are entitled upon their buyout amount under Mass. G.L.c. 108A, §42 by reference to cases decided under Mass. G.L.c. 156B, §§92 and 95. Unlike under Mass. G.L.c. 108A, §42, applicable here, a court acting pursuant to Mass. G.L.c. 156B, §95 has discretion to "determine the amount of interest to be paid in the case any stockholder."

the assets of the Realty Trust, the valuation to be undertaken by the Court must recognize that Plaintiffs' beneficial interests in the Realty Trust were not liquid. Accordingly, the value assigned to Plaintiffs' interests must reflect what those interests would fetch in the open market, which is the very reason why courts apply minority interest and lack of marketability discounts when valuing illiquid business interests. Petro at 2.[16]

## Conclusion

When valuing Plaintiffs' former interests, Defendants respectfully ask the Court to remain cognizant of the following facts:

(1) Plaintiffs withdrew from a continuing partnership;

(2) The Partnership real property is owned by the Realty Trust and not the Partnership;

(3) The beneficial interests in the Realty Trust are held by the individual beneficiaries, not the Partnership enterprise;

(4) Plaintiffs could not compel the trustees to sell or liquidate the Realty Trust's assets, or compel the trustees to convey those assets to the Partnership; and

(5) Plaintiffs' beneficial interests in the Realty Trust' were not liquid.

Accordingly, this Court's determination of the value of Plaintiffs' former interests in the ongoing Partnership and their former beneficial interests in the Realty Trust must take into account

---

[16] Plaintiffs' reliance on Petro is not persuasive. Unlike here, Petro concerned a contractual obligation to buy back shares in a corporation. Petro at 1. As the Petro court noted, there was no need to "attempt to simulate an open market purchase and sale" in that case. Id. at 3. As explained above, such a market simulation is required here.

Defendants' expert evidence as to the discounts for lack of control and lack of marketability which would be applied by marketplace participants.  <u>Anastos</u>, 443 Mass. at 152.

Respectfully submitted,

/s/  Sander A. Rikleen
Sander A. Rikleen – BBO# 420280
Christine M. O'Connor – BBO# 647535
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Ph:  617·239·0100
Fx:  617·227·4420
Attorneys for the Defendants

Dated:  December 10, 2007

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system pursuant to Local Rule 5.4 will be sent electronically to all other parties.

/s/ Sander A. Rikleen