UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| PHILIP L. TROPEANO, PETER TROPEANO, and CAROLYN PATTON, <br><br>    Plaintiffs, <br><br> v. <br><br> CHARLENE DORMAN, BIANCA DORMAN, LYDIA DORMAN, TODD DORMAN, T&N REALTY TRUST and CAPTAIN PARKER ARMS PARTNERSHIP, <br><br>    Defendants. | DOCKET NO. <br> 03-CV-12231-RGS |

(Leave to file granted on December 14, 2007)

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO DETERMINE THE APPLICABILITY OF A MINORITY INTEREST AND/OR LACK OF MARKETABILITY DISCOUNT**

"Pay no attention to the man behind the curtain!" – The Wizard of Oz

Introduction

In a continuing campaign to keep a tightly drawn curtain between the Court and the facts of this case, the defendants have submitted yet another lengthy pleading that eloquently argues positions with no basis in fact or law. Plaintiffs trust that the Court will, after reviewing the cases cited and the documents referenced in Plaintiffs' motion and the defendants' opposition, reject out of hand the defendants' arguments in total. However, given the proximity to trial and the abundance of other issues that the Court must already consider, Plaintiffs endeavor to bring into the light some of what the defendants' opposition has so artfully concealed in the shadows, reserving for oral argument an explication of the opposition's remaining misinformation.

<u>Argument</u>

    A.    <u>The T&N Realty Trust Was Clearly Intended to Be a Nominee Trust.</u>

It could not be clearer that the Captain Parker Arms Partnership (the "Partnership") intended the T&N Realty Trust (the "Trust") to act as its <u>nominee</u> in holding legal title to the real property at issue. Indeed, the original partnership agreement unequivocally states that:

> In order to dispense with the necessity of obtaining signatures of the partners' respective wives and all of the partners' signatures to deeds, mortgages, leases and other documents, <u>the title to the real estate shall be taken in the name of the partners' nominee</u>, … namely, Wilbur C. Nylander and Alfred P. Tropeano, Trustees of the T&N Realty Trust under a Declaration of Trust dated June 26, 1962, which Trust has not been recorded and has no present assets and is to be amended by the Trustees thereof to designate that they will hold the real estate in trust for the benefit of this partnership.

Paragraph 4 (emphasis added). It is equally clear that the original partners intended that the sole beneficiary of the Trust would be the Partnership, and the original partners expressly prohibited the trustees from designating any beneficiaries other than the Partnership when they stated that:

> The said Wilbur C. Nylander and Alfred P. Tropeano by signing this agreement of partnership covenant and agree that they will not acquire any other property in the name of said Trust excepting that which pertains to this partnership <u>and that they will not further amend said Trust to designate any beneficiaries other than this partnership</u>.

<u>Id</u>.[1]

The defendants spend the last twelve (12) pages of their opposition arguing that: (1) the Trust is a "real" trust as opposed to a "nominee" trust, and (2) the beneficiaries of the trust are the individual partners as opposed to the partnership. Clearly, this is not

---

[1] A true and accurate copy of the original Captain Parker Arms Partnership agreement is attached to Second Affidavit of Thomas M. Ciampa ("Ciampa Aff.") as <u>Exhibit A</u>.

what the partnership agreement says, nor is it what any partners of the Partnership ever considered prior to this lawsuit. See Ciampa Aff., Exhibit A, ¶ 4 (expressly prohibiting the trustees from amending the trust to designate any beneficiaries other than the Partnership); Transcript of February 26, 1996 Deposition of Alfred P. Tropeano, 52:24-53:4 ("Q. But the property was held in trust?  A. The title was.  The Partnership was the beneficiary, so the trust only had the legal title – the equitable title to the beneficiaries, which would be the Captain Parker Arms Partnership").[2]

Undaunted, the defendants push forward with their arguments, employing a combination of mantra and quotation from the trust instrument of language not normally found in a classic nominee trust.  Distilled down to their essence, the defendants' arguments posit that the Trust must be a "real" trust because the instrument describes the trustees as having real authority.  Unfortunately for the defendants, this very argument was recently advanced before the Massachusetts Court of Appeals in a strikingly similar case and flatly rejected.  See Bellemare v. Clermont, 69 Mass. App. Ct. 566 (2007).

In Bellemare, the defendant was the former secretary of an attorney who, in 1977, created for one of his clients a trust to hold legal title to residential property in Lowell, Massachusetts.  In accordance with a practice common at the time, the attorney designated his secretary (the defendant) a trustee of the trust.  Id. at 567 n. 3.  The attorney's client and the client's wife were, either individually or together, the beneficiaries of the trust.  Id. at 567.

---

[2] Alfred "Pat" Tropeano was an original partner of the Captain Parker Arms Partnership and a practicing attorney.  His deposition was conducted on February 26, 1996 in the matter entitled Emily A. Tropeano, Individually and as Executrix of the Estate of Joseph C. Tropeano or Successor to his Interest v. Alfred P. Tropeano, et al., Middlesex Probate and Family Court, Docket No. 94E-0216-G1, in which Emily Tropeano sought to determine her rights regarding Joseph Tropeano's former interest in the Partnership. The signed Certificate for this transcript with Errata Sheet is dated April 22, 1996.  True and accurate copies of select pages from the transcript of Alfred Tropeano's deposition, the Certificate, and the Errata Sheet are attached to Second Ciampa Aff. as Exhibit B.

3

The trust was intended to be a nominee trust. Id. at 570. However, the trust instrument selected by the attorney was not the type of instrument normally used to create a nominee trust. Id. at 571. Instead, it was an instrument normally used to create a Massachusetts business trust. Id. As a result, the trust instrument described "shareholders" instead of "beneficiaries," and described the trustees as having authority beyond that normally delegated to trustees of a nominee trust. Id. at 572 ("Thus, in the instrument chosen by Attorney Monarski, the beneficiaries are referred to as "shareholders"; the trustees are empowered to operate the trust free of control by the beneficiaries; and the provision normally found in nominee trust instruments that the trustee shall take direction from the beneficiaries on all matters is absent").[3]

In 2004, the plaintiff asserted claims against the defendant and others for lead paint poisoning allegedly contracted by him while a child residing in the trust property. Id. at 566. The defendant moved for summary judgment, which the Housing Court allowed based upon its determination that the defendant was not an "owner" within the meaning of the Childhood Lead Poisoning Prevention and Control Law. Id. at 567. The plaintiff appealed, arguing that "because the defendant held title to the property as trustee of a real estate trust, she qualifies as an owner under the statute and is consequently liable in accordance with the statutory terms." Id.

In affirming the Housing Court's decision, the Appeals Court held that, despite the attorney's use of a Massachusetts business trust instrument, the factual circumstances surrounding the creation of the trust make it clear that the attorney and his clients all "contemplated that title to the premises would be held in a so-called 'nominee trust.'" Id.

---

[3] It would appear that the T&N Realty Trust was also created using an instrument normally used to create a Massachusetts business trust.

4

at 570.  Confronted by this distinction between what the parties intended and the language of the instrument, the Court held that:

> where, however, the written agreement is so plainly inconsistent with the parties' purposes … we enforce what the parties intended, not their mistaken written product.  Indeed, on this record, the written instrument would plainly be subject to reformation.

Id. at 572 (citing Barker v. Barker, 447 Mass. 1012, 1012-1013 (2006) and Lattuca v. Robsham, 442 Mass. 205, 207 n.6 (2004)).

The issue before this Court could hardly be more similar to that adjudicated in Bellemare.  Clearly, the intent of the Partnership was that the T&N Realty Trust act as its nominee in holding legal title to the Partnership res, and clearly the T&N Realty Trust was created – prior to the creation of the original partnership agreement – by use of an instrument normally used to form a Massachusetts business trust.

During his February 26, 1996 deposition, Alfred Tropeano explained why the "nominee" trust described in the original partnership agreement looks so much like a Massachusetts business trust.

> A.  Originally, we were going to set up shares and everybody had received copies of the proposed documents.  We had a meeting with the accountant, and it developed that by setting up the shares it would have been taxed as a corporation.  And therefore, we would form a partnership to avoid the corporate taxes on that. ….
>
> Q.  But the property was held in trust?
>
> A.  The title was.  The Partnership was the beneficiary, so the trust only had the legal title – the equitable title to the beneficiaries, which would be the Captain Parker Arms Partnership.

Second Ciampa Aff., Exhibit B, 52:8-15, 52:24-53:4.  While the original partners appear to have initially considered using a Massachusetts business trust, due to the tax implications, the original partners chose to form a partnership and to use the previously-

5

created trust solely as the Partnership's nominee to hold legal title to the real property of the Partnership. Therefore, the defendants' argument that the Trust is a "real" trust, and that the defendants should therefore be allowed to transfer millions of dollars of value from Plaintiffs to themselves, is wholly without merit.

      B.     <u>The Defendants Are the First to Contrive Such a Position.</u>

While wholly unsupportable, the defendants' argument lacks nothing for originality. Indeed, the Partnership was created more than forty (40) years ago and in all that time <u>no one else</u> appears to have considered the Trust anything but the Partnership's nominee.

<u>Not the certified public accountants</u> – whether before or after the defendants became the sole partners of the Partnership – each accounting firm appearing to have faithfully filed IRS Form 1065 (U.S. Return of Partnership Income) and IRS Form 8825 (Rental Real Estate Income and Expenses of a Partnership or an S-Corporation) to account for all rental income, expenses, depreciation, and distributions relating to the real property located at 125 Worthen Road and the business operated thereon. [4]

Had these certified public accountants considered the Trust anything but a nominee trust, they would certainly have filed annual IRS Form 1041s (U.S. Income Tax for Estates and Trusts) and other appropriate trust income tax documentation instead of the partnership returns that they did file. If the Court decides to hear testimony on this issue, Sandy Kennedy, Kennedy & Kennedy CPAs, who was the Partnership's certified

---

[4] Following Plaintiffs' withdrawal, the defendants engaged a new public accounting firm which continued filing IRS Forms 1065 and 8825 but did so under the name Captain Parker Arms Realty Trust. There is no entity relating to this matter called Captain Parker Arms Realty Trust, which appears to be a misnomer. True and accurate copies of the annual partnership tax returns filed to account for the property located at 125 Worthen Road and the business operated thereon for 2002-2005 (minus Schedule K-1s) are attached to Second Ciampa Aff. as <u>Exhibit C</u>. Notably, each partnership return designates the defendant Charlene Dorman as Tax Matters Partner for the tax year in question.

6

public accountant between approximately 1987 and August 2003, is expected to testify that he filed annual partnership tax returns for the Partnership and does not recall ever filing a Form 1041 return for T&N Realty Trust.

<u>Not the original partners</u>, including Alfred Tropeano, the presumptive scrivener of both the partnership and trust instruments, who on the two prior occasions when the Partnership redeemed partnership interests did so by appraising the property located at 125 Worthen Road and giving the departing partner (or his estate) the net asset value of his or her interest in the Partnership <u>including the real estate</u>.

Specifically, former Captain Parker Arms Partnership partner Joseph Tropeano died on or about August 14, 1985. In the following years, the Partnership sought to determine the value of Joseph Tropeano's 15% interest as of his death so that it could pay that amount to his widow, Emily Tropeano. In calculating the value of Joseph Tropeano's former interest, the Partnership, in the person of Alfred Tropeano, employed a net asset valuation method with <u>no discount</u> attributable to either the fact that Joseph Tropeano owned a minority interest in the Partnership <u>or</u> the fact that legal title to the Partnership property was held in the name of the Trust.[5]

On or about February 19, 1993, the Partnership redeemed a 17.65% partnership interest that had formerly been held by original partner Wilbur Nylander. When Mr. Nylander died in 1992, his interest automatically transferred to his daughter, Joan C. Ripley, and his grandchildren, Wade Ripley and Lynne Preston. When the Ripleys determined that they wanted to "cash out" their interest in the Partnership, the Partnership arrived at a redemption price for their collective interest of 17.65 by: (1) commissioning

---

[5] True and accurate copies of letters dated October 28, 1991 and March 20, 1992, respectively, from Alfred Tropeano to Emily Tropeano setting out the calculation by which the Partnership valued Joseph Tropeano's former partnership interest are attached to Second Ciampa Aff. as <u>Exhibit D</u>.

7

an appraisal of the real property, which yielded an appraisal value of $4,966,000, (2) deducting approximately $2,400,000, which would have been the approximate amount of the mortgage outstanding on the real property at that time,[6] (3) deducting an additional $46,051, and (4) arriving at a purchase price of approximately 17.65% of the net asset value of the Partnership including the real estate.[7]

No discount of any kind was applied by the Partnership in redeeming this interest, and the Partnership specifically viewed the redemption as including a direct transfer of the real estate. See Second Ciampa Aff., Exhibit B, 17:14-17:19 (Testimony of Alfred Tropeano that the descendents of Wilbur Nylander "transferred their interest in the real estate to myself, and to Louie, and to Phil. So then I wound up with 57.14 percent, and each of the others wound up with 21.43 percent"). See also Second Ciampa Aff., Exhibit E ("We, Joan C. Ripley, Wade Ripley and Lynne Preston (the Sellers) collectively the holders of 17.65% of the real estate owned by the partnership entitled "Captain Parker Arms" in consideration of the hereinafter specified sum paid to us, … assign, transfer, sell and deliver unto Alfred P. Tropeano, Louis Tropeano and Philip L. Tropeano (the Purchasers) our interest in the aforesaid real estate") and (This Transfer excludes all partnership assets other than the real estate").

In light of this history, there is simply no legitimate argument that the Trust was ever intended or considered to be more than the Partnership's nominee.

---

[6] See Second Ciampa Aff., Exhibit B, 42:22.
[7] True and accurate copies of documents memorializing this redemption in terms of both the real estate and personal property of the Partnership are attached to Second Ciampa Aff. as Exhibit E. See also, Second Ciampa Aff., Exhibit B, 16:12-17:19 (Alfred Tropeano deposition testimony explaining formula behind Partnership's redemption of Ripley interests).

<u>Conclusion</u>

With the trial of this matter scheduled to commence three days from today, the sides have struggled to develop a plan for putting on their entire respective cases within the time allotted.  A ruling that no minority interest or lack of marketability discount should apply would limit the need for certain witnesses to testify, and would eliminate the need for others.  Certainly such a ruling is the correct result as a matter of fact and as a matter of law.  For this reason, and all of the reasons described above, Plaintiffs request that this Honorable Court grant their Motion *In Limine* To Determine the Applicability of A Minority Interest And/Or Lack Of Marketability Discount and rule that no such discounts should apply.

                                      PHILIP L. TROPEANO, PETER
                                      TROPEANO and CAROLYN PATTEN

                                      /s/ Thomas M. Ciampa
                                      _____
                                      Thomas M. Ciampa (BBO#566898)
                                      Ciampa & Associates
                                      20 Park Plaza, Suite 804
                                      Boston, MA 02116
                                      (617) 742-5955

Dated: December 14, 2007

**Certificate of Service**

I, Thomas M. Ciampa, hereby certify that on this 14th day of December, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                              ___/s/ Thomas M. Ciampa____